UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ADAM RAISHANI,
    a/k/a "Saddam Mohamed Raishani,"

                                    Defendant.

S3 17 Cr. 421 (RA)


# THE GOVERNMENT'S SENTENCING MEMORANDUM


                                    GEOFFREY S. BERMAN
                                    United States Attorney
                                    Southern District of New York
                                    for the United States of America


Sidhardha Kamaraju
Jane Kim
George D. Turner
Assistant United States Attorneys
    *Of Counsel*

**Table of Contents**

BACKGROUND .................................................................................................................. 2

   I.    The Offense Conduct ................................................................................................. 2

   II.   The Charges and Raishani's Guilty Plea ................................................................. 7

DISCUSSION ..................................................................................................................... 8

   I.    Applicable Law ........................................................................................................ 8

   II.   The Undisputed Guidelines Sentence Is 300 Months' Imprisonment .................... 9

   III.  The Statutory Sentencing Factors Call for a Guidelines Sentence of 300 Months'
       Imprisonment ......................................................................................................... 12

      A.   The Nature and Seriousness of Raishani's Conduct and the Need for Just
           Punishment Warrant a Guidelines Sentence ................................................. 12

      B.   A Guidelines Sentence Is Necessary to Protect the Public from Further Terrorism
           Crimes of Raishani .......................................................................................... 15

      C.   A Guidelines Sentence Will Avoid Creating Unwarranted Sentence Disparities ........ 17

      D.   A Guidelines Sentence Is Necessary To Afford Adequate Deterrence and To
           Promote Respect for the Law .......................................................................... 21

   CONCLUSION .................................................................................................................. 23

## <u>Table of Authorities</u>

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................... 8, 9

*United States v. Alaa Sadeh*, 15 Cr. 558 (D.N.J.) ...................................................... 18

*United States v. Badawi, et. al*, 15 Cr. 60 (DOC) (C.D. Cal.) .................................... 18

*United States v. El-Gammal*, 15 Cr. 588 (ER) (S.D.N.Y.) .......................................... 18

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011)............................................... 14

*United States v. Farhane, et al.*, 05 Cr. 673 (LAP) (S.D.N.Y.)................................... 17

*United States v. Igbal, et al.*, 06 Cr. 1054 (RMB) (S.D.N.Y.)..................................... 20

*United States v. Issa, et al.*, 09 Cr. 1244 (BSJ) (S.D.N.Y.) ........................................ 19

*United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003)....................................... 11, 12, 15

*United States v. Natsheh*, 16 Cr. 166 (RS) (N.D. Cal.)................................................ 21

*United States v. Pugh*, 15 Cr. 116 (NGG) (E.D.N.Y.)................................................. 18

*United States v. Saidakhmetov*, 15 Cr. 95 (WFK) (E.D.N.Y.).................................... 18

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ....................................... 11, 12, 22

*United States v. Zea*, 13 Cr. 72 (SJF) (E.D.N.Y.) ...................................................... 18

**Statutes**

18 U.S.C. § 2339................................................................................................... 7, 8, 18

18 U.S.C. § 3553 ................................................................................................... passim

18 U.S.C. § 371 ............................................................................................................ 8

The Government respectfully submits this memorandum in connection with the sentencing of Adam Raishani, a/k/a "Saddam Mohamed Raishani" ("Raishani" or the "defendant"), scheduled for April 2, 2019.

Raishani is a 32-year-old Bronx resident who pledged his allegiance to the Islamic State of Iraq and al-Sham ("ISIS"), agreed with another ISIS supporter ("CC-1") to leave the United States and join ISIS overseas, helped CC-1 in his successful effort to join and fight for ISIS, and attempted to travel to Syria himself to join and wage jihad for ISIS—leaving behind his wife, parents, and young son.  Law enforcement thwarted Raishani, arresting him as he attempted to board a plane for Turkey, where he planned to cross into Syria, join ISIS, and further its violent agenda.  As he told an undercover law enforcement officer during the course of the investigation, Raishani was prepared to die, to martyr himself, for ISIS and its cause.

As explained below, the Government respectfully submits that the Court should sentence Raishani to 300 months' imprisonment, which is the sentence called for by the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G") and recommended by the United States Probation Office (the "Probation Office").  Such a sentence is necessary and appropriate to reflect the extremely serious nature of Raishani's terrorism offenses, to provide just punishment for his conduct, to deter and prevent Raishani from resuming his activities in support of radical Islamic terrorist ideology, and to deter others in the United States from, like Raishani, seeking to join and serve violent terrorist groups such as ISIS.

Raishani chose to devote himself to a terrorist organization dedicated to the murder of Americans.  Raishani's commitment to ISIS's mission of terror, murder, and hate was absolute— he abandoned his family and aspired to die for ISIS—and his actions were reprehensible, first helping CC-1 travel to join ISIS, and then seeking to join the group himself.  The defense fails to

identify any mitigating considerations, and there are none.  A Guidelines sentence is appropriate in this case.

