UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          17 Cr. 421 (RA)

SADDAM MOHAMED RAISHANI,
                                            Sentence
                Defendant.

------------------------------x

                                            New York, N.Y.
                                            April 2, 2019
                                            4:15 p.m.


Before:

                    HON. RONNIE ABRAMS,

                                            District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
GEORGE TURNER
SIDHARDHA KAMARAJU
     Assistant United States Attorneys

GERALD J. MCMAHON
     Attorney for Defendant

1

2          (Case called)

3          MR. TURNER:  Good afternoon, your Honor.  George

4  Turner and Sid Kamaraju for the government.

5          MR. KAMARAJU:  Good afternoon.

6          THE COURT:  Good afternoon.

7          MR. MCMAHON:  Good afternoon, your Honor.  Gerold

8  McMahon for the defendant Saddan Raishani.

9          THE COURT:  Good afternoon to both of you.  You can be

10  seated.  So this matter is on for sentencing.  Mr. Raishani

11  pled guilty in November to attempting to provide material

12  support to a foreign terrorist organization and conspiring to

13  provide material support or resources to a foreign terrorist

14  organization.

15          In connection with today's proceeding, I've reviewed

16  the following submissions:  The final presentence investigation

17  report, revised as of February 6; Mr. Raishani's sentencing

18  memorandum, dated March 18 with accompanying exhibits; and a

19  supplemental submission, dated March 27, and the government's

20  sentencing memorandum, dated March 26.

21          Have the parties received each of these submissions

22  and am I missing anything?

23          MR. TURNER:  We've received the submissions, your

24  Honor, and there's nothing further from the government.

25          THE COURT:  Thank you.

1          MR. MCMAHON:  Same with the defense, your Honor.

2          THE COURT:  Thank you, Mr. McMahon.

3          Why don't we begin by discussing the presentence

4    report.

5          Mr. McMahon, have you read the presentence report and

6    discussed it with your client?

7          MR. MCMAHON:  We have, your Honor.

8          THE COURT:  Do you have any objections?

9          MR. MCMAHON:  No, we do not.

10         THE COURT:  Does the government have any objections to

11   the presentence report?

12         MR. TURNER:  No, your Honor.

13         THE COURT:  The court adopts the factual findings in

14   the report.  The presentence report will be made a part of the

15   record in this matter and placed under seal.  If an appeal is

16   taken, counsel on appeal may have access to the sealed report

17   without further application to the Court.

18         Mr. Raishani, when you pled guilty in November, we

19   discussed the federal sentencing guidelines.  As you know, they

20   are a set of rules.  They are designed to guide judges when

21   they impose sentence, although at one time they were mandatory,

22   meaning judges were required to follow them, they're no longer

23   binding on judges.  They're no longer mandatory, but judges

24   must nonetheless consider them.

25         Do the parties agree with the guidelines calculation

1   in the presentence report pursuant to which Mr. Raishani is

2   facing a guidelines range of 300 months in prison?

3           MR. TURNER:  Yes, your Honor.

4           MR. MCMAHON:  Yes, your Honor.

5           THE COURT:  So based on the parties' agreement and my

6   independent evaluation of the sentencing guidelines, I accept

7   the guidelines calculation in the presentence report.  I find

8   Mr. Raishani's offense level is 36, his criminal history

9   category is six, and his recommended guidelines sentence is 300

10  months in prison.

11          As I said a moment ago, that range is only advisory.

12  Courts may impose a sentence outside of that range based on one

13  of two legal concepts, a departure or a variance.  A departure

14  allows for a sentence outside of the advisory range based on

15  some provision of the guidelines themselves.  In the plea

16  agreement, both parties agree that no departure from the

17  guidelines range is warranted.  Nevertheless, I've considered

18  whether there is an appropriate basis for departure from the

19  advisory range within the guidelines system.  And while

20  recognizing that I have the authority to depart, I don't find

21  any grounds warranting departure.  I also have the power to

22  impose a nonguidelines sentence based on what we call a

23  variance, as you all know.  With that, I'll hear from the

24  parties.

25          Would the government like to be heard?

1          MR. TURNER:  Thank you, your Honor.  We would.

2          Your Honor, the government made a detailed submission

3     which your Honor alluded to.  We won't repeat what's in our

4     submission, but we would like to highlight several points for

5     the Court.

6          THE COURT:  Sure.

7          MR. TURNER:  And the first, your Honor, is the

8     duration of the defendant's support for ISIS.

9          THE COURT:  It's almost a two-year period.

10         MR. TURNER:  It's almost a two-year period.  That's

11    correct.  It began with a pact with another ISIS follower, the

12    follower we described as CC-1 in our papers.  That was in 2015.

13    And it culminated after nearly two years with the defendant's

14    attempt to travel overseas himself to join ISIS.

15         Your Honor, this was not a hasty or a rash or

16    impulsive decision.  This was a period of time during which the

17    defendant radicalized, and that radicalization fermented and

18    built and culminated in his own efforts to travel overseas and

19    join this group.  We submit that is relevant for a number of

20    respects, but particularly it underscores the seriousness of

21    the conduct, and the need for the sentence here to protect the

22    public from further crimes of the defendant.  His

23    radicalization at the time of his arrest was total and

24    absolute.

