# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

# 17 Cr. 421 (RA)

---

## UNITED STATES OF AMERICA,

### Respondent,

## V.

## SADDAM MOHAMED RAISHANI,

### Movant.

---

## TO THE HONORABLE RONNIE ABRAMS

## MOTION FOR COMPASSIONATE RELEASE AND SENTENCE REDUCTION
## PURSUANT TO §3582(C) (1) (A)

**SADDAM MOHAMED RAISHANI**
**Reg. No. 76012-054**
**FCI Fairton**
**Po Box 420**
**Fairton, NJ 08320**
**Movant, Pro Se.**

## Mr. Raishani's Four Criteria Presented To Be Considered In Conjunction For Compassionate Release

### EXTRAORDINARY AND COMPELLING REASONS

(i) – Mr. Raishani's **"Lengthy Sentence"** Is Unduly Harsh Due To His Guideline

 §3A1.4 Enhancement;

(ii) – Mr. Raishani's **"Rehabilitation"** And Correction Of Islamic Ideology;

(iii) –Mr. Raishani Is The Only Available **"Caregiver"** To His Elderly Parents;

(iv) –Mr. Raishani's **"Harsh prison conditions"** Due To The Pandemic.

 Movant Saddam Mohamed Raishani moves this Honorable Court for his 20-year sentence to be reduced to a term less than ten years or in the alternative, if the Court finds appropriate, to time served. He is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g).

### JURISDICTIONAL STATEMENT

## RESPECTFULLY

## LEGAL STANDARD FOR COMPASSIONATE RELEASE

 The court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the

warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in Section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such reduction.

The Second Circuit has held that, when reviewing a compassionate release motion brought by a prisoner, district courts are free "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them" and are not bound by Sentencing Guideline 1B1.13 or its application notes. _United States v. Brooker_, 976 F.3d 228, 237 (2d. Cir. 2020). A district court's discretion in this context is "broad," except that rehabilitation alone is not sufficient to reduce a sentence. Id. At 237-38. A defendant's "age at the time of his crime and the sentencing court's statements about the injustice of his lengthy sentence" may "weigh in favor of a sentence reduction." Id. At238.

Before reducing a defendant's sentence, the court must consider the factors set forth in 18 U.S.C. §3553(A). _United States v. Roney_, 833 F. App'x 850, 852 (2d. Cir. 2020) (internal citation omitted).

> "These factors include, inter alia, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence; and protect the public from future crimes by the defendant; and the need to avoid unwarranted sentencing

disparities." The court is required to take into account "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." See §3553 (a) (6).

Courts have held that the disparity between the sentence a defendant received and the sentence he would face today can constitute an extraordinary and compelling reason to grant a sentence reduction, see *United States v.Maumau,* 993 F.3d 821, 837 (10th Cir. 2021); *United States v. McCoy,* 981 F3.d 271, 285-85 (4th Cir. 2021); *United States v. Reid,* 2021 U.S. Dist. LEXIS 42380, 2021 WL 837321, at *5-6 (E.D.N.Y. Mar. 5, 2021); *United States v. Ellerby,* 95-cr-77 (CBA), 2020 U.S. Dist. LEXIS 216657 at *5-7 ( E.D.N.Y. Apr. 29, 2020); *United States v. Haynes,* 456, F.Supp. 3d 496, 514-16 (E.D.N.Y. 2021); *United States v. Davis,* 2020 U.S. Dist. LEXIS 215167, 2020 WL 6746823 at *2 (E.D.N.Y. Nov. 17, 2020); *United States v. Anglin,* 98-cr-1124 (ERK), (E.D.N.Y. Nov.18, 2020); *United States v. DiGirolamo,* 2020 U.S. Dist. LEXIS 196737 at *1 (E.D.N.Y. Oct. 22, 2020).

One of the factors arguably favors an early release, "history and characteristics of the defendant," but is "outweighed by the combined force of several other factors," *United States v. Walter, No.* 18-cr-0834, 2020 U.S. Dist. LEXIS 67910, 2020 WL 1892063, at *3 (S.D.N.Y. Apr. 16, 2020) (citing Section 3553(a)). Specifically, "the nature and circumstances of his offense of conviction are serious." *United States v. Asaro,* No. 17-cr-0127, 2020 U.S. Dist. LEXIS 68044, 2020 WL 1899221 at *7 (E.D.N.Y. Apr. 17, 2020).

## ADMINISTRATIVE REMEDY EXHAUSTION

As required, Movant Raishani has requested via BP-9 for compassionate release and sentence reduction – for the BOP Director to file a §3582 (c) (1) (a) on his behalf to the Warden at FCI Fairton. That request was denied. See Exhibit **A.** – Administrative Remedies

## PRELIMINARY STATEMENT

On June 21, 2017, Movant Mr. Raishani was arrested by the FBI authorities at JFK Airport in New York City.

On November 15, 2018, Mr. Raishani pled guilty to Superseding Information S2 17 Cr. 421 (RA) (the "Superseding Information"). (Dkts. 48, 52). The Superseding Information charged Mr. Raishani with: (i) attempting to provide material support to the Islamic State of Iraq and al-Sham (ISIS), from January 2017 through June 2017, in violation of 18 U.S.C. § 2339B, based on his attempted travel to join ISIS in Syria (Count One); and (ii) conspiring with another ISIS supporter ("CC-1")  to provide material support to ISIS, from September 2015, through June 2017, in violation of 18 U.S.C. § 371 (Count Two). (Dkt. 48).

The plea took place in November of 2018. Mr. Raishani faced a maximum sentence of 20 years imprisonment on Count One and a maximum sentence of five years imprisonment on Count Two. The parties stipulated to an applicable Guidelines sentence of 300 months imprisonment ("Plea Agreement") at 3.  On April 2, 2019, the court sentenced Mr. Raishani to the "statutory" maximum of 20

years imprisonment on Count One and to the "statutory" maximum of five years imprisonment on Count Two, to run concurrently. (Dkt. 60).

On July 30, 2020, a habeas petition pursuant to §2255 was filed on the docket. (Dkt. 69 ("Petition")). In that petition Mr. Raishani claimed (i) ineffective assistant of pre-trial counsel for counsel's failure to argue that the statutory maximum penalty for Count One (§ 2339B) was 15 years rather than 20 years imprisonment (Petition at 2-3); (ii) his guilty plea was not knowing and voluntary because at the time of his plea, Mr. Raishani should have been advised that the statutory maximum penalty was 15 years rather than 20 years imprisonment. This Court denied that petition on December 3, 2020.

## EXTRAORDINARY AND COMPELLING REASONS

## Mr. Raishani's Four Criteria for Compassionate Release.

Respectfully, Movant Adam Raishani asserts that the present motion for compassionate release and reduction in sentence is comprised in conjunction to the following four criteria:

1. – Mr. Raishani's **"Lengthy Sentence"** Is Unduly Harsh Due To His Guideline §3A1.4 Enhancement;

2. – **"Rehabilitation"** and correction of Islamic Ideology;

3. – The only available **"Caregiver"** to his elderly parents;

4. – **"Harsh prison conditions"** due to the pandemic.

## I.   Mr. Raishani's Lengthy Sentence is Unduly Harsh Due To His Guideline §3A1.4 Enhancement

Mr. Raishani is "**not challenging**" his enhancement, ineffective assistance of counsel, prosecutorial misconduct, or judge's error. He is carefully and respectfully making a showing that his 20-year sentence is lengthy and unduly harsh "**due**" to the enhancement.

The Second Circuit have paved the way through and by compassionate release for a prisoner to bring forth such motion to the sentencing court by establishing extraordinary and compelling reasons that merit a sentence reduction. Those reasons are "**broad**". Even to the extent which led the Court to reach the harsh and lengthy sentence. In this case, it was cause by an enhancement that added 16 years to Mr. Raishani's current 20-year sentence. This motion is properly brought in the context for a sentence reduction and not to "**correct**" or "**vacate**" his sentence. The Court maintains a broad discretion as to how much of a reduction it may impose. Although a compassionate release motion is not the proper vehicle for the Court to remove or vacate the enhancement, Mr. Raishani is highlighting the facts laid herein solely in pursuit of the Court's consideration for a reduction in sentence in light of his unwarranted lengthy sentence.

Section 3582 (c)(1)(A) was designed to expand, expedite, and improve the process of compassionate release or sentence reduction. *United States v. Brooker*, 976 F.3d 228, 237 (2d. Cir. 2020). "District courts are afforded discretion to consider a "**wide**" range of factors in assessing a motion for compassionate release, including '**the injustice of a lengthy sentence.**'" Id. At 238. "Section 3582 (c)(1)(A) does not '**define**' extraordinary and compelling reasons. Rather, the Court has

'**broad**' discretion to consider reasons beyond those listed in the Sentencing Guidelines, including the 'severity of [the defendant's] sentence in weighing his motion for compassionate release." See _United States v. Vargas_, U.S. Dist. LEXIS 22053 (S.D.N.Y. Nov. 24,2020). (finding that, in combination, the defendant's rehabitation, "**harsh sentence**", medical issues, the pandemic, and intention to care for his mother were extraordinary and compelling reasons).

Mr. Raishani acknowledges that he is guilty of his two counts of conviction. However, a 12-level enhancement pursuant to U.S.S.G. § 3A1.4 is unduly harsh. The enhancement raised his offense level from level 26 Category I, which would have carried a guideline of 63-78 months, minus 3-level for acceptance of responsibility would have been a guideline of 46-57 months of incarceration. A potential sentence substantially less than "FIVE" years.

The 12-level enhancement caused Mr. Raishani to get a twenty-year statutory maximum sentence for Count One – Attempt to Provide Material Support to Terrorist Organization pursuant to §2339B, particularly ISIS.

Patently, there is nothing on the record that establishes that Mr. Raishani knew which government ISIS was intending to intimidate or influence.

The terrorist enhancement, U.S. Sentencing guidelines Manual § 3A1.4, imposes a significant harsher punishment on those who commit certain types of crimes of terrorism. The enhancement increases a defendant's offense level to a minimum of 32 and designates a defendant's criminal history category as Category VI, regardless of whether the defendant has previously committed a crime. To trigger this enhancement, the government must prove elements distinct from those of the crime of conviction, specifically that the offense committed involved,

or was intended to promote, a federal crime of terrorism. The term "federal crime of terrorism" is defined as an offense that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, 18 USCS §2332B (g)(5)(a), and that is a violation of certain enumerated statutes, 18 USCS §2332B (g)(5) must be satisfied for the enhancement to apply.

§ 3A1.4. Terrorism; provides that:

"(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI."

In the case of *Linde v. Arab Bank*, PLC, 882 F.3d 314 (2d Cir. 2018), the Second Circuit held that a violation of §2339B "does not invariably equate to an act of international terrorism." And "to qualify as international terrorism, a defendant's act '*must*' also involve or endanger human life. See id. §2331(1)(A). Further, the act must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government. See id. §2331(1)(B). And it must have occurred primarily outside the territorial jurisdiction of the United States or transcend national boundaries. See id. §2331(1)(C); *Licci ex rel. Licci v. Lebanese Canadian Bank*, SAL, 673 F.3d 50, 68 (2d Cir. 2012) (identifying as "separate requirements" of §2331(1) definition of international terrorism that act at issue (1) involve violence or endanger human life; (2) violate federal or state criminal law if

committed in the United States; (3) appear intended to intimidate or coerce civilian population, influence government policy, or affect government conduct by specified means; and (4) occur primarily outside the United States or transcend national boundaries. "

The Ninth Circuit held "(1) that 18 USCS §2332B (g)(5) - providing that the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct – imposes a specific intent requirement; and (2) that the defendant's conviction of violating 18 USCS §2332B (a)(1) is one of the enumerated statutes in 18 USCS §2332B (g)(5)(b). Addressing the remaining question whether the defendant's conduct satisfied 18 USCS §2332B (g)(5)(a), and noting that it was the government's burden to provide that element by clear and convincing evidence, the panel held (1) because the district court failed to determine whether the defendant knew how the accounts he opened were to be used, it could not find that he specifically 'intended' that the accounts be used to 'coerce or intimidate a government'; and (2) the district court did not find sufficient facts to indicate that the defendant's opening of social media accounts was 'intended to retaliate against government conduct.' The Panel concluded that the district court therefore abused its discretion in applying the terrorist enhancement §3A1.4 for attempting to provide material support to a terrorist organization in violation of 18 USCS §2332B (a)(1). See *United States v. Amer Sinan Alhaggagi,* 978 F.3d 693 (9th Cir. 2020).

Also see *United States v. Awan,* 607 F.3d 306 (2d Cir. 2010), where the Second Circuit interpreted and explained that "in the context of U.S. Sentencing Guidelines Manual §3A1.4, the ordinary meaning of 'involved' is to have within or

as part of itself, or to include. A defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, i.e., the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 USCS §2332B (g)(5)[(A) or (B)], or his relevant conduct includes such a crime. Then U.S.S.G. §3A1.4 is triggered. "

The panel further detailed that the "intended to promote" language in §3A1.4 means something different from the word "involved." Because §3A1.4 is written as a disjunctive phrase and must be interpreted to avoid redundancy, the "intended to promote" prong must be applicable in some circumstances in which the "involved" prong is not, i.e., where the defendant's offense or relevant conduct does not include a crime of terrorism. The ordinary meaning of "promote" includes to bring or help into being, to contribute to the growth, enlargement, or prosperity of, or to encourage, or contribute to a federal crime of terrorism as that term is defined in 18 USCS §2332b (g)(5). Then U.S.S.G. §3A1.4 is triggered.

In the case at bar, pursuant to the 'involved' prong of §3A1.4, there was no evidence to find that Mr. Raishani's conduct was "calculated" to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" under 18 USCS §2332B (g)(5)(a). During Mr. Raishani's plea he stated at page 21:

"in – for Count One, in June 2017, I attempted to travel to Syria for the purpose of joining ISIS It was my intention to use my training as a nurse to assist them at that time. I knew that is was unlawful to try to join ISIS because it was on a list of foreign – designated foreign terrorist organization.

As for Count Two, in October 2015, I agreed with another person that we should both join ISIS. I supported him. He traveled overseas to do that.

On October 30th, 2015, I went with that person in a taxi from the Bronx to the JFK Airport."

Mr. Raishani was arrested at JFK Airport. He never met or talked to an active ISIS member in or from Syria to be informed of which government they planned to intimidate, influence, coerce, or affect the conduct of such government. Mr. Raishani had no idea as to who or where in particular ISIS members were going to retaliate or intimidate a government.

The Awan Panel further stated:

"if an offense cannot be 'intended to promote' a federal crime of terror unless the defendant himself committed one of the crimes specified in 18 USCS §2332b (g)(5)(a), §3A1.4 would not apply to defendants who clearly 'intended to promote' federal crimes of terrorism committed by other persons."

Awan's convictions were vacated and remanded for further proceedings.

Also see *United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008), where the district court failed to make factual findings necessary to impose USSG §3A1.4 enhancement; defendant's presentence report (PSR) stated that terrorism enhancement applied but gave no explanation for such conclusion and although defendant's convictions under material support statutes clearly satisfied first element of enhancement, PSR did not contain any factual assertions and district court did not make any factual findings related to intent element; instead, both appeared to assume, erroneously, that enhancement automatically applied to

material support conviction; because there was no factual finding on intent element, and because basic facts supporting conviction did not give rise to automatic inference of required intent, defendant's sentence was vacated.

Also see _United States v. Parr,_ 545 F.3d 491 (7th Cir. 2008), where the district court also erred in applying crime of terrorism enhancement under USSG §3A1.4, because threat itself did not "_involve_" crime of terrorism as that term was understood under 18 USCS §2332B (g)(5)(a) and (b); however, defendant's crime might still qualify for enhancement if district court found that purpose of threat was to "_promote_" crime of terrorism.

See a recent case, (_United States v. Ramirez_, No. 20-10564 11th Cir November 1, 2021), where defendant Ramirez plead guilty to and appealed his 240-month sentence for providing material support to a foreign terrorist organization, in violation of 18 USCS §2339B (a)(1). Ramirez challenged the district court's imposition of the terrorism enhancement under U.S.S.G. §3A1.4. The Eleventh Circuit Panel held that Ramirez's §2339B (a)(1) offense required that he "_know_" that the ELN is designated foreign terrorist organization and "that the ELN has engaged in or engages in terrorism or terrorist activity." The Panel further stated that " §2339B (a)(1) does not contain the additional requirement found in §2332B (g)(5)(A) that the defendant's offense be calculated (i.e., planned or intended) to influence, affect, or retaliate against government conduct." With no calculated or specific intent finding at all, the district court failed to make the required fact findings for the terrorism enhancement, and that Panel vacated Ramirez's sentence and remanded for resentencing and fact findings.