## **BACKGROUND**

### I.    **The Offense Conduct**

By 2015, Raishani had radicalized, devoting himself to extremist Islamic ideology and, in particular, ISIS.  In the fall of 2015, Raishani made a pact with another Bronx-based ISIS supporter, CC-1, to travel to Syria to join ISIS.  They agreed that CC-1 would depart first for ISIS, which he did, in October 2015.  In June 2017, after unsuccessfully seeking to radicalize his wife and convince her to join him, and leaving behind his young son, Raishani attempted to travel overseas to join ISIS himself.  On June 21, 2017, he was arrested at John F. Kennedy International Airport ("JFK Airport") as he attempted to board a flight bound for Turkey, where he planned to cross into Syria, join ISIS, and wage jihad.

Raishani is a 32-year-old native of Yemen who resided in the Bronx prior to his arrest in this case.  Presentence Investigation Report, dated Feb. 6, 2019 ("PSR"), ¶ 9.[1]  Raishani and CC-1 attended the same mosque in the Bronx, and developed a relationship in the months leading up to CC-1's departure for the Islamic State in October 2015.  *Id.*  Prior to CC-1's departure, Raishani went shopping with CC-1 in the Bronx to purchase supplies for CC-1's planned journey to Syria to join ISIS.  *Id.* ¶ 10.  On October 30, 2015, CC-1 flew from JFK Airport to Turkey (via

---

[1] Raishani does not dispute the factual recitation of his offense conduct set forth in the PSR.  *See* PSR at 17.  The offense conduct summarized in the PSR and herein is culled principally from recorded meetings, emails, and text messages involving Raishani and CC-1, as well as documentary and physical evidence seized from Raishani and his residence following his arrest.

Italy), where he planned to cross into Syria to join and fight for ISIS.  *Id.*  Raishani helped to coordinate CC-1's transportation to JFK Airport, and accompanied CC-1 to the airport, where CC-1 boarded his flight.  *Id.*  Raishani and CC-1 agreed that Raishani would join ISIS at a later date.  *Id.* ¶ 9.

Following CC-1's departure, Raishani sent a series of encrypted emails to CC-1 repeatedly inquiring, in coded terms, as to whether CC-1 had successfully reached ISIS.  *Id.* ¶ 11. In those encrypted emails, Raishani also made various references to his and CC-1's shared support for ISIS.  *Id.*  In May 2016, CC-1 responded to Raishani, indicating that he had succeeded in joining ISIS, and that he was fighting for ISIS against "the kuffars," or non-believers.  *Id.* ¶ 12.  CC-1 also posted multiple images on his Instagram account further confirming that he had joined the ISIS army, including a photograph of CC-1 holding an AK-47 assault rifle and the black and white flag of ISIS, with an accompanying comment stating that he was "living under the shariah [law]."  *Id.*  There is no record of CC-1 ever returning to the United States.  *Id.*

Several months later, in January 2017, Raishani reached out to an individual whom he knew from the community as an Uber driver who attended Raishani's mosque, but who was, unbeknownst to Raishani, a confidential source ("CS") working with law enforcement.  *Id.* ¶ 13. Raishani asked to meet the CS in person to discuss potentially driving for Uber, and the CS met Raishani the following day.  *Id.*  At the outset of the meeting, Raishani said that he was considering driving for Uber, and asked the CS about various aspects of working for Uber.  *Id.* In the course of the conversation, the CS observed an image of the ISIS flag displayed on Raishani's cellphone, and asked Raishani if he supported ISIS.  *Id.*  Raishani indicated that he

did, and stated that before continuing the conversation, they should turn off their cellphones, which they did.  *Id.*  As the conversation continued, Raishani referenced having assisted CC-1 to travel overseas to join ISIS, and said that he desired to travel overseas to join ISIS himself.  *Id.*  Raishani also told the CS to download a particular encrypted Internet browser, which Raishani stated that he used to access and view ISIS propaganda videos online.  *Id.*

Following this meeting, during which Raishani expressed his support for ISIS and his desire to join ISIS overseas, the Federal Bureau of Investigation ("FBI") began investigating Raishani.  Over the ensuing months, the CS, acting at the direction of the FBI and New York City Police Department ("NYPD"), maintained contact with Raishani and introduced him to an undercover NYPD detective ("UC-1"), who posed as a fellow ISIS supporter also looking to travel overseas to join ISIS.  *Id.* ¶ 14.  Between January 2017 and June 2017, the CS and UC-1 had a series of meetings with Raishani, many of which were recorded.  *Id.*  During those meetings, Raishani repeatedly expressed his fervent support for ISIS and its mission, embraced its violent ideology, viewed ISIS propaganda videos glorifying the murder of civilians, reiterated his desire to join ISIS overseas, and described supporting CC-1 in his successful effort to travel abroad to join ISIS.  *Id.*  Raishani also engaged in sophisticated operational security measures in an effort to conceal his allegiance to ISIS from law enforcement.  *Id.*; Compl. (Dkt. 1) ¶¶ 6(h), 7(a).  For example, Raishani put on latex gloves before using a laptop to download and view ISIS propaganda videos with the CS and UC-1, and explained that he did not want to leave his fingerprints on the laptop.  PSR ¶ 14.  After viewing the ISIS propaganda videos, Raishani deleted the video files from the laptop.  *Id.*  Raishani also advised the CS and UC-1 to cover the

computer's camera and turn off the computer's microphone when watching such ISIS propaganda videos.  Compl. ¶¶ 6(d)(ii), (f)(i).