25         Your Honor, another point we'd like to address, and we

 1    do touch on this in our submission, but it is the defendant's

 2    claim at sentencing that he intended only to provide medical

 3    services to the Islamic State after traveling overseas.  The

 4    undisputed facts in this case, including the facts set forth in

 5    the PSR, to which there are there is no objection, made clear

 6    that the notion that the defendant was somehow just a peaceful

 7    humanitarian or someone interested only in providing

 8    humanitarian aide is nonsense.  The defendant absorbed,

 9    consumed, and embraced violent ISIS propaganda.  These are

10    videos that glorified beheading, murder, terrorist acts.  He

11    trained physically before traveling, attempting to travel

12    overseas.  He told an undercover law enforcement officer that

13    he was prepared and aspired to die to commit the ultimate

14    sacrifice to martyr himself for ISIS.  The defendant was fully

15    prepared to fight for ISIS and assist the group and further its

16    cause in any way that he could.

17            But even if, even if the Court credits the defendant's

18    claim that he intended to provide medical services, that

19    doesn't mitigate his conduct here.  The Second Circuit, this is

20    the *Farhane* case we cite in our papers.  The Second Circuit has

21    made clear that providing medical services to a terrorist

22    organization is squarely within the heartland of the type of

23    conduct that the material support statute prescribes.  ISIS and

24    other groups like it, they need, they depend on followers

25    supporting and serving the groups in any number of ways.  And

1    here, the defendant, even if we credit that claim, he assisted

2    and supported another ISIS supporter to travel overseas and

3    travel and fight successfully for ISIS.

4          THE COURT:  Is the first time that you've heard this

5    contention that he was only going over there to provide medical

6    assistance at sentencing in connection with the sentencing?

7          MR. TURNER:  Your Honor, the defendant did reference

8    his medical background and his capability to provide those

9    types of services during the course of the investigation, but

10   that was in parallel to also making these other references to

11   his willingness and his preparation to serve the group in other

12   ways.  And we would also note that he explicitly described how

13   he intended to use his medical background as a ruse to cross

14   borders overseas posing as a humanitarian aid worker.  Your

15   Honor, it's quite possible that the defendant did intend to

16   provide some medical assistance when he reached the Islamic

17   State, it is clear from the fact that he was prepared to fight

18   and serve the group in other ways.

19         Your Honor, we would note for the Court in this

20   regard, we noted in the our submission, it is telling in our

21   view that the probation office, which interviewed the defendant

22   rejected this claim as an after-the-fact attempt to justify his

23   actions.  And the probation department put it, in our view,

24   quite well, when there is no possible justification for seeking

25   to join and serve a group like ISIS.

1          Your Honor, the third point we'd like to touch on is

2     related to the first point, the duration of the conduct, but

3     it's the intensity of the radicalization here.  The facts leave

4     no doubt that at the time this defendant walked down that

5     jetway and tried to board a plane, his commitment to the cause,

6     the murderous cause of ISIS was total.  This is a defendant who

7     wrote a will, a lengthy will, and left it for his family

8     members.  We've attached that to our submission.  We

9     respectfully submit that will is cold, it is calculating, and

10    it is terrifying, because it is a window into a man who was

11    prepared to leave everything behind -- the family members and

12    the other, undoubtedly supporters of the defendant today, those

13    are the people who the defendant was willing and prepared to

14    abandon.  He chose ISIS over those folks.

15         Now, he didn't just choose ISIS.  He did it after

16    trying to convince his wife to go with him.  So during that

17    intervening period between helping CC-1 and trying to travel

18    overseas, he tried to radicalize his wife and get her to go

19    with him.  She refused.  That didn't stop him.  He left her on

20    his way to the airport.

21         Your Honor, another factor is the defendant's life

22    experiences, his history and his characteristics.  Those are

23    aggravating factors here, because ISIS, over the last several

24    years and other groups like it, but ISIS has preyed often on

25    young men who are, for various reasons wayward, perhaps it's

1   drug addictions, perhaps it's a lack of family connections, no

2   job.  The defendant was none of those things.  He was in his

3   late 20s, he wasn't a teenager, he had a college degree, he was

4   employed, family connections, he was a United States citizen,

5   and he made a considered and calculated decision over time to

6   leave all of that behind and choose ISIS over all of that.

7   Judge, in our view that is terrifying, because that is

8   indicative, it underscores the commitment to the cause and the

9   likelihood that he would return to supporting radical jihadist

10  ideology.

11          Lastly, Judge, deterrence.  We respectfully submit it

12  is a very important consideration here.  We are living,

13  unfortunately, in a world where ISIS and other groups like it

14  recruit young men in the west and in this country through their

15  propaganda and websites online.

16          THE COURT:  Do you think a lengthy jail sentence is

17  going to deter someone who is willing to die for an extremist

18  cause?