Mr. Raishani would like to also point to the Second Circuit's decision in _United States v. Pugh,_ 945 F.3d 9 (2d Cir. 2019), where Pugh appealed his conviction of (i) attempted to provide material support to a foreign terrorist organization; and (ii) obstruction of justice after a jury trial and was subsequently sentenced to 180 months on Count One and consecutive 240 months on Count Two, for a total effective sentence of 420 months incarceration, the maximum allowable sentence.

The Panel vacated the sentence and remanded for resentencing. _United States v. Pugh,_ 150 F.Supp. 3d 218, U.S. Dist. LEXIS 165694 (E.D.N.Y. Dec. 9, 2015) The Panel held that, "Defendant's sentence had to be vacated because the district court's articulation of its reasoning for imposing the maximum permissible sentence was insufficient."

The Panel further held that the district court has an obligation to weigh all the factors listed in Section 3553(a). See _United States v. Fernandez,_ 443 3d 19,26,29 (2d Cir. 2006). The Pugh Panel further stated that Judge Garaufis "was obligated, at the time of sentencing, to 'state on open court the reasons for its imposition of the particular sentence.' §18 U.S.C. 3553(c). In addition, because the guidelines ranges here, 360 to 420 months, was greater than two years, the district judge had a further obligation to 'state in open court... the reason for imposing a sentence at a particular point within the [Guidelines] range...' Id §3553(c)(1). Those statutory requirements were not met in this case."

Mr. Raishani was initially subjected to a Guidelines range of 46-57 months for Count One. He received a maximum statutory sentence of 20 years incarceration. He request this Honorable Court do a thorough evaluation of his sentence and consider all of the facts laid herein. Due to Mr. Raishani's knowing

plea, he does not claim an error or misapplication on the Court's part. He also understands that a compassionate release motion is not a motion to vacate, set aside, or correct his sentence or conviction. However, his sentence is lengthy and unduly harsh. The disparity between the sentence he received and the sentence he would face today, constitute an extraordinary and compelling reason to grant a sentence reduction.

## II. Mr. Raishani's Rehabilitation From Incorrect Islamic Ideology

Mr. Raishani was born on September 7, 1986. He was born to Mr. Mohamed Raishani and Ms. Mahlyah Asaidi in Yemen. Movant-Raishani comes from a line of moderate Sunni Muslims.

Mr. Raishani Senior entered legally into the United States in 1973. Movant-Raishani entered legally into the United States along with his mother in 1990. Mr. Raishani Senior became a naturalized United States citizen when Movant-Raishani was a young child. By immigration law, Movant-Raishani also became – by a child beneficiary petition – a United States citizen on the date that Mr. Raishani Senior was naturalized.

Movant-Raishani attended school from 1990 until one year before his arrest in New York City.

Movant-Raishani does not suffer from any severe physical illness. Mr. Raishani is currently married to Ms. Rawdha Alsamet and has a six year old son from his marriage.

Mr. Raishani has utterly admitted to his two counts of conviction and does not justify or undermine the seriousness of his offenses. He has utmost respect for the law and the United States Government.

Since his sentence in 2019, he has been working very hard towards his rehabilitation. His rehabilitation efforts began with his remorse for making incorrect decisions by an incorrect religious ideology.

Mr. Raishani has learned today that the ISIS propaganda that he was brainwashed under is completely false. He has been reading material of de-radicalization from his religious text and from online material from Islamic scholars who are authentic and on a correct understanding of the Qur'an and Sunnah (legal ways) of Prophet Muhammad .

Mr. Raishani is now under the understanding and has learned that Prophet Muhammad made the following statements during the foundation of Islam, and the statements have been compiled among other authentic narrations: " Religion is very easy and whoever overburdens himself in his religion, will not be able to continue in that way. So you should not be extremists, but try to be near to perfection and receive the good tidings that you will be rewarded; and gain strength by offering the Salat (prayer) in the mornings, afternoon, and during the last hours of the nights." (See Fath Al-Bari) [Sahih Al-Bukhari; 1/39 (O.P. 38)].

The highest Islamic scholars are called the "Ulema," and they are all under the ideology and have made clear that extremism in religion is unlawful in Islam. And that suicide is forbidden and it is the "greatest" of sins and one in which Allah (The One God) does not forgive because one has died upon such a terrible sin.

Beheading innocent people under oppressive questioning for them to embrace Islam is utterly not Jihad (holy war). A calling to Islam has never been done by the use of force or terror. Prophet Muhammad never beheaded anyone because religion is by choice and not by oppression. Putting fear into the hearts of non-believers is by far not the way of Prophet Muhammad.

In an article, the Resolution – Central Asian Ulema Forum – Islam Against Extremism and Terrorism stated the following:

"Extremism and Terrorism do not further any religious or human values. Extremism and Terrorism, in their scale, speed of spreading, and threatening violence have become one of the most serious problems of modern society. The saddest thing is that the religion of Islam, which calls for amiability, peace, and harmony, as well as tolerance for other beliefs, is portrayed by extremists in a negative light, creating an image of a hostile, threatening, and dangerous religion. In this way, not only does interreligious harmony collapse, but discord is sown among Muslims. These false believers, who hide Islam in order to archive their goals, corrupt the meaning of the Koranic verses and the Hadith (quotes from Prophet Muhammad) to fit their evil ideology. Also, they associate their sinful actions with 'Jihad,' which has its own sacred meaning Islam. However, there are absolutely no links between extremism and terrorism and Islam. This is demonstrated by the fact that when greeting each other, Muslims wish for peace. Upon greeting somebody, Muslims pronounce the words "Assalamu alaikum," which means 'Peace be upon you!' Today's extremism and terrorism, which is foisted upon Islam, threatens international security. The members of terrorist groups are religiously ignorant people who do not even know the basic tenets of Islam. The terrorist actions of these extremists completely

conflicts with Sharia (Islamic law). Almighty Allah commanded the Muslims not to go beyond the legal limits. Allah has forbidden bloodshed, injustice, and ignobility. In the Holy Quran, the Almighty Allah commands: "whoever kills a person not for murder or for spreading mischief in the land, this is as if he had killed all the people, and whoever saves the life of a man, this is as if he saves the life of all the people." Also in the next verse it is sternly said: "Do not spread ungodliness on the earth, after it is put in order." Those who fall out of grace for violating the peace of society are described as follows: "Their effort is for corruption in the land, and Allah loveth not corrupters." Suicide bombers, who kill innocent people, consider themselves to be "Shahids" or "jihadists." In fact, suicide is considered to be a major sin in Islam. This is what Almighty Allah says: "Do not kill yourself, as Allah is ever Merciful onto you."

Mr. Raishni "now" understands that terrorist groups such as ISIS are religiously ignorant and that he fell into their ignorance and corrupt views. His beliefs are now genuinely changed for the better. He is now on the correct minhaj (path). He has now acquired the religious cognitive methods directly from the Quran and Sunnah (ways) of the Prophet.

The Holy Quran states: "No change let there be in khalq-illah" (the religion of Allah). Quran chapter 30 verse 30. And it follows in the next two verses (30:32), "Of those who split up their religion, and become sects (Shii'a), [i.e. they invent new things in the religion (Bid'ah - - innovation, change in Islam), and followed their vain desires], each sect rejoicing in that which is with it."

Surely, all terrorist organizations are committing major prohibited acts. They are upon Bid'ah (forbidden innovation or changes in the religion of Islam). Prophet

Muhammad stated that "every Bid'ah is a going astray, and every going astray is in the fire of hell." He said that his religion had been perfected as proscribed and to not innovate it. This includes the rules and regulations for holy war. For example, an Islamic martyr can only be killed in a battlefield by the hands of an enemy combatant. The Holy Quran states: "Whoever thinks that Allah will not help him in this world and in the hereafter, let him stretch out a rope to the ceiling and let him strangle himself. Then let him see whether his plan will remove that whereat he rages!" (Chapter 22 verse 15).

Meaning that for those who doubt and lose faith in Allah (The One God), they will see that the sin of suicide is no way out. Prophet Muhammad stated the following pertaining to suicide:

"He who kills himself with steel (weapon) would be the eternal denizen of the Fire of Hell and he would have that weapon in his hand and would be thrusting that in his stomach for ever and ever; he who drank poison and killed himself would sip that in the Fire of Hell where he is doomed for ever and ever; and he who killed himself by falling from (the top of) a mountain would constantly fall in the Fire of Hell and would live there for ever and ever." Narrated in Sahih Muslim; Book of Faith.

Jihad by the means of suicide bombing is forbidden. And declaring holy war on innocent people is in fact not holy war to begin with.

In order for Muslims to legally wage holy war, there has to be an opposition to the "religion" of Islam, not an opposition to "extremist views" of Islam. Extremist groups have transgressed the bounds within Islamic regulation.

Therefore, if non-Muslims wage war on and oppose extremist groups, this is not a transgression against Islam, and it is not holy war. Mr. Raishani is "now" in the understanding that the two-billion plus Muslims in Asia and Africa will not assist or aid such transgression against extremist groups, thus neither will he. The groups who make changes to the religion of Islam for selfish motives are considered disbelievers themselves, specifically, because they are upon forbidden innovation. The same way that Sunni Muslims believe that the so-called Muslims from Iran (the Shii'a-sect) are not considered Muslims because they are also upon forbidden innovation.

Unfortunately, the BOP do not offer a de-radicalization religious program. Thus, Mr. Raishani took it upon himself to search for the answers and guidance through prayer and religious research. He is now certain that the answers were always there in the religious texts, which he overlooked when erroneously accepting the ISIS propaganda. That propaganda had put a veil on his eyes for that short period and he had failed to turn to the original texts or seek the correct guidance from the people of Islamic knowledge such as his own father who has been on a correct religious path for his entire life.

Mr. Raishani is currently a participant with Link Outside, which is an organization that serve the spiritual, moral, and educational well-being of incarcerated Muslims in the United States. See Exhibit **B** — Link Outside Introduction.

Mr. Raishani believes that his rehabilitation is most imperative in the area of acquiring genuine and correct Islamic/religious views. Religious rehabilitation is

most important and necessary for his reentry into society. See Exhibit C – Current Participation in the Embracing Interfaith Cooperation Program.

Unfortunately for Mr. Raishani, he does not qualify for "any" extra good time with the BOP due to his current crimes of conviction. This includes the RDAP drug residential – one year off, FSA – up to fifteen extra BOP Good Conduct Time ("GCT") days per month, nor extra time for home detention and/or home confinement.

Also due to his crime of conviction, his email communication with family and friends are being delayed for approximately one week per message. His ability to receive contact visits has also been compromised. His rehabilitation has been utterly hindered. His twenty year sentence is by far more punitive than intended to be. His family ties have been dramatically impacted. This has also obstructed, and hindered his endeavors towards programing and rehabilitation.

At this time he is eligible for BOP low security placement. The BOP advised him that the vulnerability to COVID-19 contraction is far more difficult to control at a lower security facility. Due to those risks, he chose to stay at FCI Fairton temporarily until the process of this motion has ended.

In a sense, Mr. Raishani is grateful that the FBI arrested him at JFK Airport prior to him erroneously attempting to join such a heinous group. He feels that he was saved rather than arrested. Mr. Raishani has no post-sentencing incident reports. His BOP PATTERN categorized him LOW RISK RECIDIVISM LEVEL. See Exhibit D - Mr. Raishani has completed numerous educational programs at the BOP. See Exhibit E.

Mr. Raishani completed many programs at the BOP. He completed over [20] programs during his pre-sentence stage while at the MCC. He completed a six-

month drug rehabilitation program – over 100 hours of program participation, plus an additional 200 hours of other educational programs completed.

His post-sentencing educational programs completed at FCI Fairton include Vocational Training  NCCER Core Curriculum Certification – 100 hours of program participation, plus an additional 100 hours of other educational programs completed. There are other miscellaneous completed programs that add up to an additional 100 hours of program participation. His total programing hours exceed 600 hours.

Mr. Raishani is currently on the waiting list for vocational programs such as, e.g., carpentry, dry wall maintenance, plumbing, and other educational programs. He is also on the waiting list to participate – through the psychology department – in the Suicide Watch Companion program – with pay.  See Exhibit F - Reiterating by BOP staff Chief Psychologist Mr. B. Redondo.

a) <u>Mr. Raishani's Support Letters:</u>

Mr. Raishani's support systems are divided into three sections; (1) family; (2) BOP staff; and (3) fellow inmates.

Mr. Raishani's family stated in pertinent part:

[1] Family.

"Our son is the only support we have; he provided for us by doing our paperwork, taking us to the doctor, etc. without him, we do not know how we will make it through."

By Mr. Raishani' parents.

"Saddam's views opened up more as he witnessed how his mistakes affected those who loved and cared for him. And, I know he would never commit the same mistakes again after all the sadness and sorrow he gave to me, his parents, and his love ones."

By Mr. Raishani's wife.

See Exhibit **G**

[2] BOP Staff.

"Since his arrival at FCI Fairton and before, inmate Raishani has programed constantly and this record can be seen above. He has taken several courses that can be used to further himself once released back into the community. Companion Training, Parenting etc. Inmate Raishani has even taken classes more recently that will help in the pursuit of a nursing career since he is a registered nurse in New York State."

See Exhibit H – Progress Report, page 2 of 4.

By Case Manager Mr. Smith.

Also see General Comments on page 3 of 4 of the Progress Report.

"Mr. Raishani has been in housing Unit C since his arrival at FCI Fairton. While in Housing Unit C, Mr. Raishani has been a quiet and respectful inmate. Mr. Raishani has transitioned and adjusted  well to the institution and has had no issues or concerns regarding his incarceration."

By Counselor Ms. Cole.

See Exhibit I

"I witnessed Mr. Raishani provide medical attention to one of his fellow inmates who had debris in his eye, Mr. Raishani was able to assist and resolve a

problem safely on (12/2/2021 between 2-3:30 PM) Mr. Raishani has transitioned and adjusted well to the staff and institution, he has good family ties and interactions on visits and has proven that he is remorseful for his serious crime. Mr. Raishani shows signs in his behavior and conduct that he is rehabilitated and will become a productive member in society."

By Unit Officer Mr. M. Harris.

See Exhibit J.

"Inmate Saddam M. Raishani 76012-054 has demonstrated excellent conduct and behavior here in the Recreation  Department at FCI Fairton. Participating in most of the recreational activities made available for inmates. Inmate Raishani has been a role model and mentor to his fellow inmate by staying active by participation in most of the classes here in the Recreation Department. Listed are the Recreation Self-Study Courses and classes completed by inmate Raishani."

By Recreation Specialist.

Mr. T. Snyder.

See Exhibit K.

" I have been employed here since October 13th 2019 and worked in the unit where inmate Raishani resides on numerous occasions. He has always been respectful and never gave me or any officer I worked with any issues. I also see inmate Raishani involved in a lot of programs in this facility and is a mentor and role model for his peers."

By Unit Officer D. Sterling.

See Exhibit L.

"In the time spent in the presence of inmate Raishani, he has showed nothing less than the utmost respect to staff as well as inmates alike. [Also] has always taken initiative to go above and beyond the duties the job called for."

> By Senior Officer I. Cross.

> See Exhibit **M**.

[3] Fellow Inmates. See Exhibit **N**.

| | | |
|---|---|---|
| [1] Ibn Muhammad | Reg. No. 64131-050 |
| [2] Andre Davis | Reg. No. 11189-078 |
| [3] William Smalls | Reg. No. 92824-083 |
| [4] Jeffrey Okine | Reg. No. 68300-054 |
| [5] James Hogeland | Reg. No. 59573-066 |
| [6] Israel Hernandez | Reg. No. 73986-112 |
| [7] Johnny Fletcher | Reg. No. 33617-171 |
| [8] Randy Lucero | Reg. No. 11700-031 |
| [9] Hubert Young | Reg. No. 75362-067 |

b) <u>Mr. Raishani's Legal Argument For Compassionate Release:</u>

Respectfully, Movant Saddam Mohamad Raishani asserts that granting a sentence reduction pursuant to §3582(c)(1)(a)'s compassionate release, has become prevalent in this Circuit.

Mr. Raishani's sentencing factor set forth in 18 U.S.C. §3582(a) combined with his extraordinary and compelling reasons warrant reassessment of his current sentence.