In the course of Raishani's meetings with the CS and UC-1, Raishani made clear that he regretted not having accompanied CC-1 to join ISIS in Syria in 2015 and that he was determined to travel overseas to join ISIS himself.  PSR ¶ 15.  During recorded meetings in April and May 2017, Raishani discussed undertaking specific preparations for leaving the United States and joining ISIS abroad.  *Id.*  For example, Raishani expressed his belief that a Muslim must pay off all debts before traveling to join ISIS and pursue jihad, and he instructed UC-1 that if UC-1 wished to accompany Raishani to ISIS, UC-1 would need to follow Raishani's example of saving money and training physically.  *Id.*  Raishani informed the CS and UC-1 that Raishani planned to leave for ISIS before the end of the Islamic holy month of Ramadan, which ran from approximately May 26 to June 24 in 2017.  *Id.*

At Raishani's request, the CS gave Raishani contact information on an encrypted messaging application (the "Application") for a purported ISIS affiliate who could help facilitate Raishani's travel to ISIS-controlled territory once he reached Turkey.  *Id.* ¶ 16.  Soon thereafter, Raishani contacted the purported facilitator, who was in fact an undercover FBI agent ("UC-2").  *Id.*  Over the course of late May and June 2017, Raishani exchanged encrypted messages with UC-2 on the Application.  Raishani expressed his interest in making "hijrah" (migrating to ISIS-controlled territory to join ISIS and pursue jihad); he informed UC-2 that he had previously "helped a sincere brother" (a reference to CC-1) travel abroad to join ISIS; and he conveyed that he aspired to finish his journey with "istishhad" (martyrdom).  *Id.*; Compl. ¶ 7(f)(iii).  Raishani

also discussed with UC-2 whether it would be easier for Raishani to travel to Syria or Yemen to join ISIS.  PSR ¶ 16.

Raishani ultimately decided that he would seek to join ISIS in Syria.  *Id.* ¶ 17.  Raishani explained to the CS and UC-1 his belief that, in the view of Allah, it would be better to join ISIS in Syria than in Yemen.  *Id.*  Raishani purchased an airline ticket departing JFK Airport for Istanbul (via Portugal), and finalized preparations for his journey: he paid off thousands of dollars of debts; he sold his car to generate additional funds for the trip; and he went shopping, with the CS and UC-1, to purchase supplies, including clothing items and a tactical flashlight. *Id.*  During a recorded meeting with the CS and UC-1 on June 7, 2017, Raishani informed them that if he was caught by law enforcement attempting to travel to join ISIS, that would not matter, as Allah would reward him for attempting to wage jihad.  *Id.*

On June 21, 2017, Raishani attempted to execute his plan.  Raishani arrived—without his wife and young son, whom he left behind—in a taxi at JFK Airport for his flight to Turkey, where he planned to cross into Syria to ISIS-controlled territory.  *Id.* ¶ 18.  Raishani checked in, presented his boarding pass, and attempted to board the flight.  *Id.*  Law enforcement agents then arrested Raishani on the bridge connecting the boarding gate to the airplane, as he prepared to begin his journey to ISIS.  *Id.*

Following the arrest, the FBI searched Raishani's Bronx residence pursuant to a search warrant.  *Id.* ¶ 19.  The FBI recovered, from a safe in Raishani's bedroom, a "will" that Raishani had addressed to members of his family (the "Will").  *Id.*  Raishani had previously informed the CS and UC-1 that he planned to prepare a will for family members prior to departing for ISIS.

*Id.* Raishani prepared the Will in both English and rudimentary Arabic. *Id.* A copy of the English version of Raishani's Will is attached hereto as Exhibit A.

In the Will, Raishani advised his wife that she could still choose to "[j]oin" him and ISIS overseas. Ex. A at US_0004010. Raishani expressed regret that she did not share his radical views and that he had been unable to convince her to accompany him to join ISIS, stating:

> Over the year you have shown disgust and animosity towards this option. I did my best to reason with your intellect. Unfortunately, I was not successful. It makes me sad that you reject this with all the proofs and evidence that Allah has made apparent to you.

*Id.* Raishani further instructed his wife in the Will as follows:

> Do Not Divulge this document and other documents that I have giving to you to the authorities. Do not believe their plots. Do not divulge my absences but instead say I went to do volunteering outside the country with my medical skills and health background.

*Id.* at US_0004012.