19          MR. TURNER:  Judge, we think it's an significant

20  consideration for this reason.  In 2015, the defendant, an

21  educated man living comfortably made a conscious choice to go

22  down this road.  He starts consuming propaganda and he

23  radicalizes.  We submit the next young man who is out there now

24  who is not radicalized yet who still has a choice yet and who

25  is not yet brainwashed and who is not yet prepared to die for

1   ISIS should understand and that a sentence in a case like this

2   a United States citizen in the New York City area who picks up

3   and is willing to leave and go and join and fight for ISIS, the

4   sentence imposed, we submit should send the message when you

5   conspire with a terrorist organization like that and you make

6   that choice, the consequences will be of the utmost

7   seriousness.

8              Judge, I'll conclude by saying that for all of those

9   reasons and all of the other reasons that we've set forth in

10  our submission, we do submit that the appropriate sentence here

11  is a guidelines sentence and that the defense has not

12  identified any mitigating considerations.  And we submit that's

13  because there aren't any.  Most recently, the defense put in a

14  sentencing reply letter, which contained personal attacks

15  against government counsel, in terms of its substance,

16  frankly, it was bizarre and somewhat disturbing.  This case has

17  nothing to do with the IRA or Vietnam.  And your Honor, the

18  notion that terrorism with respect to ISIS is somehow in the

19  eyes of the beholder, that's beyond the pale.  This is a group

20  that is responsible for countless deaths of Americans here and

21  abroad, and the defendant tried to board a plane overseas, join

22  it, and help it.

23             So, your Honor, at the end of the day, this case is

24  fairly straightforward.  The defendant radicalized, he devoted

25  himself to ISIS, he helped another man, another U.S. citizen

travel overseas and join and fight for ISIS, and then he tried
to do the same thing himself.  We believe that a guidelines
sentence is warranted and appropriate.  It's the sentence that
probation recommends and it's supported by the case law that
we've cited in our papers, your Honor.

THE COURT:  Thank you.

Mr. McMahon.

MR. MCMAHON:  Yes, Judge.  First of all, your Honor, I
do not believe that the reply submission was a personal attack
on the government.

THE COURT:  There is a little bit of an attack on
there.

MR. MCMAHON:  It was an attack on the government's
submission, the tone and tenor of that submission was, as I
thought exactly as I described.

THE COURT:  Are you really comparing an ISIS fighter
to an American soldier?

MR. MCMAHON:  Well, Judge, what I was comparing was
ISIS fighter to an IRA soldier and to an Irgun soldier.

And in terms of comparative impropriety, in terms of
comparative wrongdoing, you can't escape the fact that 58,000
American soldiers died in Vietnam in an undeclared war
originating in a mistake, in fact, a fraud, the Gulf of Tonkin.
I was that soldier.  I got drafted, I could have been dead, but
I wasn't.  So to say that the United States Government, which

perpetrated that act over 10 years, 58,000 dead and just to

say, well, that's nothing, you can't compare that to Al-Qaeda

or to ISIS, well, I do think in terms of harm caused, I think

you absolutely can.

As bad as ISIS is, and it is particularly bad mostly

in its tactics, beheading is an anathema to people in the west.

So you can't get around that.  But in terms of, as I pointed

out, the total number of people dead as a result of ISIS

doesn't come anywhere near the 58,000 dead fellow soldiers who

fought in Vietnam in an undeclared war that was unjust and

immoral.  And as to some of those people who were victims in My

Lai and other places of napalm attacks, that was not very

pretty either, not at all.

What I did try to point out in the reply, and I knew

that it would be, to say the least rile the government a little

bit, but there is, Judge, this concept of terrorism, we in the

west because of 9/11 and everything associated with that, we

have this view.  And I myself, when Bin Laden was killed, it

was a great moment for all Americans.  We feel that, we

understand that, but there's the rest of the world, we are not

the only country in the world.

And in terms of the Israelis, Menachem Begin was a

stone cold terrorist.  He was an anathema to England, to United

States, to everybody.  Except to the Jewish people there.  So

he was an absolute terrorist, then he's the president of the

 1    country, the Prime Minister.

 2          Martin McGuinness, Adams, and Michael Collins were

 3    terrorists.  The IRAs, parts of it is still on the foreign

 4    terrorist organization designation.  That's what it is.  Now,

 5    to the McMahon family, the IRA has never been a terrorist

 6    organization and never will be.  So we don't care that the

 7    government said now.  That doesn't mean that I, Jerry McMahon

 8    go out and give money and arms to the IRA, because I know the

 9    consequences.

10          So the point I'm trying to make, Judge, and it's not a

11    equivalent, it's not a perfect equivalent, but don't be misled

12    by the concept of the terrorism that ISIS, Al-Qaeda and

13    Hezbollah are so foreign, so completely otherworldly that they

14    have to get a 25-year sentence with no criminal record and a

15    credible background and really no actual harm done.

16          THE COURT:  We're talking about an organization that

17    regularly slaughters and beheads innocent people, enslaves

18    women.

19          MR. MCMAHON:  Yes.

20          THE COURT:  That rapes children.

21          MR. MCMAHON:  Yes.

22          THE COURT:  And in your view, should that not properly

23    be labeled a terrorist organization?

24          MR. MCMAHON:  Yes, no question about it.  And he

25    pleaded guilty when I came into the case, we probably pled

 1    within three weeks after talking to the government and their

 2    superiors.