See the case of _United States v. El-Hanafi,_ 406 F.Supp. 3d. 502 (S.D.N.Y. May 19, 2020), where El-Hanafi pleaded guilty to an Information charging two counts : (1) providing, and attempting to provide, material support and resources to a designated foreign terrorist organization, namely Al Qaeda, in violation of §2339B, and conspiracy in violation of §371, and sentenced to the then statutory maximum of 15 years on January 20, 2015. The Honorable District Judge Kimba M. Wood granted his compassionate release motion and resentenced El-Hanafi to 9-years time served. The Judge stated:

"Defendant's offence was exceptionally serious, but the considerations that counseled leniency at the time of sentencing are even more salient today," and also that, "the court is convinced that defendant is a rehabilitated offender who pose no danger to the community. His continued incarceration is not necessary to effectuate specific deterrence."

In the case of El-Hanafi's co-defendant, Hasanoff, Judge Wood also reduced his 18-year sentence to time served because "he was the sole available caregiver for his ailing mother since his father's death." Hasanoff had siblings and a wife. See _United States v. Hasanoff,_ U.S. Dist. LEXIS 199816 (S.D.N.Y. Oct. 27, 2020).

The government opposed Hasanoff's motion. However Judge Wood stated:

"Hasanoff's (pro se) motion is granted based on the combination of his family circumstances and his extraordinary record of rehabilitation."

Judge Wood further explained that:

"Hasanoff's rehabilitation has centered on religious activities. He represents the Muslim community at FCI Otisville as the inmate liaison with senior staff. He has worked in the chapel as an orderly. He has taught classes focusing on morals, prayer, tolerance, and moderation in Islam. Of particular note is that, after reading a news article in 2018, Hasanoff proposed that FCI Otisville establish a "deradicalization program" for inmates convicted of terrorism – related offenses. Hasanoff offered to facilitate the program, and he eventually met with representatives of the National BOP Program Activities Department, who are currently considering the proposal."

Judge Wood further explained that:

"Releasing Hasanoff (eight years early) from a 216-month sentence, however, in order to allow him to care for his frail mother and in recognition of his unique record of rehabilitation, will not undermine general deterrence. Early release also will not undermine the goal of achieving just punishment and promoting respect for the law. 18 U.S.C. §3553(a) (2) (A), (B)."

Judge Wood finally stated:

"Hasanoff's crimes (§2339B and §371) were extremely serious. However, Hasanoff points out that when he committed the offenses, he was in his early thirties, did not have a good sense of his place in society, and was susceptible to seeking guidance from 'all the wrong places.' These circumstances have changed. In his motion and supporting papers, Hasanoff sincerely and repeatedly expresses remorse for his actions. He recognizes that he has a supportive network of family and friends, plans to prioritize his mother's health, and has a 'strong desire' to

return to, and be a productive member of, his community. The BOP considers Hasanoff to be at 'minimum risk' of recidivism. Hasanoff is not a danger to any person or the community."

Statistics compiled by the United States Sentencing Commission show that for fiscal year 2019, the average national sentence imposed for crimes categorized "National Defense," which according to the Commission's Sourcebook includes the crime of "providing material support to designated foreign terrorist organizations," the average sentence is 42 months (3 years, 6 months).

On that note, it is hard to fathom how a young nurse with no criminal record would have to serve two decades in prison for planning a flight to Syria with no agenda to commit a violent act of terrorism.

The irony of the matter is that statistics compiled by the U.S. Sentencing Commission show that in the same fiscal year of 2019, the average national sentence imposed for murder is 255 months (21 years, 4 months). That is the approximate sentence that Mr. Raishani received.

Please see the case of the assassin Manzoor Qadar, who was found guilty by a jury for murder-for-hire on April 17, 2002. Qadar was sentenced to mandatory life imprisonment on June 10, 2003. The murder-for-hire plot caused the death of Shaukat Parvez, Qadar's Pakistani cousin, who was shot and killed on November 22, 1996 from a car in which Qadar was one of the occupants in Queens New York.

On Qadar's second motion for reconsideration for release, the Honorable Judge Ross granted Qadar compassionate release and reduced his mandatory life term to time served. Qadar served approximately 18 years. That is a lesser sentence than Mr. Raishani received for planning a flight, and Mr. Raishani accepted

responsibility and Mr.Qadar did not. See *United States v. Qadar,* U.S. Dist. LEXIS 136980 ( E.D.N.Y. July 27, 2021). Also see the case of Sinmyah Amera Caesar. She connected individuals in the United States with individuals affiliated with ISIS and she posted propaganda for that organization online. She planned to travel to ISIS territory and join the organization there. Subsequent to her guilty plea for conspiracy to provide material support, went on presentence release because of health problems, Caesar engaged in similar conduct, lied to the Government about it, and deleted records of her communications favoring ISIS. The former Judge Weinstein sentenced her to 48 months of incarceration. Judge Weinstein undermined the Government's sentence recommendation of 30-50 years and stated:

"The sentence is designated to ensure that (1) the public is adequately protected from ISIS and organizations like it, (2) Caesar is punished for her dangerous criminal conduct, and (3) her rehabilitation to a productive, lawful citizen of the United States is encouraged. It is apparent that this young woman is in need of long-term intensive educational, emotional, and economic support to address her traumas, which have, in part, motivated her actions to join a dangerous organization as a substitute for normal family life. In Europe, countries such as Denmark and the Netherlands have designed and used intensive disengagement and de-radicalization programs to assist prisoners charged and convicted of terrorism related offenses. The United States has no such program. The Bureau of Prisons should seriously consider designing an appropriate program to deal with American terrorist like this one. Without access to treatment while incarcerated or on supervised release, defendant will likely remain an un-rehabilitated supporter of ISIS and a continuing danger to the United States. Caesar's counsel and the

Probation Department are developing a program of intensive treatment and support for the term of her supervision after her incarceration; the treatment should begin in prison and connect seamlessly with control and assistance by Probation. The sentence is sufficient, but not greater that necessary. The Bureau of Prisons and other relevant federal agencies should design and use disengagement and de-radicalization programs to help ensure that people in similar circumstances have a reasonable chance at rehabilitation. See _United States v. Doe_, 323 F. Supp. 3d. 368 (E.D.N.Y. 2018)(explaining the non-incarceration sentence of a young person who had broken from ISIS and was on the path to reintegration into lawful society)." See _United States v. Caesar,_ 388 F. Supp. 3d. 194 (E.D.N.Y. July 31, 2019).

Dr. Lorenzo Vidino assisted in Caesar's case and he provided expert testimony at sentencing. He is the Director of the Program on Extremism at George Washington University; he is an expert on radicalization, mobilization, disengagement, and de-radicalization of jihadist groups, including ISIS. The Program on Extremism at George Washington University researches extremism around the world, but centers its research on jihadist extremism in the United States, including advising policy makers and law enforcement.

For over 20 years, Dr. Vidino has been researching, and writing about terrorism. He has published several books and articles on the subject. Dr. Vidino submitted an expert report and opinion about ISIS 's history, radicalization by ISIS, de-radicalization and disengagement, with focus on Ms. Caesar's past and current relationship with ISIS .

Dr. Vidino's programs are aimed to facilitate disengagement and de-radicalization are multilayered and bring together mentors, security services, social workers, and psychologists to work with the radicalized individual according to a specific plan. Unfortunately, for Mr. Raishani, there was no Dr. Vidino or any other expert to testify at his sentencing.

When it comes to rehabilitation, in deciding a compassionate release motion in the Southern District of New York, see the case *United States v. Millan,* U.S. Dist. LEXIS 59955 (S.D.N.Y. Apr. 6, 2020). Mr. Millan was serving a mandatory and statutory life sentence for his role as a former drug kingpin. The Honorable Senior Judge Loretta Preska stated in pertinent part that:

"Mr. Millan's education and rehabilitative accomplishments are unique and distinctively important because he engaged in such positive activities without any tangible incentive other than self-improvement, given that his life sentence meant that he could neither earn any "good time" credit nor receive any other sentence reduction benefit. Simply put, Mr. Millan, in the face of a life sentence, assumed a positive outlook and attitude towards life, sought to improve himself to the utmost extent possible and was motivated to do so notwithstanding his circumstance. The court finds this to be an extraordinary and compelling circumstance. [Also] Mr. Millan has ascended to a leadership role within the church at FCI Fairton."

Millan's life sentence was reduced to time served.

The same in the following cases where defendants had mandatory life sentences and were released on compassionate release and had their sentences reduced to time served. See *United States v. Torres,* 464 F.Supp. 3d 651 (S.D.N.Y.

June 1, 2020); _United States v. Asaro,_ 2020 U.S. Dist. LEXIS 68044 (E.D.N.Y. Apr. 17, 2020)(murder conviction); _United States v. Quinones,_ U.S. Dist. LEXIS 37628 (S.D.N.Y. Feb. 27, 2021)(The jury decided a life sentence instead of the death penalty); and codefendant "Rodriquez"; _United States v. Ramsay,_ U.S. Dist. LEXIS 89741 (S.D.N.Y. May 11, 2021)(murder conviction); _United States v. Lewis,_ U.S. Dist. LEXIS 144018 (S.D.N.Y. July 31, 2021) (murder conviction); _United States v. Underwood,_ U.S. Dist. LEXIS 8378 (S.D.N.Y. Jan. 15, 2021) (convicted kingpin who ordered five murders); _United States v. Fisher,_ 493 F.Supp. 3d 231 (S.D.N.Y. Oct. 9, 2020)(dangerous drug kingpin from Harlem); also see the District of Connecticut; _United States v. Cruz,;_ U.S. Dist. LEXIS 68857 (D.Conn. Apr. 9, 2021) (murder conviction); _United States v. Perez,_ U.S. Dist. LEXIS 41040 (D.Conn. Mar. 4, 2021) (murder conviction); _United States v. Rios,_ U.S. Dist. LEXIS 230074 (D.Conn. Dec. 8, 2020) (murder conviction); _United States v. Colon,_ U.S. Dist. LEXIS 188587 (D.Conn. Oct. 12, 2020) (murder conviction);

The above mentioned cases detailed that rehabilitation is key for reentry into society. The Supreme Court had admonished the "evidence of post-sentencing rehabilitation may be highly relevant to several of 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing. "_Pepper v. United States_, 62 U.S. 476, 491, 131 S.Ct 1229 (2011).

In the case of _United States v. Echevarria,_ No. 17-cr-44 U.S. Dist. LEXIS 77894 (D. Conn. May 4, 2020), compassionate release was granted where defendant's "substantial criminal record" was counterbalanced by his "substantial rehabilitative efforts" and the fact that "his only violent offense was committed over 18 years ago."

In a study, the U.S. Sentencing Commission found that over two-thirds of federal offenders released in 2005 – 68.3% of 25,431 individuals were not ultimately convicted of another offense. Kim Steven Hunt & Robert Dumville, U.S. Sentencing Comm. Recidivism Among Federal Offenders: A Comprehensive Overview 5 (2016).

In Torres, 464 F.Supp. 3d at 663, the court stated:

> "In ordinary parlance, "Rehabilitation" is defined as the process of seeking to improve a criminal's character, and outlook so that he or she can function in society without committing other crimes." Id. (quoting Rehabilitation, Black's Law Dictionary (11th ed. 2019); See _Mistretta v. United States,_ 488 U.S. 361, 363, 109 S.Ct. 647, 102 L.Ed. 2d 714 (1989) (defining the goal of rehabilitation as "to minimize the risk that [a defendant] would resume criminal activity upon his return to society.")

## III. Mr. Raishani Is The Only Available Caregiver To His Elderly Parents.

Mr. Raishani is the youngest of five siblings. His mother, Ms. Mahlyah Asaidi is 72 years old, and his father, Mr. Mohamed Raishani is 78 years old. They are legally married and have been together since the 1960s. They both met and married in Yemen. His father is a retired small business owner in New York City where he and his wife currently reside at their own home.

Due to their old age, and because Mr. Raishani has training in the field of nursing, he is the only available caregiver to his parents. His parents are elderly and have health complications. His father suffers from obesity, diabetes, hypertension,

and high cholesterol. He also has a history of heart attack, which resulted in placement of stents. He also suffers from bone pain, which is the result of Osteo Arthritis.

His mother has a history of high cholesterol, obesity, and Osteo Arthitis. Mr. Raishani is a nurse. None of his siblings are in the health field. He will be living under the same roof with his parents. His siblings are not "available" to move into their parents' home as they have their own families at their respective households.

Mr. Raishani will be there with his parents. He will care for them, retrieve their prescriptions, take them to appointments, maintain up keeping of the house, etc. They are also computer illiterate; they use the household phone as the only means of communication. They do not know how to navigate the internet.

In this circuit, it is well established that "the need to care for one's aging and sick parent," or one's child," may, in certain circumstances, warrant a finding that an extraordinary and compelling reason exists." *United States v. Ayala, U.S. Dist. LEXIS 211459 (S.D.N.Y. Nov. 12, 2020)* (quoting *United States v. Yoda, U.S. Dist. LEXIS 166758 (S.D.N.Y. Sept. 11, 2020)).* However, courts generally require a showing of "evidence from several sources indication that the defendant is the only available caregiver for a family member in dire conditions, before concluding that "an extraordinary and compelling reason has been established." *Ayala, WL 6626015, at *1* (quoting *United States v. Lisi, 440 F. Supp. 3d 246, 252 (S.D.N.Y. Oct. 27, 2020)* (granting motion when "ample evidence," including "affidavits, letters, and medical records" showed that movant "has become the only available caregiver" to his ailing mother). Other district courts in the Second Circuit and other circuits have concluded this analogy to be correct. See *United States v. Wooten,*

*U.S. Dist. LEXIS 191940 (D. Conn.  Oct. 16, 2020)* (holding  that the incapacitated family member may be someone other than a spouse or registered partner); *United States v. Dragone, U.S. Dist. LEXIS 17980 (D. Conn.  Feb. 1, 2021); United States v. Bucci, 409 F. Supp. 3d 1, 2 (D. Mass. 2019)* (granting compassionate release for an inmate who is the only available caregiver for his ailing mother); *United States v. Walker, U.S. Dist. LEXIS 180084 (N.D. Ohio  Oct. 17, 2019)* (the failing health of defendant's mother and his ability to provide for her financially constitute "extraordinary and compelling reasons" warranting compassionate release). See Exhibit O – Parents Medical Records.

Mr. Raishani is not asking the Court for time served as he has only served approximately five years of his sentence. He is asking the Court to reduce his sentence to less than ten years so he can hopefully find his parents alive. However, the Court has full discretion, if it finds appropriate, to reduce his sentence to time served.

Mr. Raishani has been married to Ms. Rawdha Alsamet, 32, since 2014.  He has a 6 year old son, Khalid Raishani, as a result of that marriage. Mr. Raishani hopes to be released early to also be reunited with his wife and child. Mr. Raishani is a key party for the best interest of his immediate family and he deeply regrets planning to leave them behind when he attempted to travel out of the country. He has, and will continue to maintain close family ties. If his sentence was reduced, he plans to reside with his parents, wife, and son at his parent's home in New York City.

## IV. Mr. Raishani's Harsh Prison Conditions Due To The Pandemic.

Had the pandemic been in existence at the time Mr. Raishani was initially sentenced, it would be conceivable to assume that the court would have sentenced him to a term less than twenty years of imprisonment. Indeed, district courts have found this analogy to be correct. See *United States v. Garcia,* U.S. Dist. LEXIS 230236 (S.D.N.Y. Dec. 8, 2020), ("It is obvious that the ... court would have imposed a lower sentence if the pandemic conditions were in play at the time of the original sentence.") The Garcia court also noted, "How much of a reduction it warrants is a very different inquiry, not subject to any guidelines or other proscribed calculation." Id. Also see; *United States v. Quinones,* U.S. Dist. LEXIS 37628, *5 (S.D.N.Y. Feb. 27, 2021) ("the courts find, as it did with Rodriguez, that the pandemic, because of the concomitant lockdowns and restriction that are necessary to ensure inmate safety, has rendered Quinones' incarceration "far harsher and more [*6] punitive than the court had anticipated at sentencing." *United States v. Rodriguez,* U.S. Dist. LEXIS 181004, at *8 (2020). This too, is relevant to the court's finding of extraordinary and compelling reasons.")

The court in Ciprian was more transparent;

> "As has been widely chronicled, the pandemic has required extreme restrictions on prisoners' movements and visits. It also exposed prisoners to heightened fears of contagion. Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by court measuring the just sentence." The same logic applies here. A day spent in prison under extreme lockdown and fear of contraction a

deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While not intended as punishment, _United States v. Ciprian,_ U.S. Dist. LEXIS 18698 (S.D.N.Y. Feb. 1, 2021).