## II.      The Charges and Raishani's Guilty Plea

On June 22, 2017, following his arrest at JFK Airport, Raishani was charged in Complaint 17 Mag. 4763 with attempting to provide material support and resources to a designated foreign terrorist organization (ISIS), in violation of 18 U.S.C. § 2339B. Dkt. 1. On June 29, 2017, a grand jury in this District returned Indictment 17 Cr. 421 (GHW) charging Raishani with the same offense. Dkt. 5. On September 7, 2017, the grand jury returned Superseding Indictment S1 17 Cr. 421 (GHW) adding one count charging Raishani with conspiring to provide material support and resources to ISIS, in violation of 18 U.S.C. § 2339B, and one count charging him with providing and aiding and abetting the provision of material support and resources to ISIS, in violation of 18 U.S.C. §§ 2339B and 2. Dkt. 15.

On November 15, 2018, Raishani pled guilty to Superseding Information S2 17 Cr. 421 (RA) (the "Superseding Information"), pursuant to a plea agreement with the Government (the "Plea Agreement").  Dkt. 48, 52.  The Superseding Information charged Raishani with attempting to provide material support and resources to ISIS, in violation of 18 U.S.C. § 2339B, based on his attempted travel to join ISIS overseas (Count One), and conspiring with CC-1 to provide material support and resources to ISIS, in violation of 18 U.S.C. § 371 (Count Two). Dkt. 48.  Under the terms of the Plea Agreement, the parties stipulated to an applicable Guidelines sentence of 300 months' imprisonment.  Dkt. 52 (Plea Tr., Nov. 15, 2018), at 16; *see infra* at 9-10 (reviewing Guidelines calculation).

During his allocution at the plea proceeding, Raishani admitted, among other things, as follows:

> [F]or Count One, in June 2017, I attempted to travel to Syria for the purpose of joining ISIS. . . .  As for Count Two, in October 2015, I agreed with another person that we should both join ISIS.  I supported him.  We traveled overseas to do that.  On October 30, 2015, I went with that person in a taxi from the Bronx to the JFK Airport.

Dkt. 52 at 21-22.

## DISCUSSION

### I.    Applicable Law

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the

offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available"; the applicable Guidelines range itself; any relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims." 18 U.S.C. § 3553 (a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553 (a)(2).

## II.    The Undisputed Guidelines Sentence Is 300 Months' Imprisonment

It is undisputed that the Guidelines call for a sentence of 300 months' imprisonment.  As set forth in the PSR, and consistent with the terms of the Plea Agreement, the defendant's Guidelines offense level is calculated as follows:

- The two counts in the Superseding Information are grouped together into a single Group, pursuant to U.S.S.G. § 3D1.2(b).  PSR ¶ 25.

- Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group is the highest offense level of the counts within the Group; here, Counts One and Two result in the same offense level, so the offense level for Count One is the applicable offense level for the Group.

9

- The Guideline that applies to a violation of 18 U.S.C. § 2339B is U.S.S.G. § 2M5.3, which yields a base offense level for Count One of 26. *Id.* ¶ 26.

- Pursuant to U.S.S.G § 2M5.3(b)(l)(E), because the offense involved the provision of material support or resources with the intent, knowledge, or reason to believe that they were to be used to commit or assist in the commission of a violent act, two levels are added. *Id.* ¶ 27.

- Pursuant to U.S.S.G. § 3A1.4(a), because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, 12 levels are added. *Id.* ¶ 28. The adjusted offense level for Count One therefore is 40. *Id.* ¶ 31.

- Assuming the defendant continues to demonstrate acceptance of responsibility prior to the imposition of sentence, *see* U.S.S.G. § 3E1.1(a), and because he timely notified authorities of his intention to plead guilty, *see id.* § 3E1.1(b), the offense level is decreased by three levels. PSR ¶¶ 33-34.

- Accordingly, the total offense level is 37. *Id.* ¶ 35.

The defendant does not have any known criminal convictions. *Id.* ¶ 37. However, because the offense involved a federal crime of terrorism, the applicable criminal history category ("CHC") is VI, pursuant to U.S.S.G. § 3A1.4(b). *Id.* ¶ 38. A total offense level of 37 and a CHC of VI result in a Guidelines range of 360 months to life imprisonment. *Id.* ¶ 81. However, because the aggregate statutorily authorized maximum sentence for Counts One and Two is 300 months' imprisonment, the applicable Guidelines range—or, in this case, Guidelines sentence—is 300 months' imprisonment, as stipulated in the Plea Agreement. *Id.* ¶ 81.[2]

---

[2] The statutory maximum term of imprisonment for Count One is 20 years, and the statutory maximum term of imprisonment for Count Two is five years. PSR ¶¶ 79-80. Pursuant to U.S.S.G. § 5Gl.2(d), because the bottom end of the applicable Guidelines range is higher than the statutory maximum sentence for the count carrying the highest statutory maximum, the Guidelines prescribe that the sentences imposed on Counts One and Two shall run consecutively, to result in a sentence of 300 months' imprisonment.