 3              Judge, that's the anomaly of the case.  As the

 4    government rightly points out, this is not your average

 5    terrorist, by no means, I would dare say that in none of the

 6    cases that he could find, Judge Jones or anything with judge

 7    Berman, cases in California, all of the other places, how many

 8    of those people had college degrees, a nursing degree, those

 9    things?

10              THE COURT:  But doesn't that make him more blameworthy

11    rather than less.  It's different if you have a kid, if you

12    have someone young and impressionable, there are cases with

13    people who have some form of mental illness.  But this is not

14    that case, this is someone who is a full-grown adult who made

15    this decision knowingly to radicalize.

16              MR. MCMAHON:  Yes.

17              THE COURT:  And I attribute that, your Honor, to two

18    things.  No. 1, religion is an instrument of war, thousands and

19    thousands of years Muslims and Crusaders have been going at it.

20    In northern Ireland, Ireland, it was the Protestants and

21    Catholics.  Religion creates the circumstances under which war

22    is easy.  My client is a singularly disciplined, intense

23    person.  He doesn't really do things halfway.  That's to his

24    credit academically and things like that, but it's to his

25    detriment when he goes off on a religious path that is not very

1   good, not for him, not for his family or for the country.

2           As he said in his letter to the Court, that he

3   betrayed the country, he knows that.  The country -- he came

4   here when he was about five years old.  The country provided

5   his father and his mother with a good living.  It provided him

6   with an education.  Through his own efforts he worked it, but

7   it was a country where, unlike in the Middle East, here he

8   could work hard, get ahead, get an education, and do all of

9   those things.  So in his letter to the Court, and I believe

10  that your Honor will see that as a heartfelt letter,

11  Mr. Raishani does not do things willy-nilly.

12          THE COURT:  How do I know this is heartfelt?  This is

13  a man who is deceptive in the course of his conduct.  In the

14  will itself he directed his wife to mislead investigators.

15  When he looked at the propaganda, he deleted it, he wiped his

16  fingerprints.  He was trying to cover his tracks.  Why should I

17  believe that there is genuine remorse in that letter or

18  anything that he may choose to say today?

19          MR. MCMAHON:  Because, Judge, I think it's a different

20  person today than he was then.  I asked him that same question

21  when I'm interviewing him going over his background, I'm

22  talking about beheadings and stuff like that.  I'm not bashful

23  about confronting him with that.  I said to him, you're leaving

24  a wife and a child and your parents, what were you thinking?

25  To which his answer was, I wasn't.  And he wasn't.

1        So your Honor, to some degree, whenever you sentence

2   the defendant, you have to take a bit of things on faith.  You

3   can't hook up a machine and measure true remorse, you cannot,

4   but what you can see is what he has done in the two years since

5   he's been in jail.  He has been enormously helpful to other

6   inmates.  He was enormously helpful in suicide watch, being a

7   companion to inmates in there to help prevent suicide in MCC.

8   The letters have suggested this is a person who was extremely

9   helpful to her people.  The nurse that he went to school with,

10  Kenny Ocasio, he describes an individual that they were in a

11  study group together, and Adam was unbelievable helpful to

12  everybody else in the group.

13       But turning more to the issue of the ISIS methodology.

14  Judge, people go off on crazy rants and the question is, is he

15  going to go off on another one when he goes out, that's the

16  question.  And that's where the family support and the

17  education, having a wife and child, make it less likely.

18       THE COURT:  That didn't make a difference.  He had a

19  little baby at home.  He left his wife, he left his child.  Why

20  is it going to be different 15, 20 years from now?

21       MR. MCMAHON:  Because when you're in the rapture of a

22  holy war that -- he was embarrassed, by the way, Judge.  When

23  he had that other fellow from the mosque, CC-1 who went over

24  there, my client felt ashamed and humiliated that he went,

25  CC-1, and he didn't.  And it sort of festered in him and he

1    felt guilty over the fact that the other guy acted on his

2    religious beliefs and my client didn't.  And that really

3    festered on him for a year thinking about that.

4            And you also have to agree, Judge, that there was a

5    confidential source, an informant and an undercover agent that

6    he certainly didn't do anything to dissuade him from that and

7    it would be fair to say that they probably stoked the fires a

8    little bit, but we didn't make this -- we're not making that

9    claim that the responsibility for the decision that he made is

10   anything but his own.

11           There is one thing that I do want to clarify, the

12   government in their papers and in the argument here said that

13   my client's commitment was absolutely total and forever.  Those

14   are the words that they were using.  I don't think that the

15   facts justify that assessment.  First of all, the plane ticket

16   that my client bought was a roundtrip ticket.  It wasn't a

17   one-way ticket.  It was a roundtrip ticket.  This was a

18   gentleman who was meticulous about money, every dollar he

19   nursed every dollar.  So he wasn't going.

20           THE COURT:  He paid as many debts as he could before

21   he left.

22           MR. MCMAHON:  Paid off his debts.

23           THE COURT:  He prepared to die, right?

24           MR. MCMAHON:  Yes, yes, but, but he prepared to die,

25   paid off his debts, apparently the Koran tells him he must.