In a recent case, the court stated:

> "harsh prison conditions of imprisonment occasioned by the pandemic are not, without more, sufficient 'extraordinary and compelling' to warrant compassionate release." That court went on to say, "Moreover, it is also true that courts reviewing motions for sentence modifications have considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences harsher and more punitive than would otherwise have been the case." _United States v.Hatcher,_   No. 18-cr-454-10 (KPF) WL   1535310 (S.D.N.Y. 2021)

For the past 24 months, Mr. Raishani has suffered from harsh prison conditions presented by the pandemic. Harsh prison conditions can be combined with other factors to demonstrate that extraordinary and compelling reasons exits. The Second Circuit has indicated that while rehabilitation "alone" is insufficient, it can "interact with the present coronavirus pandemic" to create an extraordinary and compelling reason for a sentence reduction. See _United States v. Brooker,_ U.S. App. LEXIS 30605, 2020 WL 5739712, at *9.

The Honorable Chief Judge Roger Gregory for the Fourth Circuit declared, "Section 3582(c)(1)(a) necessarily envisions that the 3553(a) factors may balance differently upon a motion for compassionate released than they did at the initial

sentence." And further stated, "There is good reason to believe that, in some cases, a sentence that was 'sufficient but not greater than necessary' before the coronavirus pandemic may no longer meet the criteria. A day in prison under the current conditions is a qualitatively different type of punishment than one day in prison used to be. In these times, drastically different. These conditions, not contemplated by the original sentencing court, undoubtedly increase a prison sentence's punitive effect. " *United States v. Kibble,* 2021 U.S. App. LEXIS 9530 (4th Cir. Apr. 1, 2021).

In closing, the fact that Mr. Raishani may not be able to hug and kiss his parents, wife and son in a visit room due to a COVID partition, is the hardest aspect of incarceration that he has ever endured. The thought of potentially losing his parents while under his current state is alarming at the highest scale.

## MR. RAISHANI'S RELEASE PLAN

Mr. Raishani has a Bachelor Degree in the field of nursing prior to his incarceration. While at the BOP, he will use his knowledge to help others, and he will also seek new skills to better himself. When he is released, he will take the steps into renewing his nursing license and acquiring reinstatement of his career and he will be searching for a job at a hospital in the New York City area. He will be the law abiding United States citizen that he was prior to this ordeal. His skills as a nurse can be more useful in society, in the front lines at a hospital assisting COVID-19 patients. See Exhibit **P** – Article Stating "Nursing Is In Crisis." As a priority, part of Mr. Raishani's release plan is to attend to the wellbeing of his parents. He also intends to be a husband and father to his wife and son.

Mr. Raishani has received a letter from an employer who is willing to help him obtain employment. See Exhibit **Q** – Letter From Potential Employer.

Mr. Raishani is currently a participant in Focus Forward Project, Inc. which is a non-profit organization that focuses on preparation for prisoner' reentry into society. He has been a participant since his pretrial stage into his incarceration. See Exhibit **R** – Latest TFFP Update Letter.

# CONCLUSION AND PRAYER

WHEREFORE, Movant Saddam Mohamed Raishani respectfully avers that his sentence of twenty years is no longer necessary for deterrence. There are different circumstances that did not exist at the time of sentencing. Today, Mr. Raishani is by far not on the same ideology. Absent the 12-level enhancement, he would have received a sentence of less than five years. A twenty-year sentence is far in disparity to that of other defendants sentenced to similar crimes. Mr. Raishani deserves the opportunity to be reunited with his immediate family at a date much earlier than 2034. He prays for re-assessment towards just punishment and for this Court to consider the harsh prison conditions that he is subject to in conjunction with his rehabilitation, and his parent's current state.

Mr. Raishani hopes that this Court consider his extraordinary and compelling reasons for a sentence reduction to less than ten years or in the alternative, if the Court finds appropriate, to time served. He finally request to this Honorable Court to apply any and all other relief it deems just and proper.

## SWORN DECLARATION

I, Edgar Marino Sanchez, the prisoner paralegal who prepared this motion, hereby declare the foregoing material facts to be true and correct to the best of my knowledge and understanding. I declare to have carefully drafted the foregoing motion for compassionate release in good faith and believe it not to be malicious or frivolous. I declare the foregoing under the penalty of perjury pursuant to 28 U.S.C. §1746.

Respectfully Submitted,

Dated: _1 - 31 - 22_

_Edgar M. Sanchez_

Edgar Marino Sanchez
Reg. No. #11708-265
Paralegal.

Dated: _1/31/2022_

Saddam Mohamed Raishani
Reg. No. #76012-O54
FCI Fairton
PO Box 420
Fairton, NJ 08320
Movant, Pro se

## CERTIFICATE OF SERVICE

I, Saddam Mohamed Raishani hereby certify that I have served a true and correct copy of the following Compassionate Release Motion Pursuant to Section 3582(c)(1)(a). Which is deemed filed at the time it was delivered to prison authorities for forwarding. Houston v. Lack, 101 L. Ed. 2d 245 (1988), upon AUSA George D. Turner for the United States Attorney's Office, by placing same in sealed, postage prepaid envelope addressed to:

To:    U.S. Attorney's Office

Attn.:  AUSA George D. Turner

One Saint Andrews Plaza

New York, NY 10007

And deposited same in the United States Mail at:

FCI Fairton

PO Box 420

Fairton, NJ 08320

I declare the foregoing under the penalty of perjury pursuant to 28 U.S.C. §1746.

That the foregoing is true and correct.

Dated: 1/31/2022

Saddam Mohamed Raishani

Reg. No. #76012-054

FCI Fairton

PO Box 420

Fairton, NJ 08320

Movant, Pro se

# EXHIBIT INDEX

------------------------------------------------------------------------------------------

[A] Administrative Remedies (BOP)

[B] Link Outside Introduction

[C] Current Participation In The Embracing Interfaith Cooperation Program (BOP)

[D] FSA Recidivism Risk Assessment – PATTERN (BOP)

[E] Completed Educational Programs (BOP)

[F] Letters Consistent to Waiting List For Suicide Watch Companion (BOP Staff)

[G] Support Letters – Parent & Wife

[H] Support Letter – Progress Report – Case Manager Smith (BOP Staff)

[I] Support Letter – Ms. Cole (BOP Staff)

[J] Support Letter – Unit Officer Harris (BOP Staff)

[K] Support Letter – Recreation Specialist Officer Snyder (BOP Staff)

[L] Support Letter – Unit Officer D. Sterling (BOP Staff)

[M] Support Letter – Senior Officer I. Cross (BOP Staff)

[N] Support Letters – Fellow Inmates 1-9

[O] Parent's Medical Records

[P] Article Stating "Nursing Is In Crisis"

[Q] Support Letter From Potential Employer

[R] Latest Update Letter From The Focus Forward Project

# EXHIBIT A

RECEIPT - ADMINISTRATIVE REMEDY


DATE: NOVEMBER 9, 2021



FROM: ADMINISTRATIVE REMEDY COORDINATOR
      FAIRTON FCI

TO  : SADDAM MOHAMED RAISHANI, 76012-054
      FAIRTON FCI     UNT: C     QTR: C03-327L


THIS ACKNOWLEDGES THE RECEIPT OF THE ADMINISTRATIVE REMEDY REQUEST
IDENTIFIED BELOW:

REMEDY ID         : 1100297-F1
DATE RECEIVED     : NOVEMBER 5, 2021
RESPONSE DUE      : NOVEMBER 25, 2021
SUBJECT 1         : REDUCTION-IN-SENTENCE REQUEST
SUBJECT 2         :

SADDAM MOHAMED RAISHANI, 76012-054
FAIRTON FCI     UNT: C     QTR: C03-327L
P.O. BOX 280
FAIRTON,  NJ 08320


RECEIVED
NOV 2 3 REC'D
By

Wardens office
11/19/2021

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Raishani, Saddam, M.          76012-054     C-Right     FCI Fairton
       LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.    UNIT     INSTITUTION

**Part A– INMATE REQUEST** Their was no response to the Informal Resolution—see attached. Request for the BOP Director—through and by the Warden at FCI Fairton—to file a motion for compassionate release and sentence reduction on my behalf pursuant to §3582 (c)(1)(A). I request such reduction in sentence in conjunction to the following four criterias: (1) Lengthy Sentence; (2) Rehabilitation; (3) Caregiver; (4) Harsh prison conditions due to the pandemic.

11–4–21
DATE

SIGNATURE OF REQUESTER

**Part B– RESPONSE**

Please see Wardens Response

11/19/2021
DATE

WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**

CASE NUMBER: 1100297-F1

Raishani, Saddam Mohamed
Register Number: 76012-054
Administrative Remedy Number: 1100297-F1

## Part B-Response

This is in response to your Request for Administrative Remedy, received in my office on November 4 2021. In your request, you ask for consideration for a Compassionate Release for several reasons. Specifically, you ask for a compassionate release based on lengthy sentence, being rehabilitated, becoming caregiver for your elderly parents, and due to the harsh conditions in prison because of COVID-19.

The criteria for a Compassionate Release/Reduction in Sentence, in Program Statement 5050.50, Compassionate Release/Reduction in Sentence, under 18 U.S.C. 3582(c)(1)(A), includes a Terminal Medical Condition, Debilitated Medical Condition, Elderly Inmates and/or extraordinary/compelling reasons. You do not qualify for Reduction in Sentence/Compassionate Release because you have failed to provide adequate extraordinary/compelling reasons per the policy stated above.

Accordingly, your request for a Compassionate Release/Reduction in Sentence is denied. If you are dissatisfied with this response, you may appeal to the Regional Director, Northeast Regional Office, U.S. Customs House-7th Floor, 2nd and Chestnut Streets, Philadelphia, PA 19106. Your appeal must be received in the Regional Office within 20 days from the date of this response.

_____          _____
Thomas E. Bergami, Warden                Date  11/19/21

Federal Correctional Institution
and Federal Prison Camp
Fairton, New Jersey

ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES
INFORMAL RESOLUTION FORM

\*\*This form is to be completed by the Correctional Counselor.

Date: *Saddam M. Raishani  8-13-21*

Inmate Name: *Saddam Raishani* Reg. No.: *76012-054* Unit: *C-Right*

1) The inmate's complaint:
*Request for the BOP Director and Warden to file a compassionate release motion and sentence reduction on my behalf. See ATTACHED*

2) The relief he is requesting:
*To have my sentence reduced.*

3) Efforts made by the inmate to informally resolve the complaint, including the names of staff he contacted:
*I spoke to Case Manager Smith*

4) Efforts made by staff to informally resolve the complaint:

Date Informally Resolved: _____ -or- Date BP-229 issued:_____

_____        _____
Counselor Signature                                        Date

_____        _____
Unit Manager's Signature                               Date

_____        _____
Inmate Signature                                             Date received from staff

# BP-8 ATTACHMENT

Request for the BOP Director — through and by the Warden at FCI Fairton — to file a motion for Compassionate release and sentence reduction on my behalf pursuant to §3582(c)(1)(a)

I request such reduction in sentence in conjunction to the following four criterias:

(1) <u>Lengthy sentence</u> — I was sentenced to the statutory maximum of twenty years for Count One — attempt to provide material support to terrorist organization pursuant to §2339B; and Count Two — Conspiracy pursuant to §371;

(2) <u>Rehabilitation</u> — since my charges involve my attempt to join a terrorist group, I seeked self-improvement towards de-radicalization and correction of Islamic beliefs;

(3) <u>Caregiver</u> — I am the only capable caregiver to my elderly parents who suffer from health complications;

(4) <u>Harsh prison conditions due to the pandemic</u> — My sentence has become more punitive than it was initially meant to be due to the coronavirus pandemic. Prison conditions have been impacted and changed.

# EXHIBIT B



Saddam Mohamed Raishani
Reg# 76012-054
Federal Correctional Institution
P.O.BOX 420
Fairton, NJ 08320


As'salam au'aliykum wa rahamatu'Allahi wa barakatu

  We are the Islamic prison outreach organization called Link Outside. We have been serving
the spiritual, moral and educational well-being of incarcerated men and women in the United
States for over five year. Our organization operates out of the Islamic Institute of Orange
County's Outreach Committee and is administered by religious scholars, community organizers
and volunteers. Some of the services we provide include local prison visits, mail
correspondence, religious literature donations and quarterly newsletters. Please note that, due
to our volume of mail, it may take a couple of months for us to respond.

  All our literature is from Orthodox Muslim Sunni sources. When it comes to requests for kufi,
hijabs or prayer rugs we need an approval form from either one of the administrative staff, or
someone from the Institution Chaplaincy. Once we receive the approval form then we will try to
fulfill the request if our resources allow inshAllah. Also, just to let you know we do not provide
penpals or matchmaking services or financial assistance.
  We can provide you information on Islam and spiritual development free of charge .We do offer
five CIU mail correspondence courses History I, Law I, Belief I,  Prophetic Wisdom, and
Purification.  History I covers the entire life of the Prophet Muhammad (peace be upon him),
from before he was born until he passed away. On successful completion of the class, a student
should be able to recall the life-sketch of the Prophet Muhammad, be familiar with the major
events that took place during his life, and understand the various stages through which the

mission of Islam manifested itself. Law I will present the practical teachings concerning purification and prayer. On successful completion of the class, a student will be able to have an understanding of the aforementioned practices, teach these guidelines to others and deal with scholarly differences of opinions concerning them.

The correspondence courses we offer to the prison population are still in the developmental phase, and consist of only a fraction of what the university provides currently. Unfortunately, you will need to take a special exam at the university for each correspondence course you completed in order to receive credit for the classes you took in prison. Official state accreditation for completed courses cannot be provided for the prison population due to certain restrictions and course design. However enrolling in the class would allow you to understand the material and certificate of completion can be utilized for your parole hearing to show your academic endeavors. But taking the class mostly will help draw you closer to Allah by hammering down the basics and give you a methodical way to teach it amongst the other brothers and sisters within the community.

I would like to let you know that one of our staff members, Ustdah Jesse, is offering personal mentoring and guidance through our prison mail correspondence. Ustadh Jesse was previously incarcerated for 10 years and converted to Islam while in prison. He has returned back to the free world where he pursued Islamic studies and is now a Muslim public speaker at various mosques in Southern California. He offers advice that is not only practicable, but also something that you can relate to as someone who was once in your shoes. Please write back if you are interested to receive his letters by addressing your letter to Ustadh Jesse above the address line. We hope that you find comfort and encouragement in his words to help you along your journey.

If you have any questions, comments or concerns please feel free to reach out to us anytime. We love you for the sake of Allah and we beg you to please keep us within your prayers at all times. Stay strong , keep focused, and Remember Allah is always with you.

"And whoever is conscious of Allah, He will make for him a way out, And will provide for him from where he does not expect. And whoever relies upon Allah – then He is sufficient for him. Indeed, Allah will accomplish His purpose. Allah has already set for everything to a [decreed] extent." (Quran 65:2-3)

The Prophet said(peace be upon him)

Two blessing which many people waste are good health and free time( Buhkari)

Suhayb reported: The Messenger of Allah, peace and blessings be upon him, said, "Wondrous is the affair of a believer, as there is good for him in every matter; this is not the case for anyone

but a believer. If he experiences pleasure, he thanks Allah and it is good for him. If he experiences harm, he shows patience and it is good for him."( Muslim)

May Allah reward you with goodness,
LinkOutside

PS. You are on our contact list and feel free to contact us for any of our services. Also we can always send bulk donations to the Islamic community, just have the Chaplain give you the information on how to do that or have him contact us directly. He can find us at LinkOutside.com.  Also unfortunately we do not respond to Jpay

Although our organization does not offer transitional services, we have a working relationship with The Golden Path transitional home in Los Angeles.  They are a certified STOP Program Area 5 facility that is contracted through the Amity Foundation.  The Golden Path is an Islamic-themed transitional home that can meet the needs and faith-based values of Muslims re-entering into society.  You will still need to send a letter to the Golden Path to receive an acceptance letter from them before procuring housing: The Golden Path, 9827 La Salle Ave., Los Angeles, CA 90047. Phone number: 323-740-9525

Reminder about Remembrance of God

Shaykh Faisal Hamid Abdur Razak

What is the purpose of our lives? All of us, at some point or the other, have felt a sense of loss of self. To fall in and out of the flow; to lose sight of what we are most willing to put our effort in; to leave behind the joy of curiosity and the small awe of everyday living.