While the defendant concedes that the applicable Guidelines sentence is 300 months'

imprisonment, he suggests, without citing any authority, that his offense level and CHC are

overstated as a result of the application of the 12-level terrorism enhancement pursuant to

U.S.S.G. § 3A1.4(a).  *See* Def. Sentencing Mem., dated Mar. 18, 2019, Dkt. 57 ("Def. Mem."),

at 12-13.  The suggestion is without merit.  In 1994, Congress mandated that the Sentencing

Commission establish a Guidelines enhancement for terrorism offenses to ensure that those

convicted of such crimes receive punishment commensurate with the extraordinary nature of

their conduct.  *See United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (citing Violent

Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796,

2022).  The resulting terrorism enhancement at U.S.S.G. § 3A1.4(a) reflects Congress's intent

that defendants, like Raishani, convicted of terrorism offenses serve sentences that are

appropriate in light of the extreme dangerousness of their crimes and the unique risk of

recidivism that they present.  As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)).

The enhancement appropriately reflects the seriousness of the conduct in this case.  As

set forth above, Raishani devoted himself to a violent terrorist organization responsible for the

murders of countless American civilians and soldiers, and then tried to join its ranks and advance

its cause in the combat arena overseas.  Providing material support and resources—in this case,

11

personnel—to a dangerous foreign terrorist organization is a quintessential terrorism offense of the utmost seriousness. Such conduct falls squarely within the class of dangerous activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement, and the Guidelines do not overstate the seriousness of Raishani's conduct.

Nor is the enhancement's impact on the defendant's CHC inappropriate, as the defense suggests. Rather, the effect of the terrorism enhancement on the applicable CHC reflects the Sentencing Commission's assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has endorsed. *See Stewart*, 590 F.3d at 143 (citing *Meskini*, 319 F.3d at 92).

In sum, application of the terrorism enhancement is entirely appropriate, and it is undisputed that the Guidelines call for a sentence of 300 months' imprisonment. *See* PSR at 20; Def. Mem. at 8-9. The Probation Office recommends that the Court sentence Raishani to 300 months' imprisonment as prescribed by the Guidelines. PSR at 18-19. As explained below, the statutory sentencing factors, *see* 18 U.S.C. § 3553(a), also call for the imposition of a Guidelines sentence of 300 months' imprisonment.

## III.    The Statutory Sentencing Factors Call for a Guidelines Sentence of 300 Months' Imprisonment

### A.    The Nature and Seriousness of Raishani's Conduct and the Need for Just Punishment Warrant a Guidelines Sentence

The indisputably serious nature of Raishani's conduct, and the need to impose just punishment, weigh decidedly in favor of a Guidelines sentence. *See* 18 U.S.C § 3553(a)(1), (a)(2)(A). Raishani, a naturalized U.S. citizen with a college degree and a nursing job, chose to devote himself to a brutally violent terrorist group that is dedicated to murdering U.S. citizens

and attacking U.S. interests, here and abroad.  He made a pact with another ISIS supporter, CC-1, to increase the group's numbers by joining its ranks in Syria, and he acted on that pact.  First, Raishani supported and assisted CC-1 in his successful effort to travel overseas to join and fight for ISIS.  Then, after methodically planning and preparing for his own voyage, Raishani attempted to board a plane bound for Turkey, fervently committed to joining ISIS in Syria and waging jihad on its behalf.  Raishani was willing to give up everything—his job, his family, and his life—to further ISIS's mission of hate, terror, and violence.  Through skillful investigative work, the FBI and NYPD thwarted Raishani's plan, and prevented him from joining ISIS and furthering its deadly and destructive mission.

Neither the fact that the defendant is a trained nurse, nor his claim that he planned to serve ISIS through the use of his medical skills, *see* Def. Mem. at 8, mitigate the seriousness of his conduct.  First, and fundamentally, knowingly providing assistance to ISIS in any form—whether weapons, money, or medical services—furthers the group's agenda of terror and destruction.  ISIS, like other terrorist groups, does not rely solely on soldiers and suicide bombers to advance its mission, but also depends on its followers to serve in various other roles, including as doctors and nurses.  Indeed, providing medical services to ISIS members in the combat arena, as Raishani intended, is inherently critical to the success of ISIS's military campaign.  If ISIS did not have nurses to attend to its soldiers, its army would suffer.  Put simply, if Raishani had succeeded in joining ISIS in Syria and served as a nurse—even if he never picked up a weapon—he would have furthered ISIS's mission.  As the Second Circuit has recognized, aiding a terrorist organization through the provision of medical services "falls squarely within the core" class of conduct that the material-support statute proscribes.  *See*

*United States v. Farhane*, 634 F.3d 127, 140-41 (2d Cir. 2011). In sum, Raishani's claim that he intended to provide medical services after joining ISIS does not justify or mitigate his conduct. *See* PSR at 19 (rejecting Raishani's claim that he intended to "offer medical services" after joining ISIS as an "attempt[] to justify his actions," when there is "no justifiable reason why it would be necessary to join a known terrorist group").