1    But in the back of his mind, he's 32 years old, with everything

2    here.  So he has a roundtrip ticket, and he also tells his

3    family, his brother that -- about this car that he had which he

4    was going to sell and give the proceeds to his wife.  He told

5    his brother -- and it's part of the 3500 material -- that if I

6    come back shortly, tell the person that you're selling the car

7    to that I may want the car back.  That's part of the evidence

8    in the case.  So forever isn't necessarily forever.  This is a

9    young kid who made an incredible decision to leave a wife, a

10   child.

11           THE COURT:  He wasn't a kid.  He was in his late 20s.

12   He was almost 30.  He's 32 now.  He had a child, a degree, he's

13   a nurse.  This is not a kid.  If this was a kid, I could

14   understand the argument.

15           MR. MCMAHON:  Well, Judge, at the age of 29 some of my

16   29-year-old children are a little bit wacky at times too.  So

17   he's not an 18-year-old, he's not a 15-year-old, he's --

18           THE COURT:  I doubt your kids are joining

19   organizations that rape children.

20           MR. MCMAHON:  Very much so.  One of my sons is a Navy

21   pilot.  So he certainly would not be in that category.

22           But Judge, if you take a look at the courtroom.  These

23   people are from a different culture, a different faith, it's

24   completely different.  You really can't compare us the front

25   table, the back table, the lawyer, it's a different culture

1    because of religion and he gets into this rapture, believes the

2    Koran, believes these videos, believes all of that and says,

3    I'm going to go there and provide medical services and maybe

4    die a martyr's death, a glorious death, but hedging a little

5    bit, return ticket home, and if I come back, get me the car.

6    So what I'm saying, Judge, forever isn't necessarily forever.

7         There is another thing that I want your Honor to think

8    about.  And this is unique culturally for reasons we don't

9    know, and unique to young men.  And when I say "young," I mean

10   30 -- 25, 30, but not to young women.  Young men have this

11   concept as far back as reading Ernest Hemingway, writing about

12   joining the Republicans against the Fascists in the Spanish

13   Civil War.  He went and joined the military, drove an

14   ambulance.  Young men have this thing about testing themselves

15   and going into war, since time immemorial.  And it's a concept

16   that young men get fixated on in doing it and you prove

17   yourself in the cauldron of war.  Are you strong enough, brave

18   enough to do that?

19         Now, that's something that is also going through this

20   guy's mind.  He's looking at the videos, as he's feeling the

21   shame that he's feeling for having the other guy go and he's

22   sitting home with a job, with a family, and the other guy is

23   carrying an AK-47.  So all of those things are together, Judge.

24   It's what I'm trying to present is a picture of a guy who is

25   not irredeemably bad.  I know that is a possibility, I know

1     that's a speculation, but he has -- when he gets out, he has

2     the possibility not to be irredeemably bad.  And if he really

3     was irredeemably bad, he would not have acted the way that he

4     did while in incarceration.  He would not have had the people

5     write about him that he is very kind to people.  He is, there's

6     just no disputing that fact.

7             So when you take all those things together, Judge, and

8     I was thinking that that's one of the reasons why the

9     supervised release portion of the sentencing component could be

10    a very significant factor, but a sentence of 25 years, Judge,

11    what are you going to do for the people that make bombs and

12    blow up things here in New York or anywhere?  He did no weapons

13    training or rifle training or IED training.  He did none of

14    that.  He's a nurse, he's a medic.

15            So if you are giving a 32-year-old guy with no

16    crimes -- now, I understand that the Second Circuit has said

17    it's fine, if you're convicted of terrorism your criminal

18    history category is VI, even though it's I.  And even though

19    you're pleading guilty to the crime we're going to add 12 more

20    to the crime because it's terrorism.  So they have

21    artificially -- the people in Washington, the sentencing

22    commission or Congress, to say the word is to make its own

23    comment, but they say that if you plead guilty to those crimes,

24    you got to get 25 to 50 years, no matter what your background

25    is.  I don't think that's a determination for the politicians

1    to make.  That's a determination for your Honor to make.

2            So it's not an easy one, Judge.  It's a serious crime,

3    but in terms of what he actually did for that crime, and I

4    credit the FBI for that, I credit the law enforcement work, it

5    worked out to his benefit because had cars blown up or had

6    things happened, we wouldn't be arguing for a sentence that

7    we're arguing for, so I credit that.  But sometimes the actual

8    result matters.  So I would urge your Honor, given his

9    background, given the good deeds that he has, and he obviously

10   has a good inner character for the way that he has helped

11   people.

12           So your Honor can fashion the thing, a sentence that

13   will, as best as possible, minimize the risk that he's going to

14   be a recidivist.  And I don't think because Washington says

15   that because he pleaded to a terrorism he'll be a recidivist.

16   I don't think it's justified, your Honor.  A 25-year sentence

17   is simply not justified.  And so, I would, approach your Honor

18   to be far more merciful than that.

19           THE COURT:  Thank you.

20           Mr. Raishani, I read your letter, but is there

21   anything you'd like to say today?