Almighty Allah (SWT), The Most Merciful, The Most Loving, Says in the Qur'an in Suratul Baqarah, ayah 152:

$$\text{فَاذْكُرُونِيٓ أَذْكُرْكُمْ وَاشْكُرُوا۟ لِى وَلَا تَكْفُرُونِ}$$

"Remember Me and I will Remember you."

When life becomes distracting, Dhikr, or remembrance of Almighty Allah (SWT), allows us to stop in the little moments, to ponder the big moments. The mundane of life, and the ins-and-outs of our schedule, flusters us out of focus. But Dhikrullah, roots us in refocus. Especially in the purpose of our life.

Dhikr is a constant stream of connection and loving bond with your Lord, The Most Loving (SWT). It removes the rust that has stained our hearts, purifying in us a refreshed purpose, and shielding us from harmful distractions.

It is in this way that the Power of Dhikrullah and the Power of Mahabbah(love) within our lives are connected. If the purpose of life was captured in the small moments of awe and love, then all we need to do is pause and stand still, watch and listen and witness the Sublime in the world around us. This is from the teachings and best example of Sayyiduna Rasulullah ﷺ. And through this we can reclaim our purpose, and be present in the Presence of the Ever-Present (SWT)!

الَّذِينَ آمَنُواْ وَتَطْمَئِنُّ قُلُوبُهُم بِذِكْرِ اللّهِ أَلاَ بِذِكْرِ اللّهِ تَطْمَئِنُّ الْقُلُوبُ

"Verily, in the Remembrance of Allah do hearts find rest." – Surah tul ar-Ra'd, ayah 28

We ask Almighty Allah (SWT) to Bring us to be Closer to Him, and to His Beloved ﷺ. We ask Almighty Allah (SWT) to Inspire within our lives love and an ever-present state of awe within His Signs. And we ask Almighty Allah (SWT) to Help us understand the honour and dignity of always remembering Him such that Almighty Allah (SWT) Will Always Remember us. Ameen.

PSS  This is our basic introduction, and inshAllah we are sending you one of our spiritual development books. If you receive the book with no problems and would like to take some of our courses please write to us as soon as possible so we can send you your first course inshAllah. We sometimes have problems with Federal prisons.

# EXHIBIT C



**U.S. Department of Justice**
Federal Bureau of Prisons
Federal Correctional Institution

Fairton, New Jersey 08320

**December 18, 2021**

MEMORANDUM FOR W. SMITH, CASE MANAGER

**FROM:**         **J. Oliver, Staff Chaplain**

**SUBJECT:**      **Saddam Raishani, Reg# 76012-054**

I have added Saddam Raishani, Reg# 76012-054 to the participant list for Embracing Interfaith Cooperation, a Productive Activity that fosters interfaith dialogue, discussion, and understanding.

This is a faith-based course that breaks down stereotypes and barriers for people and communities to better serve together towards common civil rights and community goals. Interfaith engagement has been shown as an effective strategy to counter discrimination and religious extremism as well.

Respectfully,

**JEFFREY OLIVER**     Digitally signed by JEFFREY OLIVER
                       Date: 2021.12.19 11:28:25 -05'00'
Jeffrey Oliver
Chaplain

# EXHIBIT D

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number: 76012-054 | Risk Level Inmate....: R-LW |
| Inmate Name | General Level......: R-MIN (6) |
| Last.........: RAISHANI | Violent Level......: R-LW (8) |
| First........: SADDAM | Security Level Inmate: LOW |
| Middle.......: MOHAMED | Security Level Facl..: MEDIUM |
| Suffix.......: | Responsible Facility.: FAI |
| Gender.........: MALE | Start Incarceration..: 04/02/2019 |

**PATTERN Worksheet Summary**

| Item | - Value | - General Score | - Violent Score |
|---|---|---|---|
| Current Age | 35 | 21 | 12 |
| Walsh w/Conviction | FALSE | 0 | 0 |
| Violent Offense (PATTERN) | TRUE | 5 | 5 |
| Criminal History Points | 0 | 0 | 0 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 0 | 0 | 0 |
| Education Score | HighSchoolDegreeOrGED | -4 | -2 |
| Drug Program Status | NoNeed | -9 | -3 |
| All Incident Reports (120 Months) | 0 | 0 | 0 |
| Serious Incident Reports (120 Months) | 0 | 0 | 0 |
| Time Since Last Incident Report | N/A | 0 | 0 |
| Time Since Last Serious Incident Report | N/A | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 5 | -6 | -3 |
| Work Programs | 1 | -1 | -1 |
| | Total | 6 | 8 |

# EXHIBIT E

```
REGISTER NO: 76012-054     NAME..: RAISHANI              FUNC: PRT
FORMAT.....: TRANSCRIPT     RSP OF: FAI-FAIRTON FCI
```

```
-------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION                   START DATE/TIME STOP DATE/TIME
FAI  ESL HAS    ENGLISH PROFICIENT            05-01-2014 0503 CURRENT
FAI  GED HAS    COMPLETED GED OR HS DIPLOMA   12-06-2017 1331 CURRENT
```

```
--------------------------- EDUCATION COURSES ---------------------------
SUB-FACL  DESCRIPTION                   START DATE  STOP DATE EVNT AC LV  HRS
FAI       CROCHET                       02-14-2020 CURRENT
FAI       STRETCHING                    08-31-2021 09-27-2021  P  W  V      0
FAI       PREVENT CARDIOVASCULAR DISEASE 08-01-2021 08-30-2021 P  C  P     10
FAI       NUTRITION FOR WELLNESS        04-26-2021 06-07-2021  P  C  P     10
FAI       PHYSICAL FITNESS              03-05-2021 05-12-2021  P  C  P     10
FAI       MUSCULAR FLEXIBILITY          03-29-2021 05-03-2021  P  C  P     10
FAI       WEIGHT MANAGEMENT SELF-PACED  02-16-2021 03-13-2021  P  C  P     10
FAI       CARDIO ENDURANCE SELF-PACED   12-29-2020 01-21-2021  P  C  P     10
FAI       NUMBERS & OPERATIONS ACE      07-08-2020 07-15-2020  P  C  P      5
FAI       NCCER CORE CURRICULUM B       07-26-2019 01-17-2020  P  C  C    100
FAI       BEGINNING LEATHER             10-04-2019 11-22-2019  P  C  P      8
FAI       INSIDE OUT DAD - PARENTING    06-03-2019 07-15-2019  P  C  P     24
NYM M     PUBLIC SPEAKING SKILLS        02-13-2019 04-15-2019  P  C  P     12
NYM M     ASTRONOMY CLASS               02-13-2019 04-15-2019  P  C  P     12
NYM M     AFRICAN AND AFRICAN AM DRAMA  01-14-2019 03-27-2019  P  C  P      8
NYM M     FDIC MONEY SMART SKILL 3      01-26-2019 02-18-2019  P  C  P      3
NYM M     FDIC MONEY SMART SKILL 2      12-18-2018 03-27-2019  P  C  P      3
NYM M     INTERVIEWING SKILLS           01-22-2019 02-27-2019  P  C  P      3
NYM M     RESUME WRITING                01-28-2019 02-27-2019  P  C  P      6
NYM M     CONFLICT RESOLUTION CORP TRAIN 02-21-2019 02-21-2019 P  C  P     12
NYM M     LEADERSHIP AND INFLUENCE      12-20-2018 01-14-2019  P  C  P     12
NYM M     FDIC MONEY SMART SKILL 1      07-23-2018 01-14-2019  P  C  P      3
NYM M     STEP BY STEP TOWARDS GOALS    10-15-2018 12-18-2018  P  C  P     14
NYM M     TIME MANAGEMENT CORP TRAIN    09-27-2018 09-27-2018  P  C  P     12
NYM M     ENTREPRENEURSHIP              01-31-2018 01-31-2018  P  C  P     12
NYM M     BUSINESS ACUMEN CORP TRAINING 01-31-2018 01-31-2018  P  C  P     12
NYM M     ENTREPRENEURSHIP              07-20-2018 09-02-2018  P  C  P     12
NYM M     FOCUS FORWARD PUBLIC DEFENDERS 05-21-2018 09-05-2018 P  C  P     24
NYM M     POETRY LEISURE TIME ACTIVITY  04-01-2018 06-10-2018  P  C  P      9
NYM M     LEAD BY EXAMPLE REVERSE THE TR 03-01-2018 03-30-2018 P  C  P     26
NYM M     TUTOR TRAINING                11-01-2017 12-06-2017  P  C  P      8
NYM M     INMATE COMPANION TRAINING     11-09-2017 11-09-2017  P  C  P      2
```

```
G0000     TRANSACTION SUCCESSFULLY COMPLETED
```

```
 REG NO..: 76012-054 NAME....: RAISHANI, SADDAM MOHAMED
 CATEGORY: DRG        FUNCTION: PRT        FORMAT:

FCL    ASSIGNMENT DESCRIPTION                 START DATE/TIME STOP  DATE/TIME
FAI    ED NONE    DRUG EDUCATION NONE         05-23-2019 1319 CURRENT
FAI    NR COMP    NRES DRUG TMT/COMPLETE      02-11-2019 1409 CURRENT
FAI    NR PART    NRES DRUG COUNSEL PARTICIPANT 09-25-2018 1154 02-11-2019 1409
NYM    NR WAIT    NRES DRUG TMT WAITING       02-08-2018 0838 09-25-2018 1154
```

```
G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

REG NO..: 76012-054 NAME....:  RAISHANI, SADDAM MOHAMED
CATEGORY:  PTO      FUNCTION:  DIS      FORMAT:

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|-----|-----------|-------------|-----------------|----------------|
| FAI | TALK DOC C | TALKING WITH YOUR DOCTOR COMP | 09-24-2021 0815 | 09-24-2021 0815 |
| FAI | TALK DOC P | TALKING WITH YOUR DOCTOR PART | 08-09-2021 0855 | 09-24-2021 0815 |
| FAI | TALK DOC W | TALKING WITH YOUR DOCTOR WAIT | 02-01-2021 0759 | 08-09-2021 0855 |
| FAI | MON SM G C | MONEY SMART GENERAL POP COMP | 12-30-2020 1530 | 01-11-2021 0722 |
| FAI | MON SM G P | MONEY SMART GENERAL POP PART | 10-13-2020 1417 | 12-30-2020 1530 |
| FAI | HTH WELL C | HEALTH & WELLNESS LIFESPN COMP | 11-13-2020 0836 | 11-16-2020 0836 |
| FAI | HTH WELL P | HEALTH & WELLNESS LIFESPN PART | 11-09-2020 0728 | 11-13-2020 0836 |
| FAI | AGE BDY C | HEALTHY AGING BODY COMP | 10-01-2020 0824 | 10-01-2020 0824 |
| FAI | AGE BDY P | HEALTHY AGING BODY PART | 09-21-2020 0800 | 10-01-2020 0824 |

G0005        TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED

```
   FAIJM  531.01 *            INMATE HISTORY            *      10-13-2021
PAGE 001 OF 001 *                 WASPB                 *      09:53:55
```

REG NO..: |76012-054| NAME....: RAISHANI, SADDAM MOHAMED
CATEGORY: |WSP|     FUNCTION: |DIS|     FORMAT: |          |

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|-----|------------|-------------|-----------------|----------------|
| FAI | PAR IODC | INSIDE OUT DAD COMPLETE | 12-31-2020 0909 | 12-31-2020 0909 |
| FAI | PAR IODP | INSIDE OUT DAD PARTICIPATING | 11-09-2020 0916 | 12-31-2020 0909 |
| FAI | PAR ONEC | PHASE ONE COMPLETE | 02-14-2020 1155 | 02-14-2020 1155 |
| FAI | PAR NATLC | NATIONAL PARENTING PGM CMPLT | 12-04-2019 1025 | 02-14-2020 1155 |
| FAI | PAR NATLP | NATIONAL PARENTING PGM PART | 11-26-2019 0911 | 12-04-2019 1020 |

G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED

# EXHIBIT F



**U.S. Department of Justice**
Federal Bureau of Prisons
Federal Correctional Institution

Fairton, New Jersey 08320
(856) 453-1177

November 15, 2021

**TO:**          All Concerned

**FROM:**        B. Redondo, Chief Psychologist

**SUBJECT:**     Saddam Raishani # 76012-054

Please accept this letter on behalf of Saddam Raishani, register number 76012-054. He has submitted a request for inclusion in the Suicide Watch Companion Program at FCI-Fairton. Because the program currently has a full complement of companions, he will be placed on the waiting list for future training opportunities.

Should you have any questions about this individual, please feel free to contact me at 856-453-4078.

# EXHIBIT G

Mohamed Raishani/Mahiyah Alsaid!
1948 Gleason Avenue 15 Floor
Bronx, NY 10472

RE:Saddam Raishani
Regl:76012-054

Dear Honorable Judge Abrams:

I, Mohamed Raishani, and my wife Mahlyah Al Seidi are writing this letter to you regarding our son Saddam Raishani. We spoke to our son and he explained everything to us and has admitted guilt for his actions.

This is an unfortunate and distressing situation we never imagined being in. Our son has asked for our forgiveness. Even though his actions are wrong, we have forgiven him as parents. No one is perfect, as everyone commits mistakes. He is aware of his actions and regrets everything.

As parents, we don't ever want to see our kids in this situation. We are hurting. My wife's pain as a mother has kept her in bed and crying all day. She has been very depressed, does not want to get out of bed, does not want to eat, nor talk to anyone. These will cause her health to deteriorate as time passes on. It has affected her so much that she has no hope of living.

Even though my son has admitted his guilt, it does not make him a bad person. Saddam grew up in a decent family with morals. He is dependent, honest, and responsible. Our son is the only support we have; he provided for us by doing our paperwork, taking us to the doctor, etc. Without him, we do not know how we will make it through.

Honorable Judge Abrams, we are asking and begging you for some compassion for my son. He understands the seriousness of his actions and promises to not commit any mistakes that would jeopardize him in any way.

Sincerely,
Mohamed Raishani, Father
Mahlyah Al Saidi, Mother

Rawdha Al-Samet
1948 Gleason Avenue 15 Floor
Bronx, NY 10472

RE:Saddam Raishani
Regl:76012-054

Dear Honorable Judge Abrams:

To whom it may concern, to those who want to see and love peace in the world, I'm Rawdha Al-Samet, and I was born on 06/01/1989. I am Saddam Raishani's wife. My husband has been in jail for about five years since 2016. We got married in the US on 24/08/2014. Since our marriage, we have lived a happy life filled with love and tenderness. He has shown me the perfect example of a good husband that's humble, respectful, patient, honest, caring, loving, and supportive. He is spontaneous, cheerful, and an excellent man with a good heart, obedient to his parents, and righteous with them. To me, he means everything in my life.

Even to his neighbors, he was kind and helpful. In America, he used to help others when it snowed and clean the streets with them. One day, our neighbor's house got burned down, so Saddam helped them, gave them blankets, and stood next to them. Another similar story was when one of our other neighbors had their house burned down. Our neighbors needed to spend some time in the hospital, and they had children who were going to school, so Saddam was the one who took them to school and took care of them until their parents had recovered.

Saddam is a citizen who loves his country America very much. Once I asked him about his goal in life, and he replied that he seeks to serve his country, people, and humanity, and also he said that he loves to work in the medical field, so he decided to study nursing and did so. We often thought about our future after marriage and having children, but we waited until my husband graduated and got a job. After finding a job and our financial situation improving, we decided to have children. Days passed until I got pregnant with my child Khalid, and when I told my husband about that, he was so happy and with tears of joy dripping his face. In his own words, it was the most beautiful gift he's ever received. The excitement and optimism he had were amazing to watch.

The days of pregnancy passed, and I was suffering a lot, but his good traits were shown in his standing by my side at that time; he took the burden of working and looking after us(Khalid and I) with no complaining or neglect, he was trying to relieve my suffering and pain and trying to make me happy in different ways. After all those problems and suffering, God blessed us with our first child, who changed our lives for the better.

Months of me living my dream life, I was suddenly told that my husband had been arrested, and this news was like a thunderbolt striking me. I couldn't believe what was being said about my Husband. I had a hard time even believing it, as to why would a loving, caring, compassionate man commit these unspeakable crimes. These moments were and still are in my memory until the moment I wrote this letter.

Our lives were turned upside down, happiness changed to sadness and extreme pain, and my life became an unbearable hell. Through the generosity of your honor, I have been in touch with my husband since he was imprisoned, and on the first time, I had the opportunity to

visit him, my feet barely carried me, and as soon as he saw me and I saw him, he started crying and asking me to forgive him and that he regretted what he had done. He doesn't understand how this happened and he asked me to give him another chance. I never understood what was happening, as I had a hard time speaking to him as if it was the worst nightmare. The nights passed like many years in which I suffered a lot, and it was getting worse when my child asked me about his father, where he is, and when he will return, and I did not know what to say to him and how long his absence would be.

I have concluded that he has deep sorrow and great regret for what he had done because what happened to Saddam is a lesson he will never forget, and because he has admitted his mistake now, he knows the right path from the wrong. Saddam today is no longer like Saddam as he was yesterday. He took a tough lesson and at the same time hopes to correct the mistake he made and start a new life. Saddam's views opened up more as he witnessed how his mistakes affected those who loved and cared for him. And, I know he would never commit the same mistakes again after all the sadness and sorrow he gave to me, his parents, and his loved ones.

I ask you to allow my husband the opportunity to prove to you his good intentions, and how much he carries for America all love, respect, and the sense of belonging, and to return to me, his son, his parents, and all the family.


Yours truly.

Rawdha Al-Samet, Wife

Subscribe for $1/week

# Two Children Die in House Fire in the Bronx

f    🐦    ➜    ▢    ( Read in app )

**By Tina Kelley**

April 12, 2002

See the article in its original context from
April 12, 2002, Section B, Page 3   Buy Reprints

New York Times subscribers* enjoy full access to
TimesMachine — view over 150 years of New
York Times journalism, as it originally appeared.

**SUBSCRIBE**

Two young girls were killed and 13 adults, including 9 firefighters, were injured last night in a three-alarm fire in the East Bronx, the authorities said. Fire engulfed a two-story frame house and spread to the house next door, fire officials said.

Before they could enter the building, firefighters had to cut through a black wrought-iron gate in front of the door at 1425 Parker Street, said Chief Michael O'Brien of Battalion 20. One firefighter cut through the bars as others backed him up

The girls, whose identities were not released, were 4 and 8 years old, a fire official at the scene said. They were found in their second-story bedrooms at No. 1425.

More than one person jumped the 15 feet from an upstairs window to escape the flames. Among the injured was a pregnant woman who suffered broken bones. The firefighters suffered minor injuries.

A man in his 30's, the pregnant woman, and an elderly woman were in stable condition last night at Jacobi Medical Center in the Bronx, said Nina Johnson, a hospital spokeswoman.

Fire Marshal Louis Garcia said the fire was not suspicious, but that the cause was under investigation.

Fire officials said that nine people lived in the houses, although neighbors gave the number as 15.

**Special offer.** Subscribe for $1 a week.    >

# EXHIBIT H



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: RAISHANI, SADDAM MOHAMED  76012-054

SEQUENCE: 00272767
Report Date: 11-20-2021



| | | | |
|---|---|---|---|
| Facility: | FAI FAIRTON FCI | Custody Level: | IN |
| Name: | RAISHANI, SADDAM | Security Level: | MEDIUM |
| Register No.: | **76012-054** | Proj. Rel Date: | 07-07-2034 |
| Quarters: | C03-327L | Release Method: | GCT REL |
| Age: | 35 | DNA Status: | NYM05547 / 07-07-2017 |
| Date of Birth: | 09-07-1986 | | |

## Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| 18:2339B ATTEMPTING TO PROVIDE MATERIAL SUPPORT OR RESOURCES TO A FOREIGN TERRORIST ORGANIZATION (CT-1) 18:371 CONSPIRING TO PROVIDE MATERIAL SUPPORT OR RESOURCES TO FOREIGN TERRORIST ORGANIZATION (CT-2) | 20 YEARS |

Date Sentence Computation Began:    04-02-2019
Sentencing District:    NEW YORK, SOUTHERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit  - InOp Time |
|---|---|---|---|
| 0 /    0 /   0 | 216 | Years: 4  Months: 5  Days: 0 | + 650    JC  - 0     InOp |

## Detainers

| Detaining Agency | Remarks |
|---|---|
| *NO DETAINER* | |

## Program Plans

Inmate Raishani arrived at FCI Fairton, New Jersey, on April 30,2019.  His projected release date is July 7, 2034, via Good Conduct Time Release. Inmate Raishani has maintained an appropriate relationship with staff and is not considered a management problem. Overall, his adjustment at FCI Fairton, New Jersey, has been good.

## Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| FAI | UNASSG/CR | UNASSIGNED/C UNIT RIGHT | 03-16-2021 |

## Work Assignment Summary

Inmate Raishani has been in C-Right Unit since his arrival. He maintained an orderly position from November 2019 through March 2021. During this time inmate Raishani maintain excellent performance reviews.

## Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| FAI | ESL HAS | ENGLISH PROFICIENT | 05-01-2014 |
| FAI | GED HAS | COMPLETED GED OR HS DIPLOMA | 12-06-2017 |

## Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| FAI | W | STRETCHING | 08-31-2021 | 09-27-2021 |
| FAI | C | PREVENT CARDIOVASCULAR | 08-01-2021 | 08-30-2021 |
| FAI | C | NUTRITION FOR WELLNESS | 04-26-2021 | 06-07-2021 |
| FAI | C | PHYSICAL FITNESS | 03-05-2021 | 05-12-2021 |
| FAI | C | MUSCULAR FLEXIBILITY | 03-29-2021 | 05-03-2021 |
| FAI | C | WEIGHT MANAGEMENT SELF-PACED | 02-16-2021 | 03-13-2021 |
| FAI | C | CARDIO ENDURANCE SELF-PACED | 12-29-2020 | 01-21-2021 |
| FAI | C | NUMBERS & OPERATIONS ACE | 07-08-2020 | 07-15-2020 |
| FAI | C | NCCER CORE CURRICULUM B | 07-26-2019 | 01-17-2020 |
| FAI | C | BEGINNING LEATHER | 10-04-2019 | 11-22-2019 |
| FAI | C | INSIDE OUT DAD - PARENTING | 06-03-2019 | 07-15-2019 |

## Education Information Summary



## Summary Reentry Plan - Progress Report
**Dept. of Justice / Federal Bureau of Prisons**
Plan is for inmate: RAISHANI, SADDAM MOHAMED  76012-054

SEQUENCE: 00272767
Report Date: 11-20-2021

Since his arrival at FCI Fairton and before, inmate Raishani has programmed constantly and this record can be seen above. He has taken several courses that can be used to further himself once released back into the community. These programs include, Money Smart, Tutor Training, Companion Training, Parenting, etc. Inmate Raishani has even taken classes more recently that will help in the pursuit of a nursing career since he is a registered Nurse in New York State.

### Discipline Reports

| Hearing Date | Prohibited Acts |
|---|---|
| 07-20-2018 | 397 : PHONE ABUSE - NO CIRCUMVENTION |

### Discipline Summary

Inmate Raishani has only received one moderate level incident report over 2 years ago for phone abuse-no circumvention.

### ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|---|---|---|---|---|
| FAI | A-DES | US DISTRICT COURT COMMITMENT | 04-30-2019 | CURRENT |

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 04-30-2019 |
| CARE1-MH | CARE1-MENTAL HEALTH | 12-21-2017 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| NO PAPER | NO PAPER MEDICAL RECORD | 04-30-2019 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 07-05-2017 |
| YES F/S | CLEARED FOR FOOD SERVICE | 07-05-2017 |

### Current PTP Assignments

| Assignment | Description | Start |
|---|---|---|
| *NO ASSIGNMENTS* | | |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| ED NONE | DRUG EDUCATION NONE | 05-23-2019 |
| NR COMP | NRES DRUG TMT/COMPLETE | 02-11-2019 |

### Physical and Mental Health Summary

Inmate Raishani is assigned regular duty status and has no medical restrictions. Psychology has not expressed any mental health concerns at this time. He should be considered fully employable upon release.

### FRP Payment Plan

Most Recent Payment Plan

**FRP Assignment:** **COMPLT** **FINANC RESP-COMPLETED** **Start: 01-26-2020**

| | | |
|---|---|---|
| Inmate Decision: **AGREED** | **$200.00** | Frequency: **QUARTERLY** |
| Payments past 6 months: **$0.00** | | Obligation Balance: **$0.00** |

Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $200.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

### Financial Responsibility Summary

Inmate Raishani has completed his Financial Responsibility plan and has No Financial Obligations.

### Release Planning

Inmate Raishani proposes the following release plan:



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: RAISHANI, SADDAM MOHAMED   76012-054

SEQUENCE: 00272767
Report Date: 11-20-2021

Raishani, Mohammed
FATHER
1948 Gleason Ave.
Bronx, NY 10472
phone (home): 718-597-8407

## General Comments

Inmate Raishani has shown clear institutional conduct for over 2 years now and has continued to program and try to better himself throughout his incarceration. Inmate Raishani has shown great institutional adjustment and is respectful to all staff he encounters. Inmate Raishani is encouraged to continue this behavior and maintain clear conduct and good cell sanitation throughout the rest of his incarceration.



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: RAISHANI, SADDAM MOHAMED   76012-054

SEQUENCE: 00272767
Report Date: 11-20-2021

Name: RAISHANI, SADDAM
Register Num: **76012-054**
Age: 35
Date of Birth: 09-07-1986
DNA Status: NYM05547 / 07-07-2017

_____
Inmate   (RAISHANI, SADDAM MOHAMED, Register Num: 76012-054)

11/20/2021
_____
Date

_____
Chairperson

11/20/2021
_____
Date

_____
Case Manager

11/20/2021
_____
Date

# EXHIBIT I



U N I T E D S T A T E S G O V E R N M E N T

# M E M O R A N D U M

### Federal Correctional Institution
### Fairton, New Jersey 08320

**DATE:**     November 19, 2021

**FROM: N. Cole-Warters, C Unit Counselor**

**SUBJECT:   Institutional Adjustment**

**RE: Raishani, Saddam 76012-054**

To Whom It May Concern:

This letter serves as a commendation of Mr. Raishani's institutional adjustment, behavior and work performance since his arrival at this facility on April 30, 2019.

While housed at FCI Fairton, Mr. Raishani has successfully participated in a number of educational programs, to include, parenting, nutrition and a number of physical education courses.

Mr. Raishani has not had any disciplinary infractions since he has been housed at FCI Fairton.

Mr. Raishani has been in Housing Unit C since his arrival at FCI Fairton.  While in Housing Unit C, Mr. Raishani has been a quiet and respectful inmate. Mr. Raishani has transitioned and adjusted well to the institution and has had no issues or concerns regarding his incarceration.

If your office requires more information in reference to Mr. Raishani, Saddam 76012-054, please feel free to contact me at 856-453-4120

Sincerely,

N. Cole-Warters
Correctional Counselor

# EXHIBIT J



DECEMBER 23, 2021

**MEMORANDUM**

FROM: Officer M. Harris, C Right Unit Officer

Subject: Raishani, Saddam 76012-054

To Whom It May Concern:

This letter serves as a commendation of Mr. Raishani's behavior in the unit. Mr. Raishani has not violated any rules of conduct nor received any disciplinary infractions under my watch as the day watch unit officer for the past three quarters. I have witnessed Mr. Raishani provide medical attention to one of his fellow inmates who had debris in his eye, Mr. Raishani was able to assess and resolve a problem safely on (12/2/2021 between 2-3:30PM.)

Mr. Raishani has transitioned and adjusted well to the staff and institution, he has good family ties and interactions on visits and has proven that he is remorseful for his serious crime. Mr. Raishani shows signs in his behavior and conduct that he is rehabilitated and will become a productive member in society.

If your office requires more information in reference to Mr. Raishani, Saddam 76012-054, please feel free to contact me at 856-453-4000

Sincerely,

M. Harris
Correctional Officer

# EXHIBIT K



**U.S. Department of Justice**
Federal Bureau of Prisons
Federal Correctional Institution

Fairton, New Jersey 08320
(856) 453-1177

December 19th, 2021

**MEMORANDUM FOR:** W. Smith, Case Manager

**FROM:** T. Snyder, Recreation Specialist

**SUBJECT:** Saddam M. Raishani 76012-054

Inmate Saddam M. Raishani 76012-054 has demonstrated excellent conduct and behavior here in the Recreation Department at FCI Fairton. Participating in most of the Recreational Activities made available for inmates. Inmate Raishani has been a role model and mentor to his fellow inmate by staying active by participating in most of the classes here in the Recreation Department. Listed are the Recreation Self-Study Courses and Classes completed by inmate Raishani.
Education/Knowledge Based: Cardiorespiratory Endurance, Weight Management, Physical Fitness, Muscular Flexibility, Nutrition for Wellness, Preventing Cardiovascular Disease, The Cardiovascular System, The Digestive System, Healthy Aging Body, Healthy & Wellness Lifespan.
Art/Skills Based: Leather for Beginners, and Crochet Class. Which were incomplete due to The Covid-19 Pandemic.

# EXHIBIT L



**U.S. Department of Justice**
Federal Bureau of Prisons
Federal Correctional Institution
Fairton, New Jersey 08320

**MEMORANDUM FOR ALL CONCERNED**

FROM: OFC D STERLING _____ 1/23/22

SUBJECT: INMATE RAISHANI, SADDAM #76012-054

To Whom It May Concern:

This memorandum serves as a commendation of inmate Raishani behavior since I've been working in this facility (FCI Fairton). I have been employed here since October 13th, 2019 and worked in the unit where inmate Raishani resides on numerous occasions. He has always been respectful and never gave me or any officers I worked with any issues. I also see Inmate Raishani involved in a lot of programs in this facility, and is a mentor and role model for his peers.