Furthermore, as the undisputed facts set forth in the PSR make clear, Raishani may have worked as a nurse, but he was fervently devoted to ISIS's violent ideology, and was even willing to die for ISIS. For example, in the course of the recorded meetings with the CS and UC-1, Raishani showed the CS and UC-1 how to download and view ISIS propaganda videos glorifying the murder of innocent civilians and violent terrorist attacks. Raishani also explained how the Quran can be read to justify ISIS's violence, including beheadings. Compl. ¶ 6(h)(i). And Raishani wrote to UC-2 that he was prepared to die for ISIS overseas—that he aspired to achieve "istishhad," or martyrdom. He also told UC-1 that they needed to engage in physical training before departing for ISIS, further indicating that he was prepared to serve ISIS not only as a nurse, but as a soldier. Indeed, Raishani planned to use his nursing background as a ruse to evade authorities on his journey to ISIS—during one of the recorded meetings, he suggested that he should pose as a nurse, and UC-1 should pose as a refugee aid worker, in order to cross international borders without being questioned by authorities. *Id.* ¶ 7(b)(i); *see also* Ex. A at US_0004012 (in his Will, Raishani instructed his wife not to divulge to authorities that he had departed for ISIS, and to use his medical background to conceal his actions: "instead say I went to do volunteering outside the country with my medical skills and health background"). In short, Raishani was fully committed to advancing ISIS's mission of violence, death, and destruction.

14

That Raishani ultimately did not succeed in joining ISIS overseas should not inure to his benefit at sentencing. As an initial matter, the defense is wrong that his crimes did not result in any "actual harm." *See* Def. Mem. at 11. Raishani supported and assisted CC-1, who successfully traveled to Syria, joined ISIS on the battlefield, and, armed with an AK-47, fought against ISIS's enemies—which likely included U.S.-led coalition forces and American soldiers. *See* PSR ¶ 12.

As to his own efforts to join ISIS, Raishani failed not because he realized the error of his ways, but because he was disrupted by law enforcement. As early as 2015, Raishani and CC-1 made a pact to travel to Syria to join ISIS, with CC-1 departing first. In early 2017, when Raishani reached out to the CS, he informed the CS that he wanted to leave the United States and join ISIS overseas. Over the ensuing months, the FBI gained access to Raishani, learned the details of his plans, and stopped him. There is no question that Raishani fully intended to carry out his mission—indeed, he was arrested as he was boarding a plane for Turkey, having left the Will at his residence for his family to find. The fact that law enforcement was able to thwart Raishani and prevent an American citizen from joining ISIS is a testament to the work of the FBI and NYPD, not a mitigating factor for Raishani.

**B.      A Guidelines Sentence Is Necessary to Protect the Public from Further Terrorism Crimes of Raishani**

The need to protect the public from further crimes of this defendant, *see* 18 U.S.C. § 3553(a)(2)(C), is a paramount consideration here, and strongly supports the imposition of a Guidelines sentence. Terrorism crimes come with high recidivism rates and the rehabilitation of terrorism defendants like Raishani is notoriously difficult. *See Meskini*, 319 F.3d at 91-92

(noting the link between "the difficulty of deterring and rehabilitating" terrorism defendants and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").  Raishani's absolute commitment to ISIS and the radical Islamic terrorist ideology that it espouses, his willingness to leave his life in this country forever to join and serve ISIS, and his aspiration to commit the ultimate sacrifice, to martyr himself for ISIS and its cause, all powerfully support a single conclusion: the incapacitation of Raishani should be for the full term of 300 months permitted by statute and called for by the Guidelines.

Not surprisingly, Raishani now advances the self-serving claim, at sentencing, that he has rehabilitated and de-radicalized.  *See, e.g.*, Def. Mem. at 12.  The defense submission cites the defendant's purported attachment to his family in support of that claim.  *See, e.g.*, *id.* at 7, 12. The argument rings hollow.  Raishani attempted to radicalize his wife and convince her to join him on his journey to ISIS.  When she refused, he did not change his mind or reconsider. Instead, he abandoned her, their young son, and the rest of his family.  His devotion to ISIS was so fervent, so complete, that he chose it over his family.  *See* PSR at 18 ("His commitment to join ISIS was strong, as he was prepared to leave his parents, wife and young child behind.  His willingness to leave behind everything to join a violent terrorist group known to harm people of other religions, but especially citizens of the country that he was raised and educated in is more than disturbing.").  Nor was this a decision made rashly or hastily.  Raishani's decision to abandon his family and join ISIS played out over years, and was cold, calculating, and terrifying, as evidenced by the Will that he left behind.  *See* Ex. A.

Moreover, Raishani is a young man, now 32, and fully capable of resuming support for ISIS and radical Islamic ideology.  He claims that he no longer poses a threat, but those are

16

words.  His actions speak louder.  Based on his conduct, there is every reason to believe that he would seek to resume his support for ISIS or another group espousing the sort of anti-American terrorist ideology that he previously embraced and adopted.  The need to deter and prevent Raishani from doing so overwhelmingly militates in favor of a Guidelines sentence.