22           THE DEFENDANT:  Yes, your Honor.  May I stand?

23           THE COURT:  Yes, you may.  Bring the microphone close

24   so I can hear you, please.

25           THE DEFENDANT:  Good afternoon.

1          Thank you, your Honorable Judge Abrams for giving me

2   an opportunity to speak.  I want to thank my lawyer and his

3   associate for representing me in this case.  I want to thank my

4   family, friends, and loved ones for being here and supporting

5   me.

6          I would like to begin by saying that I am deeply sorry

7   for the actions that I've committed while being bestowed many

8   great opportunities in living in America.  I apologize to the

9   Court, probation, the marshals for using their time and

10  services, resources.  I am truly sorry and ashamed for the harm

11  that I have brought to everyone involved, especially my family,

12  my wife and my son.  My actions and way of thinking were

13  selfish and wrong.  I am very fortunate that I am alive and

14  here standing in front of your Honor.

15         I acknowledge I did have a problem so I immediately

16  pursued ways to rehabilitate myself.  While incarcerated at

17  MCC, I worked on proving myself.  I developed a new, more

18  grounded way of thinking.  I sought cognitive-behavioral

19  therapy and counseling from a social worker and spiritual

20  leader on a monthly basis.  I participated in programs such as

21  Focus Forward, Lead by Example, Step by Step, Reflection, which

22  focused on preparing me for a viable and successful reentry

23  into my community and society.

24         As a professional nurse, I always had a yearning to

25  help others.  Just before I was incarcerated, I would visit

1    patients at their homes where they are situated in unsafe

2    dangerous neighborhoods, and I would still provide the same

3    dedicated care that I would give to patients at the hospital.

4         THE COURT:  Can you see how from my perspective that

5    looks inconsistent with seeing videos of people being beheaded

6    and wanting to be part of that effort?

7         THE DEFENDANT:  You're absolutely right.

8         With that dedicated care, it pushed me to join MCC's

9    inmate companion program, where I would observe, monitor, and

10   help fellow inmates who were fragile and unstable in a

11   psychological state and at times would be suicidal.

12        I participated in many programs, great educational

13   courses.  I was an active GE tutor.  I facilitated four

14   courses, which I felt were beneficial to my fellow inmates,

15   such as poetry, which would allow inmates to express their

16   feelings and emotions in a written spoken word; time

17   management, so that inmates could better realize their time,

18   reduce the wasting of it, and make more goal-oriented choices;

19   leadership, so that inmates can learn to become leaders, be

20   autonomous, and make more responsible decisions in life; and

21   finally, conflict resolution, where in this course, inmates

22   gain the skills and techniques in anger management and how to

23   defuse a tense situation.

24        My incarceration has been difficult, but at the same

25   time it has truly been a blessing.  I've learned a lot and

1    changed for the better.  My bond with my family is stronger

2    than ever.  My outlook for the future is very positive.  I am

3    really eager and looking forward to redeeming it.  I no longer

4    hold the same views I had when I first came in.  I do not

5    support or condone terrorism.  I have learned and realized that

6    radicalism does not bring about a fruitful life, a life that

7    would allow me to grow as a human, raise a family and prosper.

8            In addition to the goals in my letter to you, if the

9    transition into nursing becomes difficult for me when I leave,

10   I would get into my second passion for a time being, which is

11   home renovation and real estate.  I would learn these trades by

12   getting jobs in plumbing, electrical and carpentry during and

13   after my incarceration.  My most important goal and desire in

14   life is to return to my family, provide them a life that they

15   deserve, and I know that this can only occur after a complete

16   my time.

17           I'm also seeking forgiveness from you, my family, my

18   friends, my loved ones, my fellow citizens, your Honor.  I'm

19   only asking you to please give me an opportunity, a chance to

20   return to my family, redeem a life that I can live up to, be a

21   role model to those that need me and correct my path in life.

22           Thank you again, your Honor, for allowing me to speak.

23           THE COURT:  Thank you.

24           I'm going to take just a one-minute break and ask you

25   all just to stay here momentarily.

1          Thank you.

2          (Recess)

3          THE COURT:  Everyone can be seated.  Thank you.

4          Is there any reason why sentence cannot be imposed at

5   this time?

6          MR. TURNER:  No, your Honor.

7          MR. MCMAHON:  No, your Honor.

8          THE COURT:  So I'm required to consider the advisory

9   guidelines range, as well as various other factors that are

10  outlined in the provision of the law, it's 18 United States

11  Code, Section 3553(a), and I have done so.

12          Those factors include, but are not limited to the

13  nature and circumstances of the offense and the personal

14  history and characteristics of the defendant, because each

15  defendant must be considered individually as a person.  Judges

16  are also required to consider the need for the sentence imposed

17  to reflect the seriousness of the offense, promote respect for

18  the law, provide just punishment for the offense, afford

19  adequate deterrence to criminal conduct, protect the public

20  from future crimes of the defendant, and avoid unwarranted

21  sentencing disparities, among other things.

22          I want to start by saying that in my view there is no

23  danger to society greater than that of terrorism, no danger

24  greater than that posed by those that think that they can

25  impose their will on others through senseless and

1   incomprehensible violence.  And just to be clear in my view

2   this case is not about culture, it's not about religion, it's

3   about terrorism.