# EXHIBIT M



**U.S. Department of Justice**
**Federal Bureau of Prisons**
**FCI Fairton, New Jersey 08320**

**Date:** January 23, 2022

**MEMORANDUM FOR ALL CONCERNED**

FROM:                    I. Cross, Senior Correctional Officer
SUBJECT:              Saddam Raishani #76012-054

Please except this letter on behalf of Saddam Raishani, Register number 76012-054. In my time spent in the presence of inmate Raishani, He has showed nothing less than the utmost respect to staff as well as inmates alike. Inmate Raishani has worked for me on the compound, cleaning the compound officer's station as well as maintaining cleanliness of the institution grounds and has always taken initiative to go above and beyond the duties the job called for.

If your office requires further information in regards to inmate Sasddam Raishani 76012-054, please contact me at 856-453-1177

# EXHIBIT N

November 26, 2021

Your honor;

　　　First and foremost I begin this letter with
giving all of my praise to God. I continue with begging
God to allow you to read this letter with an open mind and
heart. My name is Mr. Ibn Muhammad and I am
incarcerated here at FCI Fairton and have been here
since 2012. By the permission of God, I am the prison's
IMAM (leader) of the Muslim community here. I humbly
write on behalf of my brother in faith, Mr. Saddam M.
Raishani # 76012-054. Mr. Raishani has been here since
May of 2019 with me. He has discussed his case and reason
of conviction with me on numerous occasions. Not only has
he discussed his situation, he does so with "Much" Regret!! This
is not a letter to challenge Mr. Raishani's guilt or innocence.
This is a letter your honor, begging you to utilize your rightful
discretion with regards to possibly reconsidering Mr. Raishani's
fate. Your honor, a man can never and will never act upon
something correctly without correctly understanding that which
he acts upon. This proves that a person either has knowledge
of something or is ignorant when it comes to something. Yes, I
know that "Ignorance of the Law" is no excuse. However,
ignorance of religion is not punishable by God due to the
lack of knowledge of that which we think or thought we knew.
Mr. Raishani didn't violate the law because he disregarded the
law. He violated the law because he "thought" he was
fulfilling the obligations to his religion, and this proves that with
the correct information, Mr. Raishani is very loyal, candid,
and truthful. If you were raised your honor to dislike a certain

#1

people, nine times out of ten you would grow up not liking those people. This is not because it's right, but because solely this is what you were taught. When you learn that it's wrong, a wise person will correct his behavior and belief, as did Mr. Raishani. Mr. Raishani is one of the humblest people I've ever encountered. He has been of great help here with the Islamic community. I've had the opportunity to meet his family out on a visit, and he takes much pride when it comes to his family. A phrase that Mr. Raishani always says to me is " I wish I would have known better"!! Your honor, just imagine if someone falsely told you that someone you loved were in danger inside of a house, and you storm inside of that house, and harm someone because they harmed your loved one, just to find out that it was all a lie!! Your actions, however, already took place and you go to prison for 50 years. Even though "ignorance of the law is no excuse", wouldn't you want someone to hear you out, and make a just decision? Please utilize your discretion to reduce Mr. Raishani's sentence. He is not a terrorist, he's a young man who acted out of ignorance of his religion. Hurting people wasn't his agenda, pleasing God was. He just received the wrong information!! In closing, I thank you for reading my plea. Please reduce Mr. Raishani's sentence to lesser time due to the fact that you have the authority to do so via "discretion". May God bless you and your family, Ameen.

Respectfully,

Ibn Muhammad

64131-050

December 27, 2021

To whom it may concern,

Please accept this letter on behalf of Mr. Raishani, acknowledging his character. I Andre' Davis Reg. #11189-078 met Mr. Raishani in 2019. As an elder in the Islamic community here at FCI Fairton it is my job to make sure all newly arriving Muslim feel welcome. Mr. Raishani is a lot younger; however, I was drawn to him because of his maturity, sincerity, and dedication to his faith. When asked to assist in Study Groups, Arabic Classes, or Inter-Faith Function Mr. Raishani is always available.

When challenged with negativity in this prison setting he remains respectful and humble. He also serves as an example and a mentor to other young men here. I have seen him mentor, encourage, and be a friend to others in need. He is always willing to sacrifice his time for others.

Mr. Raishani also has a supportive family out there awaiting his return. I have had the pleasure if meeting his wife and son in the visiting room. I could see the joy he brings to his family by the way he interacts with them. Mr. Raishani is both respected and revered by the staff and his peers alike.

After years of interacting, it is my most sincere opinion that Mr. Raishani will make an excellent candidate for compassionate relief. He will without doubt have a positive effect on his community, and will prove to be a benefit to society as a whole.

Sincerely and Respectfully,

Andre' Davis

**#2**

Dear Judge Ronnie Abrams

I am writing this letter on the behalf of <u>Adam saddam Raishani</u>
#76012-054 to share witness and firsthand account of
the changes MR. Adam has made and the suffering he has
endured due to past decision.

Tho MR. Adam has enrolled and graduated from many academic
and [Frist step act] classes while being here at FCI Fairton.
The weight and gravity of his sentence of 20 years.
For Material support for terrorist Organization, has
truly affected his life and health and is noticeable In
Just a conversation with MR Adam

I truly do see the gravity and seriousness of MR Adam's case
and charges and tho I do not agree with his foolish dishonurable
decision. I do Know that we all (inmate or Judge) have felt the longing
to belong to something atleast once In all of our lives. MORE
commonly this Is seen In the youth amonst the Ghetto's of
the United state's rather it be street gangs, neighborhood
group's or blood's and Crip's. OR In college with alpha-FI
or any other sority or ferturity you can think of and it did'nt
cost them 20 years of there life to grow out of It

#3

In addition MR Adams actions and behavior does not reflect a person who is extreme in his beliefs and religion. He loves his family and life with them so much that I know he will do right by them

In closing I pray that you will see that Adam is remorseful for the crime he has committed but does not need 20 years to see his wrongs and how he has hurt his family and children, and in my eye's he regrets every day that decision he made years ago ...

with Smith

William Smalls #92824-083

Jeffrey Okine #68.300-054
F.C.I Fairton
P.O. Box 420
Fairton, NJ 08320

Honorable Judge R. Abrams

I hope this letter finds you in the best of health, peace, happiness and the most righteous state of mind. I am a 30 years old man who has been incarcerated since the young age of 20 years for a (924)c(iii) Hobbs Act Robbery and it has been a journey filled with struggles and lessons for both me and my family. My friend Adam whom I met when he arrived at this facility through a mutual friend of ours and due to our foreign lineage, I automatically accepted him as a friend. I can say without a dispute he is a man of decorum, morals and integrity and I am trying to put my mind to see how can he even do what he is accused of but that's neither here nor there, we all make mistakes in life, that's just human nature. As you can see he was working, going to school and helping his father with their store, and taking care of his family (son & wife), all at the same time with his freedom. Adam is very hardworking man and I know if

**#4**

he is granted the opportunity with the right people and guidance, he will achieve allot and be beneficial to society not a menace. Adam has one of the best family support I have encountered in my travels besides mines and not a day goes by without him speaking to ... his family whether on the phone or through emaling. I am asking you to allow mercy to meet justice here when you take a look at my brothers file and motion because I firmly believe he deserves another chance at physical freedom to be able to raise his son to be an upright kid and instill in him the way of decorum and how to walk with integrity like his father. We all have destinies in life, some of us veer off the track but at the end of the day it shows in our character whether we like it or not and Adam's destiny is to serve society and people (doctor, nurse, teacher or social worker). I appreciate you for taking the time out to read this and taking these words into consideration. It is highly respected and appreciated. The meaning of forgiveness is when mercy meets justice.

Sincerely Yours,
Jeffrey Okine
#68300-054

To whom it may concern ;

Honorable Judge Ronnie Abrams

I am writing this letter in regards to Saddam Raishani inmate number 76012-054

And the character I have witnessed in the course of living here at FCI Fairton.

We have encountered each other frequently in visiting, recreation, and especially

At the chapel. He seems to be of earnest devotion and exemplary character in all

Aspects of his life. Truely devoted to his family and His beliefs. I have witnessed

His family devotion by visiting in direct proximity and have seen the love exuded

To his wife and children. I don't know the man he was or what he has been charged
with, but believe that the man I have come to know exhibits the character and

Disposition that would point to a man who is remorseful and desires to be
reconnected with his family and reinstated into society. We are from different

Faith groups, but I believe that someone honestly and earnestly seeking God

Will be an asset wherever they are allowed to be planted. I pray the courts

Concideration and thank you for for any and all of your time.

Respectfully

James Hogeland

59573-066

James Hogeland

# #5

Israel Hernandez 73986112
Federal Correctional Institution
P.O. Box 420
Fairton, N.J. 08320

December 3, 2021

Judge Ronnie Abrams
United States District Court
Southern District of New York
500 Pearl Street
New York, N.Y. 10007

Re: Adam Raishani   76012-054

Your Honor,

    I have known Adam for the past 2 years. I have been able to see Adam develop and grow into a responsible adult in the short time that I have known him. I truly believe Adam has a call on his life to show others how one can be persistent and even at the darkest times, choose to turn their own life around. I know he desires to make things right and regrets very much the poor choices that have led him to where he is at today. He has always been kind and a generous person, helpful to those in need. He has a strong sense of duty in all areas. He also possesses a great deal of integrity, and constantly strives to make sure he is doing the right thing. With all due respect, I believe if Adam was granted a compassionate release/reduction, he will be an asset to any community that he is released to. I pray that you find Adam suitable to be released back into the community so he can continue his mission of giving back to society.

    In closing I want to thank you for taking time and consideration in reading my letter.

Respectfully yours,
Israel Hernandez

**#6**

12-18-21

Dear, The Honorable Judge Ronnie Abrams, my name is Johnny Fletcher I am writing this letter concerning Saddam Raishani. I myself first met Saddam in 2020, in a housing unit at the Correctional facility were currently place at. The first conversation we had was about our family an the impact this is having on them. A couple of weeks later the conversations we were having about our love ones, I start to wonder why is this loving, caring good, hearted person doing in Jail. Then we discuss what landed us in this situation were in. When he told me the charges he were serving a 20 year sentence on I didn't believe it. Saddam is one of the most caring person I ever met. He reads and programs then takes time out of his day to help other when they dont understand. Saddam mentor situation so that they turn for the better, The mistakes Saddam has made in the past I dont see in the near future for him. Saddam has helped me

**#7**

with thing that have changed my life for the better, such as education and life decisions. Judge Abram Saddam deserves a second chance at a promising life I know he will pursue in the future. One thing I'm willing to count on is the mistakes are lessons learned, life lessons. Thank you Judge for taking time to read this letter

Johnny Fletcher
33617171

12-21-21

Your Honor

I'm Writing you this letter on behalf of Saddam Raishani 76412-054 My Name is Randy Freero and I am incarcerated with Mr. Raishani. I have lived in the Same Unit with him for 2 years. In these 2 yrs Mr. Raishani has been Very helpful to me, And to the Students in G.E.D class.

Mr Raishani has taken his time out on the (daily) to help us learn the in's and Out's of the G.E.D Book. If mr. Raishani isn't helping with our homework, he's helping other people, with the First Step Act Paperwork.

**#8**

In my Opinion there are a few men like Mr. Raishani, who have come to the realization of all the pain And Suffering not Only to him, But too, his family & what they are going threw, I prey that you find

Mr Raishani Suitable to be released back into Society with the Community So he can Continue his mission giving back to Society

Thank you for taking the time out of your Busy day to read this letter.

Sincerely
Randy Soto

1170003I

Dec. 14, 2021

Re: Saddam Raishani # 76012-054

TO: The Honorable Judge
Ronnie Abrams
U.S. District Court
Southern District of New York

Honorable Judge,

It is my pleasure to write this letter of reference for Saddam Raishani a.k.a Adam.

I have known Adam since May of 2019; Adam is one of the most respectful and quiet person I know here in Fairton, NJ (FCI). I remember meeting him for the first time — he introduced himself to me and I thought to myself, he is way-too-nice of a person to be in prison.

Adam is always busy trying to better his life; he is always enrolled in some program, whether it is an ACE (Adult Continuing Education) class or a class offered on Health Education. When he is not studying, he is exercising. Adam is a positive person — I see him mentoring or just giving advise to other inmates who is willing to listen.

**#9**

In my opinion Adam has taken every opportunity to better his life while being incarcerated and as such his Compassionate release/reduction

motion should be reviewed and granted.

Thank You,
Hubert Young
#75362-067

# EXHIBIT O



AL SAIDI, MAHLYAH
71 yo Female. DOB: 05/15/1950
Account Number: 76374
1948 GLEASON AVE., 1ST FLOOR, BRONX, NY-10472
Home: 718-597-8407
Guarantor: AL SAIDI, MAHLYAH
Insurance: WELLCARE (MCR) Payer ID: 14163
PCP: Stephan B Simons
Appointment Facility: Parkchester Medical Services of NY

11/02/2021                                   Progress Notes: David Weiss, MD

**Current Medications**
Taking
- Oscal 500/200 D-3 500-200 MG-UNIT Tablet 1 tablet Orally Twice a day
  Not-Taking
- Voltaren 1 % Gel as directed Transdermal BID
- Meloxicam 15 MG Tablet 1 tablet Orally Once a day pc prn
  Unknown
- Cetirizine HCl 10 MG Tablet 1 tablet Orally Once a day prn itching
- Gabapentin 300 MG Capsule 1 capsule Orally at each bedtime
  Medication List reviewed and reconciled with the patient

**Past Medical History**
High Cholesterol.
Vitamin D deficiency, unspecified.
Low back pain.
Pain in limb.

**Surgical History**
Episiotomy at the time of delivery 1993
never done colonoscopy

**Family History**
Father: deceased
Mother: deceased
Paternal Grand Father: deceased
Paternal Grand Mother: deceased
Maternal Grand Father: deceased
Maternal Grand Mother: deceased
5 brother(s) , 5 sister(s) - healthy. 5 son(s) , 1 daughter(s) - healthy.
Denies any family h/o colon cancer.

**Social History**
General: immigrant from yemen since 1990.
Activities of Daily Living: housewife.

**Reason for Appointment**
1. Consult: C/O B/L knee and leg pains.

**History of Present Illness**
Depression Screening:
    PHQ-2 (2015 Edition)  Little interest or pleasure in doing things?  Not at all, Feeling down, depressed, or hopeless?  Not at all, Total Score  0.
HPI:
    71 year old female patient presents to the clinic for a consult.
    C/O intermittent B/L knee x 10 days. States pain radiates down her leg. Sometimes pain is noticed with walking and sometimes when sitting. States pain is 5/10 in intensity.
    Denies cough, fever, sore throat or loss of taste/smell.
    Declines covid/ flu vaccine at this time.

**Vital Signs**
Ht 65, Wt 164, BMI 27.29, BP 115/64, RR 16, HR 77, Temp 98, Oxygen sat % 97, Pain scale 5
OG.

**Assessments**
1. Leg pain - M79.606 (Primary)
2. Hyperlipidemia, unspecified - E78.5
3. Disc disease, degenerative, lumbar or lumbosacral - M51.37
4. Cervical disc disorder - M50.90
5. BMI 27.0-27.9,adult - Z68.27

**Treatment**
**1. Leg pain**
Start Meloxicam Tablet, 15 MG, 1 tablet, Orally, Once a day, 30 day (s), 30
Notes: bilateral leg pain for 2 weeks-she feels her bones hurt;no clear trigger;legs are not red or swollen;try meloxicam and voltaren gel;start PT;refer to ortho.
Referral To:Orthopedic
        Reason:bilateral leg pain

Drugs Tobacco Use assessment
Yes, Are you a smoker No, Drug Use
No.
Smoker: denied smoking.
Drug use: denied etoh.
Drug: denied drugs.
Sexually active: sexually active with
husband . no STD.
HEDIS Measures Colonoscopy:
refused, Mammogram:  does not
remember when .
referred , Ophthalmology:
referred, FOBT:  refused.
10/21/2020.

**Allergies**
N.K.D.A.

**Hospitalization/Major
Diagnostic Procedure**
as above

Referral To:Physical Therapy
        Reason:Bilateral leg pain

**2. Disc disease, degenerative, lumbar or lumbosacral**
Refill Voltaren Gel, 1 %, as directed, Transdermal, BID, 90 days, 90

**3. BMI 27.0-27.9,adult**
    IMAGING: mammogram

**Preventive Medicine**
GAd-7 :  FEELING NERVOUS, ANXIOUS, OR ON EDGE:  Not at All
0 .  Not being able to stop or control worrying:  Not at all 0.
Worrying too much about diifferent things:  Not at all 0.  rouble
relaxing:  not at all 0.  being so restless that its hard to sit still :  Not
at all 0.  Becoming easily annoyed or irritable :  Not at all 0.  feeling
afraid as if somehting awful might happen:  Not at all 0.  GAD-7
score:  0.

**Procedure Codes**
3078F DIAST BP < 80 MM HG
3074F SYST BP LT 130 MM HG
G8420 BMI<30 AND >=22 CALC & DOCU
1125F AMNT PAIN NOTED PAIN PRSNT
G8510 NEG SCR DEPRESSION PT NOT ELIG F/U/PLN DOC
G9275 DOC PATIENT CURRNT NON-TOBACCO USER
G9622 PT NOT ID UNHLTHY ALC USR SCR ALC U
3008F BODY MASS INDEX DOCD
3725F SCREEN DEPRESSION PERFORMED
3016F PT SCRND UNHLTHY OH USE
0521F PLAN OF CARE 4 PAIN DOCD
1036F TOBACCO NON-USER
1000F TOBACCO USE, SMOKING, ASSESS
H0049 ALCOHOL/DRUG SCREENING

**Follow Up**
prn



Electronically signed by David Weiss MD , MD on
11/02/2021 at 04:22 PM EDT

Sign off status: Completed