### C.     A Guidelines Sentence Will Avoid Creating Unwarranted Sentence Disparities

Across the country, terrorism defendants who have attempted to travel, successfully traveled, or assisted another person in traveling to join and serve ISIS or other terrorist organizations have received substantial sentences.  A Guidelines sentence in this case is reasonable and warranted in order to avoid creating sentencing disparities across comparable terrorism cases.

For example, in the *Farhane* case in this District, *see supra* at 14, defendant Rafiq Sabir was convicted (following a jury trial) of conspiring and attempting to provide material support to al Qaeda through the use of his medical training and expertise to treat al Qaeda fighters in Saudi Arabia.  *United States v. Farhane*, *et al.*, 05 Cr. 673 (LAP) (S.D.N.Y.) ("*Farhane*"), Dkt. 174 at 3, 176.  Sabir's Guidelines range was 360 months to life imprisonment.  *Farhane* Dkt. 174 at 15. At sentencing, Sabir, like Raishani, requested a sentence of only five years' imprisonment; Sabir claimed he had been "ensnared by a government sting operation" when he was simply trying to "fulfill his Hippocratic Oath."  *Farhane* Dkt. 172 at 6.  Then-Chief Judge Loretta A. Preska sentenced Sabir to 25 years' imprisonment, *Farhane* Dkt. 176, which is the same sentence that the Government seeks here—where Raishani, like Sabir, purportedly wanted to use his medical skills to aid a violent terrorist organization dedicated to killing Americans around the world.

*Farhane* is but one example.  The sentences in numerous other cases involving defendants convicted of violating the material-support statute, 18 U.S.C. § 2339B, by either attempting to travel or facilitating the travel of another to join a foreign terrorist organization overseas—and Raishani did both—are consistent with a Guidelines sentence in this case.  *See, e.g.*, *United States v. Badawi*, *et. al*, 15 Cr. 60 (DOC) (C.D. Cal.) (two defendants each sentenced to statutory maximum of 15 years' imprisonment[3] for conspiring to provide material support to ISIS, where one defendant was arrested at airport attempting to travel overseas to join ISIS and the other defendant had supported and assisted his travel); *United States v. Zea*, 13 Cr. 72 (SJF) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join al Qaeda in the Arabian Peninsula); *United States v. Pugh*, 15 Cr. 116 (NGG) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Syria to join ISIS); *United States v. Saidakhmetov*, 15 Cr. 95 (WFK) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Turkey to join ISIS); *United States v. Alaa Sadeh*, 15 Cr. 558 (D.N.J.) (defendant sentenced to statutory maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas); *United States v. El-Gammal*, 15 Cr. 588 (ER) (S.D.N.Y.) (defendant sentenced to 12 years' imprisonment for facilitating the travel of another to join ISIS).

---

[3] In 2015, the statutory maximum penalty for violating Section 2339B was increased from 15 years to 20 years in prison.

Raishani's request for a sentence of only five years' imprisonment—20 years below the applicable Guidelines sentence—is utterly divorced from the reality and seriousness of this case and from the relevant precedent outlined above. *See* Def. Mem. at 1. In seeking such a sentence, Raishani points to three cases that are wholly distinguishable. Raishani first cites *United States v. Issa*, *et al.*, 09 Cr. 1244 (BSJ) (S.D.N.Y.) ("*Issa*"), in which Judge Barbara S. Jones sentenced three defendants to below-Guidelines sentences following convictions for narcoterrorism offenses. In *Issa*, however, the defendants were West African drug traffickers who agreed with Drug Enforcement Administration confidential sources ("CSes") to transport cocaine for the Revolutionary Armed Forces of Colombia (the "FARC"); the CSes introduced the idea of the FARC, and in reality, the FARC was not involved in the transaction. *See Issa* Dkt. 102 at 1-3. In sentencing the defendants in *Issa*, Judge Jones made clear that the fact that the defendants had committed the charged crimes for money—rather than in furtherance of the FARC's violent mission—weighed heavily in favor of leniency. For example, Judge Jones explained:

> [The defendant] was motivated primarily, if not entirely, by money, not the desire to influence a government, in this case, anti-American ideology, or for any political reason. . . . He was not ideologically motivated and, to me, this means that it is relevant to whether or not he is likely to commit further crimes, which is something that a court must consider in determining what an appropriate sentence is. A defendant who is committed to the goals of a terrorist organization, to my mind, is far more likely to recidivate and pose danger to the government—in this case, the interests of the United States—precisely because of his ideological commitment, compared to a defendant whose goal is money, as was this defendant's.

*Issa* Dkt. 137 at 48-49; *see also Issa* Dkt. 143 at 35-36. Judge Jones also stressed that two of the defendants had grown up in abject poverty and lacked education, sophistication, and financial

opportunity.  *Issa* Dkt. 137 at 49-50, 143 at 36.  Indeed, for one of the defendants, Judge Jones

noted that she did not believe that he would have "engaged in this conspiracy on his own."  *Issa*

Dkt. 143 at 36.