4           At sentencing, I often see people who are

5   fundamentally good people, but they've done bad things.  And in

6   analyzing the sentencing factors, one question is about the

7   defendant's character, that's one of the things you're supposed

8   to look at, who is this person, what did they do, are they

9   likely to do it again?  In other words, do they pose a

10  continued risk of danger to society?

11          I read all the letters from Mr. Raishani's family, his

12  friends, his neighbors, his fellow inmates that describe him as

13  smart and gentle and helpful to others.  I've considered the

14  positive things he did he at the MCC including in participating

15  in Focus Forward, being on suicide watch, tutoring other

16  inmates.  I heard Mr. Raishani himself talk very eloquently

17  about wanting to help others and describing his love for his

18  family.

19          But this is a case where I can also learn a tremendous

20  amount about the true character of the individual before me

21  from the conduct itself.  This is someone who was willing and

22  indeed eager to leave behind his family and young son to join

23  an entity that slaughters innocents, enslaves women, and rapes

24  children.  Mr. Raishani is now apologizing for his conduct for

25  betraying the country which gave him opportunities that he

acknowledges he never would have had in the country which he

was born.

In order to avoid unwarranted sentencing disparities,

in addition to considering the recommended guidelines sentence

I not only relied on the parties' submissions, but I surveyed

dozens of publicly available sentences where an individual had

been convicted of attempting to provide material support for

terrorism and factual circumstances similar to this one.  Many

courts have sentenced defendants like Mr. Raishani to the

statutory maximum for a violation of the material support

statute, 18 United States Code 2339(b), which until recently

the statutory maximum was 15 years.  Sometimes the sentence was

imposed consecutive to another sentence on an additional

charge.  This also includes numerous cases where the defendant

did not reach his destination and includes cases where, unlike

Mr. Raishani, defendant did not also assist another individual

in traveling to fight for ISIS.  There are also, of course, a

host of cases where defendants received significantly less time

for similar conduct.

In assessing further these unwarranted sentencing

disparities or the need to avoid them, I took into account

numerous factors, including the underlying conduct and the harm

caused, whether the individual facilitated the acts of others

or acted alone, whether the individual was young and especially

impressionable, had a history of mental illness or was somehow

1    manipulated, whether the individual acted for profit, for

2    passion, or otherwise in the sentence imposed among other

3    factors.

4         Unlike in some of the material support cases where,

5    like I referred to earlier that I've reviewed where a defendant

6    was young or had mental health issues, Mr. Raishani is a

7    32-year-old, naturalized United States citizen, with a college

8    degree, a former job as a nurse, and devoted parents, wife, and

9    a young son.  Those are not mitigating factors.  Nonetheless,

10   he sought to join a terrorist organization whose mission it is

11   to murder nonbelievers.

12        And his devotion to ISIS was not short-lived.  Over a

13   year before the FBI's confidential source began speaking with

14   Mr. Raishani about his allegiance with ISIS, he had already

15   assisted the coconspirator in traveling overseas to join and

16   fight for ISIS.  Indeed, it was almost two years after he first

17   assisted another in his successful attempt to travel overseas

18   and fight for ISIS, and Raishani's own attempt to board a plane

19   to Turkey where he planned to cross into Syria to similarly

20   join ISIS.

21        In a search of his Bronx residence, as we discussed,

22   law enforcement recovered a will the defendant addressed to his

23   family members where, among other things, he criticized his

24   wife for refusing to join ISIS with him and directed her to lie

25   to authorities and say that he went abroad to volunteer.  It's

1    true that the defendant never reached his destination and never

2    actually fought for ISIS, but that's undoubtedly what he wanted

3    to do.

4             As for Raishani's argument that his intention to

5    provide medical services to ISIS makes him less culpable than

6    one who picks up arms on its behalf, I'm unpersuaded.  Even if

7    I were to believe that were true factually, as the Supreme

8    Court has noted in *Holder v. Humanitarian Law Project,* such

9    support frees up other resources within the organization that

10   may be put to violent ends.  If the defendant had played a role

11   of a highly competent trained nurse, another ISIS fighter who

12   might have been assisting people medically would have been free

13   to engage in violence.  Indeed, I don't think it's been clear

14   ever that Raishani ever maintained that he drew a line between

15   what he would and wouldn't do for this violent organization.

16   He even acknowledged his willingness to die on behalf of ISIS.

17            One aspect that both parties highlighted in their

18   letters is that the defendant faced discomfort living in this

19   country in part due to others' treatment of him and his faith.

20   His sentencing submission indicates that he left his employment

21   after experiencing negative reactions from coworkers due to his

22   religion and that on one occasion, someone used his prayer mat

23   as a tablecloth.  Of course no one should be subject to

24   religious intolerance.

25            And yet, in response to this intolerance, Mr. Raishani

1    was prepared to devote himself to a group which defines itself

2    by its intolerance of other religions.  ISIS is well known for

3    its mass executions of nonbelievers, including Muslims who do

4    not share its radical interpretation of Islamic text.  This is

5    a group which aims to purify the world of anyone who does not

6    look or think like that them.  If the defendant sought to

7    escape religious intolerance, ISIS ways not the right

8    destination.