**Progress Notes**

**Patient:** RAISHANI, MOHAMMED S
**Account Number:** 17514
**DOB:** 02/03/1944  **Age:** 76 Y  **Sex:** Male
**Phone:** 718-597-8407
**Address:** 1948 GLEASON AVE , 1ST FLOOR , BRONX , NY-10472

**Provider:** Stephan Simons, MD
**Date:** 12/31/2020

## Subjective:

**Chief Complaints:**
**Medications:** Taking Strips as directed as directed as directed as directed twice a day, Taking Levemir FlexTouch 100 UNIT/ML Solution Pen-injector 20 units Subcutaneous BID, Taking NovoLOG FlexPen 100 UNIT/ML Solution Pen-injector 20 units subcutaneously ac BID, Taking Pioglitazone HCl 15 MG Tablet 1 tablet Orally Once a day, Taking FreeStyle Lite Test - Strip as directed In Vitro BID, Taking Glumetza 1000 MG Tablet Extended Release 24 Hour 1 tablet with evening meal Orally once a day, Taking Crestor 20 MG Tablet 1 tablet Orally Once a day, Taking Aspirin 81 MG Tablet 1 tablet Orally Once a day, Taking Ramipril 2.5 MG Capsule 1 capsule Orally Once a day, Taking Clopidogrel Bisulfate 75 MG Tablet 1 tablet Orally Once a day, Taking Gabapentin 100 MG Capsule 1 capsule Orally at each bedtime, Taking Colace 100 MG Capsule 1 capsule as needed Orally Once a day, stop date 01/14/2021, Taking Ammonium Lactate 12 % Lotion 1 application to affected area Externally Twice a day R leg, Taking Docusate Sodium 100 mg Capsule 1 capsule as needed Orally three times a day prn, Taking Knee Brace - Miscellaneous as directed , Taking Knee Brace - Miscellaneous as directed AS DIRECTED daily, Taking GaviLAX 17 GM/SCOOP Powder as directed Orally , Medication List reviewed and reconciled with the patient

## Objective:

## Assessment:

**Assessment:**

1. Type 2 diabetes mellitus with hyperglycemia - E11.65 (Primary)
2. Urinary retention - R33.9 (Primary)
3. Dietary counseling and surveillance - Z71.3
4. Other hyperlipidemia - E78.49
5. CAD (coronary artery disease) - I25.10
6. Microalbuminuria - R80.9
7. BPH (benign prostatic hyperplasia) - N40.0
8. Retinal disease, right - H35.9
9. Secondary hypertension - I15.9
10. Left leg pain - M79.605
11. BMI 28.0-28.9,adult - Z68.28

## Plan:

Electronically signed by Stephan Simons , MD on 11/12/2021 at 01:52 PM EST
Sign off status: Pending

---

**Provider: Stephan Simons, MD**                                         **Date: 12/31/2020**

# EXHIBIT P

**The New York Times** | https://www.nytimes.com/2021/08/21/health/covid-nursing-shortage-delta.html

# 'Nursing Is in Crisis': Staff Shortages Put Patients at Risk

"When hospitals are understaffed, people die," one expert warned as the U.S. health systems reach a breaking point in the face of the Delta variant.

**By Andrew Jacobs**
Published Aug. 21, 2021   Updated Oct. 20, 2021

Cyndy O'Brien, an emergency room nurse at Ocean Springs Hospital on the Gulf Coast of Mississippi, could not believe her eyes as she arrived for work. There were people sprawled out in their cars gasping for air as three ambulances with gravely ill patients idled in the parking lot. Just inside the front doors, a crush of anxious people jostled to get the attention of an overwhelmed triage nurse.

"It's like a war zone," said Ms. O'Brien, who is the patient care coordinator at Singing River, a small health system near the Alabama border that includes Ocean Springs. "We are just barraged with patients and have nowhere to put them."

The bottleneck, however, has little to do with a lack of space. Nearly 30 percent of Singing River's 500 beds are empty. With 169 unfilled nursing positions, administrators must keep the beds empty.

Nursing shortages have long vexed hospitals. But in the year and a half since its ferocious debut in the United States, the coronavirus pandemic has stretched the nation's nurses as never before, testing their skills and stamina as desperately ill patients with a poorly understood malady flooded emergency rooms. They remained steadfast amid a calamitous shortage of personal protective equipment; spurred by a sense of duty, they flocked from across the country to the newest hot zones, sometimes working as volunteers. More than 1,200 of them have died from the virus.

Now, as the highly contagious Delta variant pummels the United States, bedside nurses, the workhorse of a well-oiled hospital, are depleted and traumatized, their ranks thinned by early retirements or career shifts that traded the emergency room for less stressful nursing jobs at schools, summer camps and private doctor's offices.

"We're exhausted, both physically and emotionally," Ms. O'Brien said, choking back tears.



Cyndy O'Brien, an emergency room nurse at Ocean Springs Hospital. "We are just barraged with patients and have nowhere to put them," she said.    Rory Doyle for The New York Times



A Covid patient under treatment at Ocean Springs Hospital, part of the Singing River nonprofit health system, which has 169 unfilled nursing positions. Rory Doyle for The New York Times

Like hospital leaders across much of the South, Lee Bond, the chief executive of Singing River, has been struggling to stanch the loss of nurses over the past year. Burnout and poaching by financially flush health systems have hobbled hospitals during the worst public health crisis in living memory.

With just over a third of Mississippi residents fully vaccinated, Mr. Bond is terrified things will worsen in the coming weeks as schools reopen and Gov. Tate Reeves doubles down on his refusal to reinstate mask mandates. "Our nurses are at their wits' end," Mr. Bond said. "They are tired, overburdened, and they feel like forgotten soldiers."

Across the country, the shortages are complicating efforts to treat hospitalized coronavirus patients, leading to longer emergency room waiting times and rushed or inadequate care as health workers struggle to treat patients who often require exacting, round-the-clock attention, according to interviews with hospital executives, state health officials and medical workers who have spent the past 17 months in the trenches.

The staffing shortages have a hospital-wide domino effect. When hospitals lack nurses to treat those who need less intensive care, emergency rooms and I.C.U.s are unable to move out patients, creating a traffic jam that limits their ability to admit new ones. One in five I.C.U.s are at least 95 percent capacity, according to an analysis by The New York Times, a level experts say makes it difficult to maintain standards of care for the very sick.

"When hospitals are understaffed, people die," said Patricia Pittman, director of the Health Workforce Research Center at George Washington University.

Oregon's governor has ordered 1,500 National Guard troops to help tapped-out hospital staff. Officials in a Florida county where hospitals are over capacity are urging residents "to consider other options" before calling 911. And a Houston man with six gunshot wounds had to wait a week before Harris Health, one of the country's largest hospital systems, could fit him in for surgery to repair a shattered shoulder.

"If it's a broken ankle that needs a pin, it's going to have to wait. Our nurses are working so hard, but they can only do so much," said Maureen Padilla, who oversees nursing at Harris Health. The system has 400 openings for bedside nurses, including 17 that became vacant in the last three weeks.

In Mississippi, where coronavirus cases have doubled over the past two weeks, health officials are warning that the state's hospital system is on the verge of collapse. The state has 2,000 fewer registered nurses than it did at the beginning of the year, according to the Mississippi Hospital Association. With neighboring states also in crisis and unable to take patient transfers, the University of Mississippi Medical Center in Jackson, the only Level 1 trauma unit in the state, has been setting up beds inside a parking garage.

"You want to be there in someone's moment of need, but when you are in disaster mode and trying to keep your finger on the leak in the dike, you can't give every patient the care they deserve," said Dr. LouAnn Woodward, the medical center's top executive. With staffing shortfalls plaguing hospitals coast to coast, bidding wars have pushed salaries for travel nurses to stratospheric levels, depleting staff at hospitals that can't afford to compete. Many are in states flooded with coronavirus patients.

Workers sanitized a Covid field clinic in the parking garage of the University of Mississippi Medical Center.   Rory Doyle for The New York Times

Dr. LouAnn Woodward, the top executive at the University of Mississippi Medical Center. "When you are in disaster mode and trying to keep your finger on the leak in the dike, you can't give every patient the care they deserve," she said.  Rory Doyle for The New York Times

Texas Emergency Hospital, a small health system near Houston that employs 150 nurses and has 50 unfilled shifts each week, has been losing experienced nurses to recruiters who offer $20,000 signing bonuses and $140-an-hour wages. Texas Emergency, by contrast, pays its nurses $43 an hour with a $2 stipend for those on the night shift. "That's ridiculous money, which gives you a sense of how desperate everyone is," said Patti Foster, the chief operations officer of the system, which runs two emergency rooms in Cleveland, Texas, that are over capacity.

### The Coronavirus Pandemic: Latest Updates ›
Updated 2 hours ago

- New York City schools will shorten isolation to 5 days for most students who test positive.

- In Europe, some countries are lifting restrictions and others are adding them.

- Researchers identify biological factors that may increase a person's chances of having long Covid.

Ms. Foster sighed when asked whether the hospital offered signing bonuses. The best she can do is pass out goody bags filled with gum, bottled water and a letter of appreciation that includes online resources for those overwhelmed by the stress of the past few weeks.

Business has never been better for travel nurse recruiters. Aya Healthcare, one of the country's biggest nurse recruitment agencies, has been booking 3,500 registered nurses a week, double its prepandemic levels, but it still has more than 40,000 unfilled jobs listed on its website, said April Hansen, the company's president of work force solutions. "We're barely making a dent in what's needed out there," she said.

There were more than three million nurses in the United States in 2019, according to the Bureau of Labor Statistics, which estimates 176,000 annual openings for registered nurses across the country in the next few years. But those projections were issued before the pandemic.

### The Coronavirus Pandemic: Key Things to Know

**Omicron in retreat.** Though the U.S. is still facing overwhelmed hospitals and more than 2,000 deaths a day, encouraging signs are emerging as new cases start to fall nationally. The World Health Organization said that, between natural immunity through infection and vaccination, the variant offered "plausible hope for stabilization."

Peter Buerhaus, an expert on the economics of the nursing work force at Montana State University, is especially rattled by two data points: A third of the nation's nurses were born during the baby boom years, with 640,000 nearing retirement; and the demographic bulge of aging boomers needing intensive medical care will only increase the demand for hospital nurses. "I'm raising the yellow flag because a sudden withdrawal of so many experienced nurses would be disastrous for hospitals," he said.

Many experts fear the exodus will accelerate as the pandemic drags on and burnout intensifies. Multiple surveys suggest that nurses are feeling increasingly embattled: the unrelenting workloads, the moral injury caused by their inability to provide quality care, and dismay as emergency rooms fill with unvaccinated patients, some of whom brim with hostility stoked by misinformation. Nurses, too, are angry — that so many Americans have refused to get vaccinated. "They feel betrayed and disrespected," Professor Buerhaus said.

Oxygen tanks being delivered to the emergency room at the University of Mississippi Medical Center.  Rory Doyle for The New York Times

Patti Foster, left, chief operations officer at Texas Emergency Hospital, and Cassie Kavanaugh, the chief nursing officer for the hospital's network. "I don't know how much more we can take," Ms. Kavanaugh said.  Michael Starghill Jr. for The New York Times

Increasing the nation's nursing workforce is no easy task. The United States is producing about 170,000 nurses a year, but 80,000 qualified applicants were rejected in 2019 because of a lack of teaching staff, according to the American Association of Colleges of Nursing.

"We can't graduate nurses fast enough, but even when they do graduate, they are often not prepared to provide the level of care that's most needed right now," said Dr. Katie Boston-Leary, director of nursing programs at the American Nurses Association. Newly minted nurses, she added, require on-the-job education from more seasoned ones, placing additional strains on hospital resources.

Some of the proposed remedies include federal policies that can stabilize the profession, including financial assistance to help nursing schools hire more instructors and staffing-ratio mandates that limit the number of patients under a nurse's care.

"This simplistic notion that the labor market will just produce the number of nurses we need just isn't true for health care," said Professor Pittman of George Washington University. "Nursing is in crisis, and maybe the pandemic is the straw that will break the camel's back."

The crisis is on full display at Texas Emergency Hospital, which has been treating patients in hallways and tapping administrators to run specimens to the lab. In recent days, 90 percent of those admitted to the hospital have tested positive for the coronavirus. Short on ventilators, and with hospitals in Houston no longer able to take their most critically ill patients, officials have been contemplating the unthinkable: how to ration care.

On Friday, Cassie Kavanaugh, the chief nursing officer for the hospital's network, was dealing with additional challenges: Ten nurses were out sick with Covid. She had no luck renting ventilators or other breathing machines for her Covid patients. Many of the new arrivals are in their 30s and 40s and far sicker than those she saw during previous surges. "This is a whole different ballgame," she said.

Ms. Kavanaugh, too, was running on fumes, having worked 60 hours as a staff nurse over the previous week on top of her administrative duties. She was also emotionally wrought after seeing co-workers and relatives admitted to her hospital. And her anguish only mounted after she stopped at the grocery store: Almost no one, she said, was wearing masks.

"I don't know how much more we can take," she said. "But one thing that hit me hard today is a realization: If things keep going the way they are, we're going to lose people for sure, and as a nurse, that's almost too much to bear."

# EXHIBIT Q

December 15th, 2021

To Judge Ronnie Abrams

I'm writing this letter on behalf on Saddam Mohamed Raishani. I have known Saddam for over ten years. We went to medical school together. I know Saddam for being a stand up, honest, generous, and caring person. His passion for helping others is what drove him and motivated him to seek a career in the medical field.

I am currently a manager of the HR department at Saint Barnabas, and I have the resources to ensure that he obtains and maintains a career in the medical field. To the best of my ability, I will help him recertify his CPR Adult and Pediatric Life Support Rescue certificates. I can also enroll him in a few refresher courses including Attending Nurse classes. I can also connect him with individuals for further job networking, and job interview preparedness.

In conclusion, I believe if given the opportunity Saddam will be a model citizen and an asset in the medical field. In this field of work, we need more people with strong character and strong moral standing which are characteristics that Saddam possess. I hope that you can grant him as second chance because I truly believe that he is one of the few that deserve one.

Sincerely,

Hannah Kline

# EXHIBIT R



December 16, 2021

Adam Raishani
Fci Fairton
Federal Correctional Institution
P.O. Box 420
Fairton, Nj 08320

Dear Mr. Raishani,

I'm sending this to all of the Focus Forward Project's incarcerated alumni today. I know this time of year can be a pretty emotional one, and not all of the emotions are the pleasant kind, far from family and home. I'm writing to do two things today:

The first and most important is to remind you that you matter, you are remembered outside, and that you deserve a chance at a better life. I spent a chunk of this past year revising our lesson plans, and have been thinking about one of the principles that we're making more explicit in what we teach: dignity. Dignity is something that every human being has in equal measure. While, unfortunately, some people may try to ignore your dignity, it cannot ever be truly taken from you. Your experiences are true and valid. Your identity is true and valid. You, as a human being, have inherent value that will never diminish. As a small organization operating under the rules of the Bureau of Prisons, we are limited in what we can offer as holiday gifts. But I can promise that we will always offer the simple gift that you can and should expect from everyone: acknowledgment and respect of your dignity.

The second thing this letter is meant to do is share some news. While most of you have never met me in person, I've had the pleasure of corresponding with a number of you via letter, CorrLinks, or phone. You might have noticed in my introductions and signatures the "Interim" part of my title. At the end of this year, I'll fulfill that part of my title, and step down from my work with the Focus Forward Project. My successor is named Pamela Miller, and she is a truly remarkable leader who I fully expect will be able to evolve our organization into something beyond what it's ever been before. Our mission will not change, and neither will our contact information - you'll still be able to call the same phone number, send mail to our same PO Box, and use CorrLinks to reach us at info@focusforwardproject.org. And on the other side of that

contact information will be someone at least as empathic, resourceful, and optimistic as I could ever hope to be. I sincerely hope you stay in touch with us as an organization.

Your graduation certificate does not expire, and neither will your relationship with us. You do not need to reach out to us today, this month, or even this year. We will always be happy to hear from graduates and former participants. And if you don't hear back, you know as well as I do that messages can be lost in this system, so never take it as a rejection. It likely means that the message did not reach us, and you should always feel encouraged to try reaching us again.

With that, I wish you Happy Holidays, and all the best from the Focus Forward Project.

Sincerely,

Joel Putnam
Interim Executive Director

The Focus Forward Project
PO Box 2892
New York, NY 10007
info@focusforwardproject.org
(347) 619-2080

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013; All rights reserved.

FROM: Saddam M. Raisham
Reg: 76012-054
Federal Correctional Institution
P.O. Box 420
Fairton, NJ 08320

TO: Clerk of the Court
U.S. District Court
Southern District of N.Y.
500 Pearl Street
New York, N.Y. 10007

UNITED STATES POSTAL SERVICE®



.COM®
ONLINE

Retail

**P** UNITED STATES POSTAL SERVICE®

US POSTAGE PAID
$0.00

Origin: 08320
02/03/22
3325200320-03

1 Lb 4.80 Oz
1004

C099

PRIORITY MAIL 2-DAY®

EXPECTED DELIVERY DAY: 02/07/22

SHIP
TO:
500 PEARL ST
NEW YORK NY 10007-1316

USPS TRACKING® #

9505 5149 8576 2034 2244 14

0000100014
00001000014

FOREVER / USA

REF'

TRA
INS

**PRIORITY**
**★ MAIL ★**

FOREVER / USA (repeated across stamp sheet)

2022
2022
2024

LEGAL CORRESPONDENCE
OPENED IN PRESENCE OF INMATE
DATE RECEIVED
TIME RECEIVED
DATE DELIVERED
TIME DELIVERED
DELIVERED BY

LEGAL MAIL

FCI Fairton, P.O. Box 280, Fairton, NJ 08320
Date:

"The enclosed letter was processed through special mail
procedures for forwarding to you. The letter raises a question
or problem over which this facility has no jurisdiction. The writer may wish to
have the enclosed letter was processed through special in r
opened nor inspected. If the writer may wish to r
which facility has jurisdiction or clarificati
the material for further information for forwarding u
writer enclose correspondence to absce
address e, Please l    rn the enclosure to absce

**FLAT RATE ENVELOPE**
ONE RATE ★ ANY WEIGHT★

EP14F July 2013

UNITED S
POSTA