Applying Judge Jones's analysis to this case only further supports the imposition of a

Guidelines sentence.  Here, Raishani was driven not by money or profit, but by the ideological

desire to join a violent terrorist organization dedicated to harming Americans, American values,

and American interests.  Raishani's "ideological commitment" was so deeply held that he was

willing to leave his community, his comfortable life, his well-paying job, his parents, his wife,

and his young child in order to seek out a life of violence, hate, and martyrdom with ISIS.  In

sum, *Issa* is factually inapposite, and Judge Jones's reasoning counsels firmly in favor of

imposing a Guidelines sentence here to reflect the severity of Raishani's crimes and to protect

the public from the danger that he poses.

Raishani next cites *United States v. Igbal*, *et al.*, 06 Cr. 1054 (RMB) (S.D.N.Y.)

("*Igbal*"), a case in which, like *Issa*, the defendants were motivated by money, not ideology.  In

*Igbal*, the defendants operated a satellite television business in the New York City area, and

agreed to broadcast content from a Lebanon-based station called al-Manar, knowing that it was

owned and operated by Hizballah, a terrorist organization.  *Igbal* Dkt. 107 at 2.  While the

defendants in *Igbal* supported Hizballah monetarily through this business arrangement, like the

defendants in *Issa* but unlike *Raishani*, their support was not ideologically motivated, and the

case therefore did not involve the same recidivism concerns that are present here and in the other

terrorism cases cited above.  Indeed, the terrorism enhancement was not even applied in *Igbal*,

resulting in Guidelines ranges for the two defendants of 63 to 78 months and 41 to 51 months. Simply put, that case has no bearing on this one.

Finally, Raishani points to *United States v. Natsheh*, 16 Cr. 166 (RS) (N.D. Cal.) ("*Natsheh*"), in which the defendant received a below-Guidelines sentence for attempting to travel overseas to join ISIS. The defendant in *Natsheh*, however, was nearly a decade younger than Raishani, made no effort to facilitate the travel of others, and had a troubled history that included battles with depression. *Natsheh* Dkt. 26 at 31. This case is entirely different. Raishani's decision to join ISIS and to support CC-1 in joining ISIS was not made in youthful haste or desperation. Raishani made a careful and considered decision, over the course of at least two years, that he shared ISIS's ideology and wanted to further ISIS's mission of violence, terror, and hate. He supported and assisted CC-1's trip to Syria to join ISIS. He methodically planned his own trip to Syria to join ISIS. And Raishani had the life experience, opportunities, education, and family support to make good choices. Instead, Raishani chose to join a foreign terrorist organization whose primary purpose is to kill and harm Americans.

In sum, the three cases cited by Raishani have no bearing on the appropriate sentence in this case. A Guidelines sentence is squarely in line with the relevant precedent discussed above.

### D. A Guidelines Sentence Is Necessary To Afford Adequate Deterrence and To Promote Respect for the Law

A Guidelines sentence is also necessary in order to adequately deter criminal conduct—in this case, terrorism aimed at harming Americans and American interests—and to promote the law prohibiting such destructive conduct. *See* 18 U.S.C. § 3553(a)(2)(A)-(B). As Judge Walker stated in his concurrence in *Stewart*, "[i]n no area can the need for adequate deterrence be greater

than in terrorism cases, with their potential for devastating loss of innocent life." *Stewart*, 590

F.3d at 181.

      The capacity of a terrorist organization like ISIS to thrive hinges in large part on its

ability to grow its membership—to attract, indoctrinate, and enlist new followers, like Raishani,

who are committed to advancing and serving ISIS's murderous agenda or die trying.  It is only

through this support that ISIS and other terrorist groups are able to fulfill their missions of hate,

murder, and violence.  Deterring such conduct is particularly important in today's environment,

when so many young people in the West, including in the United States, have become

radicalized by jihadist propaganda online and have either traveled or tried to travel to the Middle

East to join ISIS and other terrorist groups.  It is vital for our country's national security that

other young men and women who reside in the United States, when exposed to hateful extremist

teaching, be deterred from choosing to follow a path similar to Raishani's and CC-1's and

engaging in potentially devastating conduct in support of such groups.  It is important for those

contemplating joining a terrorist organization to know that the consequences for such conduct

are serious.  And it is important for the public to know that those who seek to join and support

terrorist organizations will face serious punishment preventing them from causing harm to

society.  A Guidelines sentence is necessary and warranted in this case to serve the pressing need

for general deterrence of such terrorism offenses.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should sentence Raishani to 300 months' imprisonment—the sentence called for by the Guidelines and recommended by the Probation Office—as such a sentence is sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).[4]

Dated: New York, New York
      March 26, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:                /s/
Sidhardha Kamaraju/Jane Kim/George D. Turner
Assistant United States Attorneys
212-637-6523/2038/2562

---

[4] The Government respectfully submits that the sentence should be apportioned as follows, in accordance with the Guidelines, the applicable statutory maximum penalties, and the Probation Office's recommendation: 20 years' imprisonment on Count One, and five years' imprisonment on Count Two, to run consecutively.