9            Finally, I considered the Congress's intent, evidenced

10    by the relevant guidelines analysis for defendants like

11    Raishani to serve sentences that as Judge Walker wrote in his

12    *Stewart* concurrence, reflect the need for deterrence,

13    regardless of the defendant's prior record.  This need is

14    present without regard to whether, as Judge Walker wrote, due

15    to events beyond the defendant's control, the defendant's

16    conduct failed to achieve its intended deadly consequences

17    would be adherence to violent organizations like ISIS are on

18    notice, if you take steps to materially support terrorism, the

19    consequences will be severe.

20            Mr. Raishani, please rise for the imposition of

21    sentence.

22            It's the judgment of this Court that you be committed

23    to the custody of the Bureau of Prisons for a term of 20 years

24    on Count One, which is the statutory maximum and five years on

25    Count Two, which is the statutory maximum, to run concurrent to

1    one another.

2          I'm also imposing a term of supervised release on 20

3    years on Count One and three years on Count Two to run

4    concurrent to one another.  I believe that this sentence is

5    sufficient but not greater than necessary to comply with the

6    purposes of sentencing set forth in the law.

7          If you'd like, you can be seated while I read the

8    conditions of your supervised release.

9          I'm not going to read the standard conditions of

10   release, unless anyone asks me to.  They're on pages 21 and 22

11   of the presentence report, I am going to read the mandatory

12   conditions.  You must not commit another federal, state, or

13   local crime; you must not unlawfully possess a controlled

14   substance; you must refrain from any unlawful use of a

15   controlled substance; you must submit to one drug test within

16   15 days of release from imprisonment and at least two periodic

17   drug tests thereafter as determined by the Court; and you must

18   comply with the standard conditions that have been adopted by

19   this Court.

20          In addition, there's a special condition that I think

21   is appropriate in this case proposed by the probation

22   department.  You shall submit your person and any property,

23   residence, vehicle, papers, computer, other electronic

24   communication or data storage devices or media and effects to a

25   search at any time with or without a warrant by any law

1    enforcement or probation officer with reasonable suspicion

2    concerning a violation of a condition of a supervised release

3    or unlawful conduct by the person and by any probation officer

4    in a lawful discharge of the officer's supervision functions.

5    I think this is appropriate in light of the electronic devices

6    that were used in connection with the radicalization.

7          If I didn't note it already, you'll be supervised in

8    the district of your residence.

9          I decline to impose a fine, because the probation

10   department has reported that you're unable to pay one.  I am

11   imposing a special assessment of $200, which shall be paid

12   immediately.

13         Pursuant to the plea agreement, the defendant agreed

14   to forfeit $3,812 to the United States.  Is the government

15   still seeking that forfeiture?

16         MR. TURNER:  Your Honor, we are seeking that

17   forfeiture, and we can submit an order for the Court's

18   consideration.

19         THE COURT:  Mr. McMahon, there's no objection to that

20   amount I assume, correct?

21         MR. MCMAHON:  That's correct, your Honor.

22         THE COURT:  The government is seeking restitution.  I

23   am assuming the answer is no.

24         MR. TURNER:  No, your Honor.

25         THE COURT:  So that's my sentence.

1        Is there any legal reason why either party believes

2   that this sentence cannot be imposed?

3        MR. TURNER:  No, your Honor.

4        MR. MCMAHON:  No, your Honor.

5        THE COURT:  The sentence is imposed.  That is the

6   sentence of this Court.

7        You have a right to appeal your conviction and

8   sentence, except to whatever extent you may have validly waived

9   that right as part of your plea agreement.  If you do choose to

10  appeal, the notice of appeal must be filed within 14 days of

11  the judgment of conviction.  If you're not able to pay the

12  costs of an appeal, you may apply for leave to appeal in *forma*

13  *pauperis*, which simply means the Court costs such as filing

14  fees will be waived.  If you request, the clerk of court will

15  prepare and file the notice appeal on your behalf.

16       Are there any open counts against Mr. Raishani or

17  underlying indictments that need to be dismissed?

18       MR. TURNER:  There are, your Honor.  The defendant

19  pled guilty to a superseding information.  We move that the

20  counts in the underlying indictments be dismissed.

21       THE COURT:  They will be dismissed.

22       Are there any other applications at this time?

23       MR. MCMAHON:  Yes, your Honor.  I would ask that the

24  Court recommend that Mr. Raishani be designated to a facility

25  as close to New York as possible, given his family and ties

1    here.

2              THE COURT:  I'll make that recommendation.

3              MR. MCMAHON:  Lastly, Judge, he provided the Court

4    with a two-page transcript of his most recent compilation of

5    conduct at the facility, MCC, for the programs and stuff, and

6    as well as a certificate, and if that could be appended to the

7    minutes of the sentencing.

8              THE COURT:  It will be appended.

9              And I don't doubt, as I said, the positive things that

10   he's been doing at the MCC.  So I have considered that

11   generally and that would not have affected my sentence.

12             We're adjourned.  Thank you.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25